**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| B.H., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 88 C 5599 |
| | ) | Hon. Jorge L. Alonso |
| GEORGE H. SHELDON, Director, | ) | Judge Presiding |
| Illinois Department of Children and | ) | |
| Family Services, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>SECOND TRIANNUAL INTERIM STATUS REPORT
ON THE B.H. IMPLEMENTATION PLAN</u>**

# TABLE OF CONTENTS

Page

Introduction and Overview ........................................................................................... 1

Detailed Status Report ................................................................................................. 1

I.    Application of Implementation Science to the Implementation Plan: .............................. 2

II.   Overarching OutcomeMeasures ............................................................................... 3

III.  Implementation of Specific Recommendations of the Expert Panel ................................ 7

      A.    Panel Recommendation #1: .......................................................................... 7

      B.    Panel Recommendation #1:  Therapeutic Foster Care Pilots ................................ 8

      C.    Panel Recommendation #1:  Care Management Entity ...................................... 13

      D.    Panel Recommendation #1:  Regenerations Pilot Project for Dually-Involved
            Youth at Cook County Juvenile Detention Center .............................................. 23

      E.    Panel Recommendation #1:  Illinois Pay for Success Pilot for Dually-
            Involved Youth ........................................................................................... 30

      F.    Recommendation #2: ................................................................................... 32

      G.    Panel Recommendation #3: .......................................................................... 46

      H.    Panel Recommendation # 3:  Amended Definition of "Fictive Kin" ................... 49

      I.    Panel Recommendation # 3:  Expanding State Funded Guardianship ................. 51

      J.    Panel Recommendation # 3:  Family Finding ................................................... 55

      K.    Panel Recommendation #4: .......................................................................... 60

      L.    Expert Panel Recommendation # 4:  Reorganization ........................................ 61

      M.    Panel Recommendation # 4:  Illinois Birth Thru Three (IB3) ............................ 61

      N.    Recommendation # 4:  SAFE Families for Children (SFC) ................................ 66

      O.    Panel Recommendation # 4:  Information Systems ........................................... 69

      P.    Panel Recommendation #5: .......................................................................... 74

    Q.     Panel Recommendation #6: ................................................................. 75

IV.    Communication Plan:  Implement a defined Communication Plan with the B.H. Expert Panel and Plaintiffs' attorneys.  (Implementation Plan, p. 55). ....................... 8081

V.    Project for a Target Group of Children and Youth/Enhanced IPS Program Beyond Medical Necessity Pilot ................................................................................................. 82

## INTRODUCTION AND OVERVIEW

DCFS, with Plaintiffs and the Expert Panel, hereby submits this Second Triannual Report to the Court regarding the projects identified in the Implementation Plan. The reporting period for the Second Triannual Report addresses the time period generally from February through March 2017.[1] As the Court likely is aware, Director Sheldon has announced his resignation effective June 15, 2017.[2] Despite this change, the Implementation Plan is a binding court order and is not directly impacted by the appointment of a new DCFS director. DCFS has assured the Expert Panel and the Plaintiffs of its commitment to the programs and initiatives it has undertaken through the Implementation plan.

While some progress toward DCFS's reform goals has been made since February, 2017, Plaintiffs and the Experts have significant concerns about the next phase of work required under the Implementation Plan. The Plaintiffs and the Expert Panel have provided separate submissions to the Court outlining those concerns.

## Detailed Status Report

The following provides the detailed report regarding the various initiatives that DCFS has undertaken pursuant to the Implementation Plan.

---

[1] The deadline for filing the First Triannual Status Report to the Court was extended, and it accordingly covered the period of approximately September 2016 through February 2017. The parties and the Expert Panel agreed that, the second report would cover a shorter time frame and would be filed now so that future reports would be back "on track" to cover a true "triannual" period. It is anticipated that the third triannual report to the Court will cover information for the period April 1 through July 31, 2017.

[2] DCFS General Counsel Lise T. Spacapan has been named the Interim Director while a nationwide search for a new Director is conducted. DCFS Associate Deputy Director Pete Digre, who has been instrumental in the actual execution of Implementation Plan also remains at DCFS.

I. **Application of Implementation Science to the Implementation Plan:**

Utilize principles of Implementation Science to develop, implement, evaluate and modify initiatives outlined in the B.H. Implementation Plan.

1. **Project Goals / Target:** This Court's Order of July 11, 2016 [Dkt. 527] provides for DCFS's retention of the National Implementation Research Network (NIRN), to review and comment on DCFS's adherence to best practices in implementation science and assist with an assessment of DCFS's implementation capacity and strategy.

2. **Status Report:** There was significant delay in finalizing the contract with Dr. Metz. The contract was executed effective February 14, 2017 and DCFS provided logic models to Dr. Metz regarding the projects in the Implementation Plan on or about February 10, 2017.

Dr. Metz provided a virtual presentation to DCFS on April 5, 2017, regarding Supporting Sustainable Implementation of Research Evidence in Child Welfare. Exhibit A, PowerPoint by Metz for Child Welfare Association. Dr. Metz has emphasized that for a system like Illinois, in which the vast majority of services are provided through private providers, it is important to work closely with those providers in developing and then co-implementing the type of practice model change that DCFS has committed to undertake. Given the present stage of DCFS's implementation efforts, Dr. Metz stated that a significantly more intensive effort to involve POS providers is needed.

3. **Revised Targets / Goals:** DCFS, the Expert Panel and the Plaintiffs are attempting to schedule an in-person meeting with Dr. Metz to further discuss implementation science and teaming issues with respect to the B.H. Implementation Plan. During the next reporting period, DCFS will develop a set of strategies with Dr. Metz to improve implementation of the initiatives in the Implementation Plan and a timeline for execution of those strategies.

2

II.     **Overarching Outcome Measures**

1.      **Project Goals / Target:**  The Implementation Plan requires DCFS to measure safety, permanency and well-being of class members and to monitor changes in both the quality and quantity of services and supports to class members and their families.   The metrics DCFS will use for measuring safety and permanency are the same measures used in the national Child and Family Service Reviews (CFSR), and the measures for well-being are based on a matrix developed by the Child Welfare Advisory Sub-Committee.  Implementation Plan, pp. 4-7.

2.      **Status Report:**

**Validation of Safety, Permanency and Stability Measures.**  DCFS originally set June 2017 as its anticipated date to complete full validation of the safety, permanency, and stability measures. Validation is ongoing for the exiting dashboards for the safety, stability and permanency measures and DCFS staff continue to finalize the validation of the overarching measures to meet the revised July 2017 deadline.

**Integration of CANS DATA.**  In the last Report, DCFS stated its intent to begin tracking as many well-being measures as possible.  At present, DCFS is in the process of consolidating the CANS application, which will allow better tracking of CANS data on child wellbeing.

DCFS also set the deadline for integrating CANS data relative to the well-being measures into the SACWIS system in the first quarter of FY18 (i.e., July through September 2017).  DCFS is currently working with DCFS executive leadership to develop a plan to prioritize the work for integrating the CANS data.

**IM CANS.**  DCFS was to decide whether to implement the Illinois Medicaid (IM) CANS before the current reporting period.  DCFS has decided to proceed with that implementation. DCFS DoIT/OITS staff have engaged with stakeholders regarding implementation of the IM

CANS and are currently identifying short term and longer range plans to consolidate CANS processes on one application.  Exhibit B, Four Month Status Report, IT Projects.

**Prioritization for Mindshare.**  By April 30, 2017, DCFS, working with the Expert Panel and Plaintiffs, was to develop a prioritization of the different B.H. projects for completion and incorporation into Mindshare and a timeline by program stating when the data for the program and associated dashboards will be up and running on Mindshare.  The Expert Panel had planned to discuss the prioritization of Mindshare dashboards with the parties at its April 5 – 6, 2017 meeting, but there was not time available at the April 2017 meeting.  DCFS has not yet provided a plan for review or consideration by the Experts or Plaintiffs, but is working on the prioritization of the dashboards in the Mindshare platform and will develop the prioritization during the next reporting period.

In the interim, DCFS has continued to develop dashboards in the Mindshare platform. Dashboards went live for several B.H. related projects, including the IB3 waiver and Family Finding.  Other dashboards, including SAFE Families and Regenerations, remain in various stages of development. Exhibit B, Four Month Status Report IT Projects.

**Validation of CANS Data.**  DCFS agreed to validate information from the CANS using a variety of other data in the CWAC wellbeing matrix.   A work plan has been developed to implement the validation work, which is currently scheduled to begin in July 2017 and end in December 2017.  Key steps in the validation process include:

| ACTIVITY | RESPONSIBLE | DESCRIPTION | TARGET DATES |
|---|---|---|---|
| ***Training in New Measures*** | IA/ Erikson | Statewide Training in the DECA | May 8-9, 2017 |
| ***Utilization –New Measures*** | IA | IA incorporates the measures into assessment process | Start: July 5, 2017 |
| ***Data Management*** | OITS/ Objective Arts/ NU | Build a database to enter new measures for | **Approval:** May 1, 2017 **Completion:** June 15, 2017 |

| | | analysis of well-being data | **Use:** July 1, 2017 |
|---|---|---|---|
| *Data Analysis:* | JPA/ NU | ***Includes the CANS, and all measures that will be in use/ can be accessed for FY '18*** | **Plan Complete:** June 15, 2017<br>**Data Analysis:** 1st & 3rd Quarters of FY '18<br>**Initial Findings:** 3rd Quarter of FY '18 |
| *CANs-Full Use Target -200 Immersion Site Casework Staff* | IA/ Harms/ NU | Immersion Sites will receive enhanced implementation support for the optimal use of the CANS in practice- requires 3-months | **Pre-work:** May 1, 2017<br>**Start:** June 1, 2017<br>**Completion:** Dec. 2017 |

Exhibit C, Immersion Site Four Month Status Update.

**ISBE Data Integration into SACWIS:** In the last report, DCFS noted that representatives from the OITS, Legal Services, and Operations were meeting in Springfield on February 14, 2017, to identify barriers in obtaining the ISBE data and developing a plan to obtain the needed data. That meeting was held and it was determined that the barrier to this initiative is determining how education data can be added to SACWIS without requiring manual matching of ISBE records with the DCFS records. Exhibit B, Four Month Status Report, IT Projects.

**Expansion of Access to the Mindshare Website Within DCFS.** Immersion Site Directors and project managers already have access to the Mindshare Website. Training for additional DCFS staff is underway as the Mindshare dashboards are developed. To date, the project managers are being trained as the dashboards for their projects are being developed.

**Private Provider Access to Mindshare.** DCFS previously reported that a security protocol must be developed to allow outside providers to access the Mindshare website. Facilitating such access will be critically important under the practice model that DCFS is preparing to implement in the Immersion Sites. However, DCFS is currently reviewing and exploring how this security protocol will be developed and then implemented.

3.      **Revised Targets / Goals:**

**Validation of Safety, Permanency and Stability Measures.**  DCFS continues to anticipate that the safety, permanency, and stability measures to be fully validated by July 2017.

**Integration of CANS Data.**  Consolidation of the CANS application was anticipated to be completed by September, 2017.  The anticipated deadline to integrate CANS data into SACWIS (during the first quarter of FY 2018) is no longer realistic.  By the next reporting period, DCFS will have developed a plan identifying the steps needed for the integration to occur and a timeline for completion of those steps.  The adjusted anticipated deadline for the integration is the fourth quarter of FY 2018; however, meeting that deadline assumes that DCFS is able to secure necessary IT support, either internally or through contracting.

With respect to development of the wellbeing matrix, DCFS and outside providers (OITS/ Objective Arts/ Northwestern University) obtained final approval of the plan for development of a database to enter the new measures for analysis of the wellbeing data on or about May 1, 2017.  It is anticipated that the new database will be completed by June 15, 2017 and operational by July 1, 2017.  The Juvenile Protective Association and Northwestern will complete a data analysis of the wellbeing data by June 15, 2017 and the initial findings will be issued by the end of the third quarter of Fiscal Year 2018.

**IM CANS.**  The IM CANS will be implemented by March 2018.

**Prioritization for Mindshare.**  The Implementation Plan states the following: "While internal positions are being established and filled, there will be some transitional activity including a contract with MindShare and with Eckerd. MindShare will collaborate with the Division of Quality Assurance, the Division of Strategic Planning and Innovation, and the Illinois Department of Innovation and Technology (DoIT).   Contracts began in September 2015

and will be in place until January 2018 to assist with the transition and to provide additional assistance." Amended and Revised B.H. Implementation Plan, [Dkt. 531] p. 50. The contract with Mindshare began in September 2015 and is in place through January 2018. At the present time, DCFS is exploring the possibility of developing a replacement for the Mindshare platform using POWERBI and MS SQL server engines in house. DCFS recently hired a Victor O. Johnathan, MBA, PMP as its Chief Information Officer, who will be involved in the exploration of the development of the possible replacement for the Mindshare platform. DCFS anticipates that a decision regarding the Mindshare platform will be made within the next reporting period and that a transition plan will be developed once that decision is made. Plaintiffs are concerned about the viability of DCFS's plan to replace Mindshare by January, 2018, as set forth in their separate submission.

**ISBE Data Integration into SACWIS**. DCFS anticipates that student records from ISBE will be available in SACWIS during the next reporting period. The ISBE records will be input into SACWIS. The next step will be for DCFS to work to develop aggregate reports from the individual records. Aggregate reports will be used for data analysis.

**Expansion of Access to Mindshare Website within DCFS.** This has been completed.

**Private Provider Access to Mindshare.** DCFS is still evaluating whether security concerns can be addressed. Decisions regarding whether access can be given will be made during the next reporting period.

III. **Implementation of Specific Recommendations of the Expert Panel**

    A. **Panel Recommendation #1:**

Institute a children's system of care demonstration program that permits POS agencies and DCFS sub-regions to waive selected policy and funding restrictions on a trial basis in order

to reduce the use of residential treatment and help children and youth succeed in living in the least restrictive, most family-like setting. (Implementation Plan, pp. 7-25).

The Implementation Plan identifies four initiatives DCFS is pursuing in response to Recommendation # 1. The first is the Therapeutic Foster Care Pilot initiative. The second is the Case Management Entity pilot. The remaining two are programs targeted to the needs of "dually involved youth" – the Regenerations pilot and Pay for Success. Each of these programs is discussed individually below.

**B.** **Panel Recommendation #1: Therapeutic Foster Care Pilots**

**1.** **Project Goals / Target:** The Implementation Plan calls for DCFS to select private agencies to implement evidence-based or evidence-informed therapeutic foster care programs over the next five years. The goal of the TFC pilot is to determine whether outcomes for youth served in the TFC pilot programs are equal to or better than those for youth who meet the clinical criteria for residential treatment and are placed in residential treatment. Implementation Plan, pp. 8-13. At least 60% of the youth served in TFC licensed homes are to be age 12 and older. Implementation Plan, pp. 8-9.

DCFS set a two-year goal for the recruitment and licensure of therapeutic foster parents and placements. The original goal included placement of a minimum of 40 children and youth in licensed TFC homes at the end of the "first contractual year" (meaning April 2018) and placement of a minimum of 100 children and youth at the end of the "second contractual year" (meaning April 2019).

**2.** **Status Report:**

**Development and Service Contracts.** Two agencies participating in the pilot asked DCFS to extend the initial development contracts due to recruitment and model implementation challenges, which postponed the delivery of services for several months. The development

contract with LSSI was extended on February 3, 2017 and the development contract with CHAID was extended on January 20, 2017. The development contracts for both LSSI and CHAID were extended to June 30, 2017. DCFS has twice provided JCFS with the extension on the development contact, but the contract has not yet been provided to DCFS. Service contracts for FY17 are in place for all providers in this pilot.

The third agency that originally was participating in the pilot – Children's Home & Aid ("CHAID") has chosen to refocus its work and is developing an alternative relative care model that focuses on strengthening and training relatives in crisis intervention and de-escalation techniques to care for challenging youth. Given CHAID's current approach, CHAID is no longer a part of the pilot as such, but DCFS will work with and continue to monitor CHAID's program in conjunction with the TFC pilot. Exhibit D, Four Month Status Report, Therapeutic Foster Care.

DCFS has added Youth Outreach Services (YOS) as an official participant in the pilot through a contract executed on March 1, 2017. YOS intends to provide therapeutic foster home placements under the Therapeutic Foster Care Oregon Model (TFCO), which LSSI is also using. Exhibit D, Four Month Status Report, Therapeutic Foster Care. Exhibit D, Four Month Status Report, Therapeutic Foster Care.

**TFC Placements.** DCFS revised its timeline for serving youth through the TFC pilot. The revised timeline called for placing a minimum of 40 children and youth in licensed TFC homes by April 1, 2018 and to have a minimum of 100 children and youth placed in TFC homes by April 1, 2019, with at least 60% of the youth served in the age group of 12 and older.

As of May 1, 2017, two youth (ages 10 and 12) have been placed through LSSI's program, one 15-year-old has been placed through JCFS' program, and one 16 year-old has been

placed through YOS. No youth have been placed with CHAID due to modifications made to the model they are currently implementing.

**TFC Foster Parent Recruitment.** LSSI trained a total of 20 families in the Therapeutic Foster Care Oregon Model during the month of February. After the training, LSSI ruled out four families as not being appropriate for the model. LSSI has identified 10 families/ homes that are projected to be licensed, trained, and certified in the TFCO model by April 30, 2017. LSSI currently has 25 families in the pipeline for licensure. Exhibit D, Four Month Status Report Therapeutic Foster Care Pilot. Families must be trained, licensed, and certified under TFCO to accept youth. At present, a total of 12 LSSI homes are available for placement and five homes already have youth placed in the homes.

JCFS continues to have two homes in the licensure/certification process. At present, a total of one JCFS home is available for placement or is already serving a child.

YOS has one home that is in the process of renewing its license and one foster home that is in the process of becoming licensed. Both homes must be certified and trained, which is projected to be completed by the next reporting period. At present, YOS has a total of two homes available for placement or are already serving a child.

**TFC Referrals and Eligibility.** During March 2017, four youth were referred to the YOS program. Of the four youth, YOS has accepted two youth in their program as of April 2017. Exhibit D, Four Month Status Report, Therapeutic Foster Care. Those two youths were placed in the homes in May 2017; one youth was placed on May 10, 2017 and the other youth was placed on May 25, 2017.

DCFS is attempting to address several issues with the referral process for the TFC pilot. Originally, the pilot limited eligible youth based on how they scored on the Child and Adolescent

10

Intensity Instrument (CASII). First Triannual Interim Status Report on the B.H. Implementation Plan (corrected) [Dkt. 538], p. 19. A CASII is required for each youth being considered for the TFC pilot and is completed either during a CIPP staffing or by request to the DCFS Clinical Division. A youth is eligible for the TFC pilot if they score a 5 on the CASII.

LSSI has had difficulty identifying youth six to 14 years of age in the correct legal county with the necessary score on the CASII for the LSSI program. To address this challenge, DCFS has partnered with the TRPMI pilot to identify such youth, as the TRPMI pilot also requires administration of CASII to determine a level of care. To date, however, none of the youth in the TRPMI pilot meet the age or county criteria for the available LSSI homes. Exhibit D, Four Month Status Report, Therapeutic Foster Care.

In addition, as of April 2017, eligibility for the TFC pilot has been expanded to include youth in residential treatment facilities with the requisite score of a five on the CASII. LSSI will target youth between six and 14 years of age who have been in residential treatment for 30 to 60 days for completion of a CASII. The DCFS Central Matching Unit, along with the TFC pilot manager, has requested additional resources from the DCFS Clinical Division to complete the CASIIs. This assistance will be provided on an ongoing basis.

The TFC Project Manager also has been working with the DCFS Central Matching Unit to identify youth who are targeted to move from one residential facility to another, youth in psychiatric hospitals and youth who are identified through the current CIPP and other staffing processes to increase the pool of referrals. Exhibit D, Four Month Status Report, Therapeutic Foster Care. These youth also will be eligible for the TFC pilot if they have the requisite CASII score.

11

The TFC Steering Committee considered, but rejected, changing the eligibility criteria for the pilot to a lower CASII score.[3]

### 3. Revised Targets / Goals:

**Expansion and Service Contracts.** Service contracts for the agencies participating in the TFC pilot are in place through Fiscal Year 2017 and are in process of being distributed and executed for Fiscal Year 2018. The Expert Panel is concerned about the current contract negotiations and rate setting process underway for this service, which have delayed finalizing contracts and reimbursing agencies for their contract expenses. The TFC contract development and approval process reflects what the Expert Panel has observed as a pervasive Departmental problem executing timely contracts that secure, maintain, and individualize needed services for families and children with challenging emotional and behavioral needs.

**TFC Placements.** The revised placement goals and timeline for the TFC pilot remains as stated in the prior Report to the Court -- a minimum of 40 children and youth in licensed TFC homes by April 1, 2018 and to have placement of a minimum of 100 children and youth by April 1, 2019, with at least 60% of the youth served in the age group of 12 and older. JCFS expects to have ten youth served and eight homes licensed and certified by September 30, 2017; YOS expects to have four youth and six homes licensed and certified  by September 30, 2017; and LSSI expects to have 26 youth served and 30 homes licensed and certified  by September 30, 2017.

**TFC Foster Parent Recruitment.** By the next reporting period, DCFS will have requested and obtained foster parent recruitment plans from all participating agencies. DCFS

---

[3]This change would have impacted the current evaluation plan since a revision of the comparison group would be required.

will continue to monitor closely the progress of the three agencies to recruit and certify TFC foster homes to meet these revised deadlines.

**TFC Referrals and Eligibility.** DCFS will continue to monitor the referral and eligibility process to ensure timeliness in the decision and placement process. The current referral and eligibility process for TFC provides that a youth will be identified either through the CIPP process, the DCFS Central Matching team, or on occasion, from the DCFS Clinical Division after a staffing. Once the youth has been found eligible for the TFC pilot, information is requested from the potential agencies for consideration. The agencies have five to seven days to make a determination if they can then accept the youth and provide an appropriate placement. DCFS has worked diligently to streamline this process from two weeks to the five to seven day window and continues to monitor this process for other necessary adjustments.

The DCFS Project Manager receives monthly recruitment efforts from each agency in order to monitor the mechanism for recruitment of potential foster parents/ families.

C.     **Panel Recommendation #1:  Care Management Entity**

1.     **Project Goals / Target:**

The planned goals for the Care Management Entity (CME) pilot include:  increasing non-traditional, community-based behavioral health supports; faster step-downs for youth in congregate care settings (i.e., 15% of enrolled youth to step down six months after enrollment and another 15% to step down 12 months after enrollment); treating youth and family voice and choice as primary factors in permanency planning and mental health/behavioral health interventions; reduction in youth experiencing elevations in level of care (i.e., youth being placed in specialized foster care or congregate care settings); increased placement stability at the traditional foster care level (i.e., fewer lateral moves); high service-intensity youth receiving

necessary behavioral health supports and services in their home and community settings; decreased psychiatric hospitalization; and increased permanency.

The CME pilot, which is administered though CHOICES, began in February 2014 and was scheduled to continue through June 30, 2017. The goal of the pilot was to serve 200 youth annually and 600 youth during the course of the pilot. DCFS committed to identifying a comparison group for the evaluation by December 2016 and to completing an interim evaluation by March 2017. Implementation Plan, p. 19.

2. **Status Report:**

**Extension of the Pilot in FY18:** Assuming that a managed care program is implemented for the children in DCFS' care beginning as of FY 2019, the Choices program will be replaced and/or essentially mooted by that managed care program. DCFS accordingly has determined that the CME model should remain in pilot status during Fiscal Year 2018. DCFS and pilot staff were to develop a plan for continuing service provision (e.g., contract renewals, new contracts) to youth in the pilot upon the conclusion of the pilot period. The original plan contemplated developing targets and timeframes to accomplish the transition from a pilot project to an ongoing care management model. This will not be completed since the decision was made to keep the Choices program in pilot status for Fiscal Year 2018 pending the anticipated move to a statewide Managed Care Organization program for youth in care beginning in FY 2019.

DCFS is in the process of revising the program plan with Choices to address issues regarding aftercare services, disenrollment (discharge) expectations and outcome data.[4] Additional changes will include the requirement for aftercare services and maintaining youth in

---

[4] For example, under the current revised program plan, youth who transition to a transitional living plan or independent living arrangement will no longer be considered "successful disenrollments," and instead will remain enrolled in the CME pilot for at least nine months post-placement to ensure stability.

the CME until permanency is achieved and DCFS is no longer the legal guardian of the youth. Additional revisions may also be required. Exhibit E, Four Month Status Report, Care Management Entity Pilot Update.

**Children Served.** The initial plan for the CME estimated an average census of 200 youth in care throughout the pilot. That target was not met. The CME pilot had served 350 youth in care through March 31, 2017. As of April 28, 2017, 157 youth in care were being served in the CME pilot. Exhibit E, Four Month Status Report, Care Management Entity Pilot Update April 2017. It is anticipated that a monthly census of approximately 160 youth will be served through the CME pilot during FY 2018.

In the pilot, the percent of children stepped down from congregate care within six months of enrollment was 1% (1 youth), compared to an expected 15%, and an additional 7% (5 youth) stepped down within seven to twelve months, compared to an expected 15%. Altogether, 8% of enrolled youth stepped down from congregate care, compared with an expected 30% within the identified timeframes.

Between January and April 2017, there was a reduction in the rate of hospitalization for children who received mobile crisis response services (from three youth hospitalized in January, 2017 to two in February, 2017, and none in March, 2017). Finally, during the latest reporting period, 15% of enrolled youth remained in a stable living arrangement (e.g. pre-adoptive home, foster home, home of relative or home of fictive kin) for at least 12 months or achieved permanency within 12 months of enrollment in the CME pilot, compared to the goal of 80%.

**Addressing Program Barriers.** DCFS previously committed to improving support for the CME pilot during this reporting period and to addressing service gaps and deficiencies in the pilot. Thereafter, DCFS was to track the extent to which its actions with DCFS regional staff,

community stakeholders and providers had a positive outcome on the services provided to youth in the pilot and the outcomes they achieve.

Meetings involving DCFS, POS, and CME were conducted on February 24, 2017, April 29, 2017, and May 30, 2017. In addition, the DCFS Project Manager and Project Supervisor for the CME pilot held teleconferences with CME administration on March 30, 2017, April 11, 2017 and April 14, 2017. The meetings and discussions focused on identification of service gaps, decision-making in Child and Family Team Meetings, and performance expectations. Exhibit E, Four Month Status Report, Care Management Entity Pilot Update April 2017.

DCFS has identified Lynda Petrick, Agency Performance Team Supervisor, as a champion of the CME pilot. Her role will be to facilitate communication between POS agencies, DCFS and Choices staff as well as to immediately address performance issues that may arise within POS partner agencies. Deborah Keen, DCFS Behavioral Health Specialist, has also been connected to the CME pilot. Her role will be to assist with frontline case issues that arise in the CME/child welfare partnership and to identify and address barriers to service implementation.

In addition, DCFS and CME Administration met and agreed to focus on placement development and resolution of non-consensus issues. While the meeting did not result in specific services for the CME to develop, they were told to establish relationships with community partners who could be called upon to develop a service tailored to a child's needs. For example, there are universities and mental health centers accessible within the four-county area. Connections with social work, psychology, and education departments could yield a group of potential providers of services for families. In addition, the CME was instructed to link with their local child welfare partners to assess what these partners viewed as priority services for children on their caseloads. They are to build services around these recommendations. This is being

monitored through the monthly Choices-Child Welfare meetings and case discussions. The placement development issue revolved around what Choices could do, as a non-licensing agency, to help recruit foster parents with both DCFS and POS agencies. By the time of the meeting between DCFS and CME Administration, Choices already had met with the CYFS foster parent recruitment group (which includes current and prospective foster parents). At that meeting, Choices was able to provide information on how the Choices program could offer supports for youth and foster parents in the home environment. Choices is scheduling similar meetings with other private agencies, such as Children's Home + Aid and LSSI. Additionally, the DCFS Project Manager and Project Supervisor informed Choices that a broader community stakeholder group, including groups such as CASA, educational providers, community businesses and law enforcement, also needed to be developed. Choices agreed to prioritize the development of the community stakeholder group in FY 2018.

To address the placement resource and development issue, the CME pilot will collaborate with the TRPMI pilot. DCFS identified 14 youth in the CME pilot who have been placed in residential treatment facilities for more than 12 months and who overlap both the CME and TRPMI pilots. These youths will be prioritized by the CME for appropriate placements. At least three youth have been staffed under this collaboration.

These staffings were not CFTMs, but were clinical reviews that involved residential treatment facility administration, the child welfare supervisor or program administrator, and the Choices Care Coordination supervisor / Clinical Director. The three youth were identified due to non-consensus within the CFTM regarding step-down from a residential treatment facility. Following the clinical reviews, which included administrative representation from the provider members, the recommendations and tasks to transition from congregate care were communicated

17

back to the Child and Family Teams meetings. CFTMs were convened for each youth on April 11, 20-17, April 18, 2017 and April 25, 2017. Before concise transition plans could be identified, the CFTMs were advised to address the most pressing barriers first such as, reluctance of adoptive parents to have youth return home, logistical challenges to aiding a parenting teen who has children placed far from her, and specific supports to improve transitioning a youth to a grandparent with minimal resources. The Choices Project Supervisor and Deanne Muehlbauer (from the University of Illinois Chicago) will be scheduling follow-up to the original clinical reviews to review the cases and determine progress with the listed action items.

Moving forward, TRPMI staff will provide additional support to the CME by completing clinical reviews on youths who experience issues surrounding clinical preparedness for discharge or lack of placement resources. Exhibit E, Four Month Status Report, Care Management Entity Pilot Update.

On the issue of "non-consensus," DCFS is implementing changes to address situations where a permanency worker does not agree with the decisions made at the CFTM (e.g., decisions to step a youth down, or not step a youth up to a higher level of placement). Such situations were resulting in delay. Going forward, in situations with disagreement, a CME/child welfare supervisory conference and a final decision by the Clinical Administrator will be completed within ten work days. Exhibit E, Four Month Status Report, Care Management Entity Pilot Update.

**Foster Parent Recruitment and Improved Communication.** DCFS committed to implementing improved communication to foster parents regarding the services available through the CME. Pilot staff were to develop a plan with specific targets and timeframes to increase the number of new and existing foster homes in the pilot project area prepared to and

capable of providing step-down placements for youth with more challenging needs. To do so, Choices met with the foster parent group at one private agency and scheduled meetings with other foster parent groups from other agencies. At these meetings, Choices will explain the additional supports it can provide to youth and to foster parents as a youth is stepped down from residential care.

**Court Outreach.** DCFS promised to undertake additional outreach with the judge in Vermillion County to provide an overview on the CME pilot, to solicit feedback from the judge and other stakeholders, and to identify supports for serving youth from Vermillion County in community-based settings. That occurred on April 4, 2017. Judge DeArmond provided positive feedback regarding performance of the CME pilot and child welfare staff. He was pleased with the performance of Choices staff and the supports they provided while working with child welfare staff and families. Judge DeArmond did not identify any corrective action items. He did, however, inquire about supports and services for parents with developmental disabilities and how those supports and services could be used to help impacted families.

**Enhancement to the Mobile Crisis Response Process:** The service of a mobile crisis response team to assess youth undergoing a behavioral health crisis has been offered through the CME Pilot since April 2016. Data continues to demonstrate that this service deflects youth from psychiatric hospitalization. Exhibit F, January 2017 Data, February 2017 Data and March 2017 Data. In March 2017, 17 DCFS youth were screened for psychiatric hospitalization. Eleven of those youth were not enrolled in Choices and six were enrolled in Choices. All of the Choices youth were able to be deflected from a hospitalization.

To enhance this service, beginning in April 2017, youth and families who receive mobile crisis response services will also receive in-home supports within 12 hours or crisis screening to

help prevent re-escalation and the need for additional crisis screenings.  Exhibit E, Four Month Status Report, Care Management Entity Pilot Update.

**Pilot Evaluation.** The target date for evaluation of the program through Fiscal Year 2017 has been delayed to September 2017.

### 3. Revised Targets / Goals:

**Extension of the Pilot.** During the March and April 2017 teleconferences, DCFS advised Choices Administration that the program would remain in pilot status during FY 2018.  A review of the program plan in April 2017 led to the clarification of expectations regarding permanency and the work that was expected to be completed by the CME, such as remaining involved with a family until legal permanency was achieved and not discharging a family when they appeared stable.  These requirements regarding permanency are being incorporated into the program plan for FY 2018.

**Children Served.** The goal for FY 2018 is for Choices to maintain a monthly census of 160 children.

**Addressing Program Barriers.**  The CME will hold a child welfare stakeholders' meeting at least once a month, where DCFS, private agency and CME administrations can discuss current challenges and work collectively to address those challenges. The first of these meetings occurred on February 24, 2017.  In April 2017, DCFS determined that monthly meetings would occur and the DCFS Project Manager and DCFS Project Supervisor are the point persons for meeting organization, documentation and reporting outcomes.  The DCFS Project Manager is currently discussing the monthly meeting protocol with participating stakeholders. DCFS will also be working with the CME pilot to ensure the CME provides data regarding

children enrolled in the Choices pilot that is more consistent with the DCFS overarching outcome measures such as permanency and placement stability.

For placement resource and development, the collaborative process has already begun.[5] The DCFS Project Supervisor will continue to identify youth for collaboration with the TRPMI pilot. By July 1, 2017 the DCFS Project Supervisor and Behavioral Health Specialist Deborah Keen will schedule staffings for identified youth, create plans for involving the CFTM in the decision-making process, and develop action steps.

The CME Administration will be responsible for arranging and/or developing the needed services and supports for each youth. The Choices Provider Relations Team is responsible for developing resources and DCFS regularly monitors the Choices provider network. For youth in residential treatment facilities enrolled in Choices, the Choices Provider Relations Team must work to develop the appropriate resource for the step-down placement. DCFS monitors this on a monthly basis through Choices reports to the DCFS Project Supervisor. Behavioral Health Specialist Deborah Keen will also serve as a real time prompt to complete assigned development tasks for each youth.

**Transition to Managed Care Program.** The DCFS Project Manager is convening internal DCFS meetings to discuss the child welfare role clarification during partnership with a managed care organization. An initial meeting was held in May 2017 to present the idea of preparing for the larger change to a statewide MCO. At the initial meeting, the idea was presented to develop archetypes of children and families served by DCFS and private agencies so

---

[5]The initial steps occurred in March 2017, when the DCFS Project Supervisor identified three youth enrolled in Choices placed in residential treatment facilities that were also part of the TRPMI pilot. The three youth were given clinical reviews and the action steps in those reviews are being reviewed. Another youth who was newly referred to Choices and is placed in a residential treatment facility that is closing will have a TRPMI review in June 2017 to assist with step-down planning.

21

there is clarity regarding what children and families really look like, the paths cases may take, and where the managed care overlay becomes apparent.

As additional meetings are scheduled, the Project Manager will include the Expert Panel, plaintiffs' counsel and other DCFS division representatives. General topics for discussion at those meetings will include decision-making for services to meet the unique needs of child-welfare involved families, communication between the MCO and the child welfare staff and the manner in which conflicts will be resolved.

DCFS acknowledges that all work for children and families must be centered within the Child and Family Team and be family-driven. The lessons learned from the Choices pilot include the fact that the child welfare staff and MCO need to both know and acknowledge who will do what for a family and that the decisions need to be driven by the family. Other lessons learned include the need for consolidation of activities, guidelines for payment of services, and collaboration. These areas will also be the topics of ongoing discussions as the MCO process continues to roll out.

**Foster Parent Recruitment and Improved Communication.** The Choices role for foster parent recruitment is for Choices to "sell" the program supports it can offer to current and prospective foster parents. Choices has committed to attending similar meetings with other private agencies. Choices has also been instructed by DCFS project management staff to create additional opportunities to reach out to potential foster parents.

**Court Outreach.** DCFS staff will schedule meetings with court personnel from Champaign, Ford and Iroquois counties involved in the CME pilot. DCFS project management staff will work with DCFS legal staff to schedule meetings with courts in Champaign, Ford, and Iroquois counties during the next reporting period.

**Enhancement to Mobile Crisis Response.** The enhancement to the Mobile Crisis Response was initiated in April 2017. The enhancement included the addition of the 12-hour post deflection response by the Choices clinical staff to provide support to the youth and the foster parent. To evaluate this enhancement, those families who receive the post-deflection response will be tracked to determine if they experience a reduction in subsequent crisis calls and fewer hospitalizations.

**Pilot Evaluation**. Mark Arber is the identified researcher from the University of Illinois, Urbana-Champaign and he has been provided with guidelines for the comparative research as well as access to the child care information. One challenge to be addressed in the next reporting period is the acquisition of information on youth in comparison counties and the plan to address that will be developed in the next reporting period.

D.    **Panel Recommendation #1:  Regenerations Pilot Project for Dually-Involved Youth at Cook County Juvenile Detention Center**

1.    **Project Goals / Target:**

The Regenerations pilot is designed to provide placements and intensive services to DCFS youth in care who are also involved in the juvenile justice system and are ready for release from the Juvenile Temporary Detention Center (JTDC). Implementation Plan, pp. 20-22. The program provides traditional mental health services, care coordination, foster care services (if needed) and individualized home and community based services through a wraparound philosophy. Id. The program goal was to serve 65 youth. There was no deadline specified in the Implementation Plan for reaching that level of service, however the pilot was scheduled to be completed in June 2017 (See report page 32).   Implementation Plan, p. 21.   The Regenerations pilot is a collaborative effort with the JTDC, Cook County Juvenile Probation, Lutheran Child and Family Services (LCFS), Youth Advocate Programs (YAP), and the University of Illinois at

Chicago (UIC).   See Exhibit G, Regenerations Pilot Project for Dually-Involved Youth at Cook County Juvenile Detention Center Four Month Status Report, April 28, 2017; Exhibit H, DCFS Regenerations RUR/Pilot Logic Model 4-28-2017.

**2.      Status Report:**

**Program Conversion.**   Beginning in February 2017, DCFS was to implement specific strategies to ensure that the service data and the billing data for youth served through the pilot project are reconciled. The billing and service data has not been reconciled. DCFS is still in the process of addressing this matter by reviewing specific cases that have billing discrepancies. The Regenerations pilot was to be moved from a pilot project to an ongoing DCFS program upon completion of the pilot in June 2017. That process has been started and will require contract adjustments with LCFS and YAP.

**Foster Parent Recruitment.**   LCFS had provided DCFS with a plan for expansion of the foster parent resources necessary for the program. First Triannual Interim Status Report to the Court on the B.H. Implementation Plan, Exhibit O, LCFS Foster Parent Recruitment Plan.  That plan, which places increased emphasis on fictive kin and enhanced family finding strategies, has been reviewed and is being revised based on feedback provided at the April 2017 monthly Regenerations Implementation Team meeting.

**Program Refinement.** Within the last reporting period, LCFS and YAP have refined their case management and advocacy approach within the pilot.  LCFS hired a Wraparound consultant in April 2017.  The consultant was retained to develop a wraparound model customized to the Regenerations pilot.  YAP hired an additional program director and three additional advocates. There has been an increase in the frequency in communication among

LCFS, YAP, and DCFS, which has resulted in improved consensus building and problem solving.[6]

In the last reporting period, there were indications that post-placement child and family team meetings (CFTM) are not being conducted as frequently as expected. The goal was to average 0.35 CFTMs per month. During the last reporting period, the CFTM data came in well below the goal, peaking at .08 CFTMs per month. The consensus during implementation team meetings was that reports of CFTMs that were facilitated may have been taking place but were not entered into SACWIS in a timely manner. Given that Chapin Hall utilizes the post-placement CFTMs to evaluate the fidelity of the wraparound philosophy, this was an important issue to remedy. To address this through continuous quality improvement, Chapin Hall has produced weekly data reports that are presented at monthly implementation meetings to review the reporting for certain evaluation outputs (e.g., CFTMs, Advocate Hours, Parent/Child/Sibling visits) compiled from SACWIS or SharePoint databases. Providers review these changes to troubleshoot circumstances where this data was not entered (e.g., child on run, in detention, in residential treatment). This review provides the opportunity for providers to maintain compliance with their program staff to be more diligent in entering data within SACWIS and SharePoint in a timely and accurate manner.

---

[6] This has assisted the agencies in quickly responding to issues. A recent case example highlights why response without delay is significant. An 18-year-old female Regenerations client, who is the parent of an infant child, went to a police station to report an attempted abduction. While at the police station, the police held the 18-year-old client on an alleged violation of probation and her infant child was subsequently taken into temporary custody. Immediate intervention by LCFS and YAP lead to the release of the youth and to reunification with her infant within a number of hours. Both the youth and her child were then placed with a foster family. This immediate response prevented the youth from being involved in the criminal justice system.

Recently, there has also been an increase in residential placements of youth pursuant to court orders. Exhibit G, Four Month Status Report, Regenerations This impacted the Regeneration pilot's ability to place youth in community-based settings with relatives or foster parents. This may limit the ability to evaluate the effectiveness of the intensive advocate support and wraparound services provided through the Regenerations pilot since many of the wraparound set of services that are utilized as part of the Regenerations pilot cannot be provided to youth placed in residential care and there may not be a sufficient number of youth placed in settings other than residential care who meet the criteria for the pilot to evaluate the effectiveness of the services provided through Regenerations.

**Program Data.** During this reporting period, DCFS implemented specific strategies to ensure the accurate and reliable submission and tracking of service data for youth assigned to the Regenerations pilot. All providers now use a coordinated protocol for staff that ensures timely data submission to SharePoint and SACWIS databases. In addition, in April 2017, DCFS and the Cook County Juvenile Court entered a data sharing agreement. The Cook County Juvenile Court will provide historical data to DCFS and Chapin Hall on youth similar to the youth in the Regenerations pilot in order to formulate a baseline and comparison group. This data will considerably contribute to the assessment of whether or not the pilot project is effective. Currently, Chapin Hall provides data reports at the monthly Regenerations Implementation Team meetings. This allows real-time feedback to the Implementation Team regarding process measures associated with the fidelity of the pilot's service model.

**Dashboard.** DCFS has identified specific data outputs and outcomes for reports regarding the Regenerations pilot and finalized the data collection methods for this information. DCFS has identified three key metrics, based on the input of the B.H. Expert Panel, and

identified an additional nine metrics. All the metrics are contained in Table 1 to the Four Month Status Report. Regenerations data were to be incorporated into the Mindshare platform by the date of this Report, and DCFS anticipated that it would begin tracking outcomes for the children who have been served to date, with a particular focus on stability and safety.

**Program Evaluation.** DCFS anticipates that Chapin Hall will perform the comparative data analysis needed to evaluate the pilot by October 2017. Exhibit G, Four Month Status Report, Regenerations Pilot.

**Additional Contracts.** In the last reporting period, DCFS was in the process of developing contracts for other agencies to provide similar services to dually involved youth: Youth Outreach Services, National Youth Advocate Program, Youth Advocate Program and Childserve. Those contracts have been executed. It was anticipated that these agencies would begin providing services by the date of this Report. Service delivery has begun.

3. **Revised Targets / Goals:**

**Program Conversion.** For FY 2018, YAP will contract with DCFS directly as an independent contractor. YAP will continue to provide intensive advocate support for Regenerations clients, but will also expand to service other youth in care outside of the pilot. YAP's intensive advocacy support is needed for all dually involved youth, not just youth being released from detention. YAP will be available to Childserve, NYAP and YOS as needed. In addition, DCFS caseworkers or dually involved specialists will be able to refer dually involved youth to a YAP advocate with the approval of the Statewide Dually Involved Administrator. YAP has hired additional staff to handle an increase in the number of youth served within the next fiscal year. Exhibit G, Four Month Status Report, Regenerations Pilot Project.

27

LCFS NYAP, YOS, and YAP will contract with DCFS directly as an independent contractor for FY 2018.

**Foster Parent Recruitment.** Only LCFS and YOS have submitted foster home recruitment plans. LCFS has submitted a draft recruitment plan in June 2017 and the plan projects 20 new homes by the conclusion of FY 2018. LCFS began recruiting in June 2017. YOS submitted a foster parent recruitment proposal in May 2017, which is under review. If it is approved and adopted, YOS projects to have 10 TFC homes by the conclusion of FY 2018.

**Program Refinement.** The Wraparound consultant retained by LCFS will provide recommendations by June 30, 2017, and the Project Manager will implement recommended protocols/processes within two weeks thereafter. DCFS will monitor this progress through regular meetings and data reviews.

To address the failure to submit timely and accurate data for program data metrics such as CFTMs, Chapin Hall will continue to produce weekly data reports that are presented at monthly implementation meetings to provide the opportunity for providers to ensure compliance with their program staff to be more diligent in entering data within SACWIS and SharePoint. To address the problems arising from the increase in residential placements of youth pursuant to court orders, DCFS and Regenerations are developing enhanced coaching and supervision for case managers to better prepare them for court hearings.

The enhanced training will be developed by August 2017, and coaching for all case managers and advocates who are a part of the Regenerations pilot will take place by September 2017. During the monthly dually involved stakeholders meeting with Judge Toomin, the presiding judge over delinquency court, the Statewide Dually Involved Administrator and Project Manager will provide updates on the Regenerations pilot and will communicate DCFS's

concerns regarding residential placement orders and the impact on service delivery. The goal of this process is to increase confidence amongst the judiciary in the Regeneration pilot to encourage supportive judicial decisions. DCFS will also host a collaborative learning and integration meeting in August 2017 with the other service providers assisting with the RUR and dually involved population. The objective of the meeting will be to share lessons learned thus far from Regenerations, provide technical assistance to the additional service providers, and set expectations for FY 2018.

**Improvement of Data Management.** The next major data goal will be to utilize historical data from the JDTC to develop a comparison group. Chapin Hall evaluators will use the historical data related to youth in care detained and released from the JDTC to compare to the reported metrics within the pilot. Chapin Hall is currently determining what metrics can provide a side by side comparison given the data collected from JDTC. A comparison data sample will be available by October 2017.

**Dashboard.** The date for development of the Regenerations dashboard in Mindshare is not yet determined, but it is anticipated that this dashboard will be in the development phase by October 2017 either with the assistance of Mindshare, the assistance of other outside consultants or a platform developed internally by DCFS .

**Additional Contracts.** Beginning on July 1, 2017, three additional service providers (YOS, NYAP and YAP) will serve dually-involved youth who are RUR at the JDTC or dually involved. These providers will not become part of the Regenerations pilot, and instead will supplement the pilot. Although LCFS and YAP are the main parts of the Regenerations pilot, there are limitations to placement resources that are needed from other agencies. The additional agencies are expected to develop between nine and 14 more specialized/dually involved foster

home beds within the next six months. DCFS's goal is to develop a broader range of expertise and resources to youth in and out of the pilot.

**E.** **Panel Recommendation #1:  Illinois Pay for Success Pilot for Dually-Involved Youth**

**1.** **Progress Goals / Target:**

The Illinois Pay for Success Pilot is designed to reduce recidivism and to increase placement stability, educational achievements and employment opportunities for youth dually involved in the child welfare and juvenile justice system.  Implementation Plan, pp. 22-25.  The pilot was to be funded through a social impact bond, by which private funds are used to pay for the pilot services.  DCFS would not have an obligation to pay for services delivered through the pilot unless it is clearly demonstrated that the services had a statistically significant impact on the outcomes of the youth enrolled in the program.  Implementation Plan, pp. 22-23.

**2.** **Status Report:**

**Funding.**  CCN completed a fundraising period that set a goal of raising $17 million by March 31, 2017.  Because that goal was not met, CCN extended the deadline for its fundraising goal to July 31, 2017.  The funds are intended to cover the projected cost of the pilot for four years of treatment (through September 2021) and three years of evaluation.

**Youth Served.**  There are 25 youth currently receiving services as part of the pilot.  CCN has capped enrollment at no more than 25 youth in Cook, Lake, Franklin and Jefferson counties through the completion of the current fundraising period.

**Program Refinement.**  DCFS previously identified two issues with the program that had to be addressed:  1) communication issues and referral pathways for caseworkers to partner with a Wrap Facilitator; and 2) CCN's concerns regarding the UIRs (Unusual Incident Report) which resulted in delays in inputting into the UIR system because caseworkers and data entry staff were

not timely completing the UIRs. This resulted in CCN getting delayed referrals of youth who had UIRs and may be eligible for the program. DCFS saw this as a system-wide issue and has replaced the UIR system with the Significant Event Reporting System which reports this information directly through the SACWIS system where CCN can access it more easily. The replacement of the UIR system with the Significant Event Reporting System alleviates the delay in referrals that had been experienced previously.

The Operations Committee believes that the UIR issue has been resolved in the last two months, when DCFS changed the from the UIR system to the Significant Event Reporting System. The Significant Event Reporting system is linked to SACWIS and provides more timely updates to significant events that occur during a youth's case.

To address the communication and referral pathway issue, CCN developed a protocol for contact between CCN management and management with the assigned private agency to promptly address the inadequate communication between the Wrap Facilitator and caseworkers. Exhibit I, Illinois Pay for Success Pilot for Dually-Involved Youth, Four Month Status Report, April 30, 2017.

**Dashboard.** The CCN dashboard is operational, but still requires some validation. Exhibit J, CCN Intake Dashboard (data through 3/31/2017).

3.     **Revised Targets / Goals:**

**Funding.** Securing funding is an ongoing challenge. Both DCFS and the Governor's Office have provided support to CCN in their fundraising presentations. If CCN's fundraising goal is not met, DCFS at the least will enter into contracts to continue serving youth assigned to the pilot. DCFS will also consider renegotiating the contract during the next reporting period.

**Youth Served.**   The current goal is to serve 800 youth in the treatment group and 800 youth in the control group over four years.

**Program Refinement.**  While services to youth continue through the program, DCFS will monitor to ensure that the change to the Significant Event Reporting system has addressed the UIR reporting issue since significant events are linked in the SACWIS system and provided in a more timely manner.  In addition, DCFS and CCN will monitor the communication issues identified above regarding referral pathways through monthly review by the Operations Committee with CCN regarding response time from the field when referrals are made.

**Dashboard.**   The Pay for Success dashboard has been developed but not fully completed or validated.  It is anticipated that the completion of this dashboard and validation will occur during the next reporting period.

**Program Evaluation.**  Because the purpose of the ramp up phase was to develop and work out system-related issues, the University of Michigan will not be evaluating the program performance during the ramp up phase.

**Panel Recommendation #2:**

Create four "immersion sites" of small geographic areas that coincide with judicial circuits to fully build, test and implement a core practice model that puts children and families at the center of service planning and builds community and home-based services for children and their families. (Implementation Plan at pp. 25-38).

**4.     Project Goals / Target:**

Immersion Sites are test or pilot sites representing a small geographic area where youth, birth parents, foster parents, DCFS staff, private agency staff and multiple other stakeholders work together to fully build and implement a "core practice model" of child welfare practice that

puts children and families at the center of service planning and builds community and home based resources to service children and families.  DCFS intends to use Immersion Sites as the center of its transformation to improve safety, permanency and stability outcomes.

To date, the immersion site process has started in four cities:  Lake County, St. Clair County, the Rock Island area (including Rock Island, Whiteside, Mercer, and Henry counties), and the five "Mount Vernon area" counties (Clay, Hamilton, Jefferson, Marion, and Wayne).

Figure 1 charts the caseflow dynamics for each of the immersion sites extending back to fiscal year 1981. The data illustrate that three of the four sites experienced peak caseload growth in the mid-1990s as foster care removals (entry cohorts) outpaced discharges (exit cohort). The rise occurred statewide (see Figure 2) and was attributed at the front-end to the cocaine epidemic that precipitated the mass removal of substance exposed infants from parental custody and a general inattention at the back-end to permanency planning options for children in long-term kinship care.



*Figure 1.—Caseflowdynamics, FY1981-2016, Immersion sites*

The percentage of children residing kinship foster homes swiftly increased between 1986 to 1995 in Illinois from 27% to 57% of out-of-home placements before a combination of front-end Home-of-Relative (HMR) reforms and back-end permanency initiatives reduced the percentage to under 40%. Since the mid-2000s, the number of active kinship foster care cases has hovered around 6,500 children. This leveling off of the HMR caseload has been accompanied by a leveling off of the population of children in foster family care, group homes, and residential care. As illustrated in Figure 2, the size of the Illinois foster care population stabilized at an equilibrium level of approximately 15,000 children. Since 2008, the number of children who are discharged each year from foster care match the number of children who are taken into foster care.



*Figure 2.—Caseflow dynamics, FY1981-2016, Illinois*



*Figure 3.—Caseflow dynamics and median days in care FY1981-2016, Cook County and the Balance of State*

There are two contrasting opinions on the stabilization of the foster care population in



35

Illinois. The first, which is the opinion of the Expert Panel and the parties, is that the child welfare system retains children unnecessarily and far too long in foster care. This is particularly true for children who are taken into foster care in Cook County, where half the children are still in foster care after 1,200 days or 40 months. Cook County consistently registers among the longest median lengths of stay compared to a national average of 14 months. Even though the median length of stay in the balance of Illinois is shorter than in Cook County, it has been steadily rising and at 750 days or 24 months, downstate counties retain children in foster care longer than 1,150 out of the 1,250 U.S. counties for which there are comparable measures.

An alternative opinion is that lengthier stays in foster care in Illinois appropriately reflect the clinical needs of the children who are taken into foster care and the challenging circumstances their families must overcome in order to regain custody. Because Illinois children are removed from their parents at far lower levels than children in other states (Illinois and Virginia are tied for the fewest removals per capita), the reasoning goes that children stay in care because good casework practice dictates that these children should remain in care in order to receive the specialized care and trauma-informed treatment they need.

In order to test the comparative merits of these two alternative opinions, the parties agreed to the creation of four "immersion sites" of small geographic areas that coincide with judicial circuits to fully build, test and implement a core practice model that puts children and families at the center of service planning and builds community and home-based services for children and their families.

DCFS identified the key components to the process as:

(i)     training and coaching of all DCFS and private agency staff in the new Family-Centered, Trauma-Informed, Strength-Based Practice Model practice model for service delivery (referred to here as "FTS");

(ii)    implementation of a new "Model of Supervisory Practice" or "MoSP;"

(iii)    integration of its Quality Assurance Division and Monitoring Divisions in the immersion sites in order to implement a new, Quality Service Review Process (QSR);

(iv)    development of community and home based services for children and families and securing Title IV-E waivers to fund same;

(v)    refinement of a data tracking system to measure outcomes for children;

(vi)    revision of coverage areas for DCFS offices to align them with the boundaries of the State's judicial circuits; and

(vii)    decentralization and internal, DCFS structural changes to improve case flow and day-to-day operational processes.

**Program Evaluation.**  The independent evaluation, which is required by the IV-E waiver demonstration, will test whether the implementation of the core practice model and accompanying systemic reforms improve upon safety, permanency and stability outcomes. Two sorts of comparisons will be drawn for rendering these summary assessments: 1) within-site, historical comparisons and 2) contemporaneous, cross-site comparisons with matched geographical areas.



37

*Figure 4—Median Days in Foster Care, FY1981-2014, Immersion Site, Cook County and Balance of State*

For example, Figure 4 shows that the median days that children in all four immersion sites remain in foster care track closely the trend line observed for the balance of the state outside of Cook County. Combining the data for all four immersion sites helps smoothen the trend lines that jump around when plotted separately for each site. One of the indicators of success is whether as a result of the roll-out of the core practice model and accompanying systemic reforms, the median length of stay in the immersion sites can be shorted to between 400 and 450 days, which is more in line with national levels. In addition, contemporaneous comparisons can also be drawn by comparing length of stay to a comparable sample of counties from the balance of state.

DCFS continues to track data on a statewide, regional and Immersion Site basis for the following outcomes: maltreatment in foster care, repeat maltreatment, child and family team meetings, supervised and unsupervised visits, family reunification within five and 12 months, permanency within 12 months, total permanency achievements by month and year to date, permanency within 12 months, total permanency achievements by month and year to date, placement moves, time to achieve family reunification and intact service levels. Exhibit K, Outputs and Overarching Outcomes: State, Regions and Immersion Sites May 1, 2017.

Health data will also be tracked for yearly EPSDT and dental checkups. Exhibit K, Outputs and Overarching Outcomes: State, Regions and Immersion Sites May 1, 2017, pp. 1, XX-XX. Historical data indicate that compliance for these checkup drops, however as children get older. Additional requirements for review of health information have been added to the review protocols for the Agency Performance Teams reviews of private agencies. Exhibit K, Outputs and Overarching Outcomes: State, Regions and Immersion Sites May 1, 2017. If

38

meaningful improvements can be observed across several indicators in comparison to both historical data and comparable counties, a case for rolling-out the core practice model to another set of immersion sites will be strengthened. If no improvements are observed by the time of the roll-out to the second set of immersion sites, however, attention will either turn to other potential solutions or reconsideration of whether current levels of observed performance are actually consistent with best practice.

The Implementation Plan set the following target dates:  finalization of Title IV-E waiver by September 2016 (now complete), presentation of a Summit in October 2016 to announce the new Core Practice Model (now complete), finalization of the QSR tool by November 2016 (finished late); completion of QSR training by January 30, 2017 (incomplete), and pilot use of the QSR process in at least one immersion site by February 1, 2017 (complete).

DCFS originally projected that it would take until September, 2017 to complete the process in the first four Immersion Sites, and roll-out to additional sites was to occur on a regular basis with a target state-wide completion date of 2019.

**5.      Status Report:**

**Roll-Out to New Immersion Sites.**  The timeline for expansion to new Immersion Sites has not yet been revised.  Rolling out the model to the next set of immersion sites, even before the evaluation of the initial roll-out has been completed, will strengthen the overall evaluation. However, it remains unclear whether the completion date of September 2019 will be met.

**FTS Training and Implementation.**  Critical to the success of any pilot initiative is assuring that a sufficient proportion of the intended recipients actually receive the desired intervention. Ninety-seven percent of the staff in the Immersion Sites completed FTS training. Make-up sessions are being offered on a rotating basis between Immersion Sites for the staff that

did not complete the FTS training and for newly hired staff. Four Month Status Report Update Immersion Sites; Four Month Status Report Update Core Practice Model. A web-based, self-directed version of FTS training is currently in development and will replace the makeup sessions in the future.

DCFS identified staff in the Immersion Sites who needed a more limited version of the FTS training and those staff completed the abbreviated self-directed version of FTS training. Ninety-four percent of the staff identified completed the abbreviated self-directed training through March 31, 2017. The following shows the completed FTS classroom trainings by Immersion Site:

| | | |
|---|---|---|
| Total targeted CLASS ROOM participants [4] | 458 | |
| Total participants who have completed FTS CLASS ROOM training | 446 | 97.38% |
| Total participants registered for upcoming CLASS ROOM training | 0 | 0.00% |
| Total participants not completed or not registered for CLASS ROOM training | 12 | 2.62% |
| Total participants scheduled for SELF DIRECTED learning - NON RESIDENTIAL [5] | 59 | |
| Total participants completed SELF DIRECTED learning - NON RESIDENTIAL | 56 | 94.92% |

**Procedure 315 Training**. As of March 30, 2017, 100% of permanency and adoption staff, including supervisors and managers in the immersion sites have completed training in revised Procedure 315.

Makeup sessions are being offered for this training as well, on a rotating basis between Immersion Sites, to account for newly hired staff and staff who need make-up sessions.

**MoSP Training.** The delivery date for the Model of Supervisory training was November, 2017, but has been pushed to December, 2017. The training will include a combination of classroom training and individual coaching. Initial presentation of the training in Immersion sites is currently scheduled to begin in December. A training schedule will be developed during the next reporting period.

**CFTM Training.** Significant delay was encountered in finalizing and executing the contract with CWG. The contract was finally signed on April 10, 2017. Under this contract, CWG will provide both training and coaching for the CFTM and the QSR processes.

CWG has completed the CFTM curriculum, including a "Preparing and Facilitating Child and Family Team Meetings Illinois Department of Children and Family Services Trainer Manual" and a "Preparing and Facilitating Child and Family Team Meetings Illinois Department of Children and Family Services Participant Workbook."

DCFS and CWG developed a plan for moving forward on the CFTM training and coaching. CWG consultants and Immersion Site directors met in May 2017 to analyze local data and develop a one day Leadership Summit for each Immersion Site for the broader child welfare community to explain the importance of the CFTM training and the role of the QSR process in overall quality improvement. CWG staff aligned specific trainers and coaches in each Immersion Site. During June 2017, the one day Leadership Summits are scheduled in each Immersion Site. The first round of CFTM training will commence in July or August 2017 in each Immersion Site.

**QSR Training and Implementation.** The CWG contract also provides for training and support for the QSR process. CWG recommends that the training be done in parts: an initial training, participation in an on-site review and, after the conclusion of three on-site reviews with

41

the participation of a CWG mentor, additional advanced training that will prepare them to become a mentor/trainer in the QSR process going forward. Exhibit C, Four Month Status Report, Immersion Sites.

The current goal is to have a total of eight QSR reviewers who are able to complete independent QSR reviews and are then able to train and mentor other staff to complete the QSR process. To date, DCFS has hired four dedicated QSR reviewers, one headquartered in each Immersion Site. The QSR process includes case sampling for each review, identification of case-stakeholders for in-person interviews, review of case documentation, rating of the case and worker on the specific case. Exhibit XX, Four Month Status Report, Immersion Sites.

**Service Provision.** Contracts for lead agencies in each of the Immersion Sites were finalized and executed in April 2017. The lead agencies are: United Methodist Children's Home in the Mount Vernon Immersion Site, Lessie Bates Davis in the East St. Louis Immersion Site, Bethany in the Rock Island Immersion Site and NiCASA in the Lake County Immersion Site. Exhibit C, Four Month Status Report, Immersion Sites.

The contracts provide for delivery of intensive and in-home evidence based services within the Immersion Sites. Each contract is premised on wrap-around principles and contains flexible funding for the development of individualized services and supports to meet the needs of individual families. Each Immersion Site program was taking referrals by the first week in June. Training in an evidence-based wraparound principles was also completed during the first week in June. The flexible funding provided and the community networks supporting each program make it possible to engage a wide array of individualized services for families and their children, such as emergency housing through the now de-centralized Norman funds; support services for substance abuse, mental health, domestic violence; and family support services such as child

care, home aides and parent education. Family needs and strength are defined through the CFTM process and the lead agency providing the service array is responsible for responding to the defined needs identified in the CFTM. Exhibit C, Four Month Status Report, Immersion Sites.

**IV-E Waiver.** The Administration for Children and Youth asked DCFS to provide a detailed plan for implementation of the IV-E waiver by April 2017. DCFS has submitted that detailed plan. The Waiver has been granted and the additional funding and flexibility is built into the DCFS budget.

**Office Realignment.** DCFS developed a plan to align regional and field offices with judicial circuits. It was anticipated that the plan would be ready for review by the Director and for union negotiations by March 31, 2017. That has not yet occurred.

**Restructuring and Decentralization.** DCFS continues to work on structural issues to better align with practice goals and expectations in the Immersion Sites.

DCFS committed to "retooling" the Integrated Assessment process, to transformation of the CIPP process into the CFTM process, and to delegation of the placement matching process to teams in the Immersion Sites by April 30, 2017, and further committed to developing a plan for statewide implementation by the end of the current reporting period. Discussions with CWG led to the conclusion that the exact role of Integrated Assessment and how it fits with the CFTM training and coaching going forward requires more study.

6. **Revised Targets / Goals:**

**Roll-Out to New Sites,** DCFS is planning to hold its Second Annual Transformation Summit on August 8, 2017 to August 10, 2017 in Springfield, Illinois. The theme of the Summit is "Pursuing Permanency: Cultivating, Maintaining and Supporting Lifelong Connections."

Exhibit L Save the Date PDF document. However, it is still too early to roll out the Immersion Site process in any additional locations, and it also is still too early to state with confidence whether statewide rollout by September 2019 is realistic. DCFS will consult and work collaboratively with the Expert Panel and Plaintiffs regarding any adjustments in the timeline for adding new Immersion Sites for the remainder of the state.

**FTS Training and Implementation.** This has been completed in the four initial Immersion Sites, as over 97% of DCFS and private agency staff have been trained. Makeup sessions will be made available for staff that still require training and a web-based training will be developed for future training.

**Procedure 315 Training.** All staff in the Immersion Sites have completed this required training.

**MoSP.** The MoSP training is projected to begin in December 2017.

**Child and Family Team Training.** The Immersion Site directors and staff from CWG will meet by the end of May 2017 to complete a data analysis and develop Leadership Summits for community stakeholders in each Immersion Site regarding the importance of and the plan for implementing CFTM training in each site.

The Leadership Summits that must precede CFTM training will be held by the end of June 2017. Initial CFTM training will commence in July 2017 and run through August 2017. The initial training will include 18 supervisors and six coach candidates and the training will include both education and observation. Exhibit C, Four Month Status Report, Immersion Sites. The training plan includes training coaches who will be trained to facilitate CFTMs, to coach CFTMs and then to become Master Coaches and Trainers for other DCFS and provider agency staff. The goal is to develop the initial coach candidates into Master Coaches by December

2017. Master coaches will be approved to develop additional cohorts of supervisors and coaches and to provide the CFTM training to additional staff. Exhibit C, Four Month Status Report, Immersion Sites.

The second round of CFTM training is scheduled to commence in September 2017. This schedule is subject to modification based on the progress of round one CFTM trainees.

**Quality Service Review Process.** The four dedicated QSR reviewers will conduct a second round of QSR reviews with the CWG mentors in June 2017 after they complete a refresher training with CWG on June 1-2, 2017. A second group of new QSR reviewers are scheduled to begin training in August 2017. DCFS will work closely with CWG to make any needed adjustments to this schedule.

**Service Delivery.** With lead agency contracts now in place for each Immersion Site, the DCFS Clinical Division will guide development and implementation of in-home services. The Clinical Division has provided consulting in the development of each Immersion Site's service array. DCFS is building service level expectations into each of the lead agency contracts. The Immersion Site Directors will be responsible for identifying gaps in available services. Service gaps will be identified and solutions developed through the ongoing stakeholders planning process which is active in each Immersion Site.

**Realignment of Office Areas.** The plan for realignment has been completed but not yet executed. When Interim Director Spacapan takes office she will be briefed and decisions will made as to the next steps that need to be taken with regard to the realignment plan.

**Restructuring and Decentralization.** During the next reporting period, DCFS will work intensely with the CWG staff to develop a plan, including a timeline and action steps to fully align the Integrated Assessment process into the Child and Family Team process and to

integrate clinical staff into that process. In that same timeframe, the CIPP assessment and planning process will be progressively transitioned into the CFTM process as the CFTM training and coaching is implemented. The Central Matching Unit is currently delegated to the Immersion Sites and will be fully integrated into the CFTM process as the CFTM training and coaching proceeds. Full implementation of integration of the matching process into the CFTMs will be completed as the CFTM training and coaching process achieves its goal of creating a total of 96 CFTM facilitators, master coaches and coaches in December 2017.

Clinical staff will be engaged in cases where youth experience more complex behavioral and emotional problems from the very beginning of the case and will remain involved with the CFTM. These assessments will drive the development of individualized plans and the delivery of needed services for youth with serious mental health and behavioral needs.

**Program Evaluation.** Details of the outputs and proximal and distal outcomes are stated in considerable detail in the status report on Immersion Sites. A few highlights include outputs such as deepening worker knowledge of the family centered, trauma informed and strength based framework which is the foundation of the DCFS practice and deepening worker understanding of the path to permanency enhanced by new opportunities, such as family finding, state subsidized guardianship and fictive kin. In addition, a plan will be developed during the next reporting period to address the apparent failure to timely provide EPSDT screenings and dental care to older youth. This plan will be implemented in the Immersion Sites.

F.     **Panel Recommendation #3:**

Fund a set of permanency planning initiatives to improve permanency outcomes for adolescents who enter state custody at age 12 or older either by transitioning youth to permanent homes or preparing them for reconnection to their birth families reaching adulthood. (Implementation Plan, pp. 38-42).

DCFS is pursuing two initiatives in accordance with this Recommendation – the Fictive Kin/ State Funded Guardianship, and Family Finding. Figure 5 updates the statewide permanency chart for older youth, which was included in Report of the Expert Panel that was submitted to the Court in July of 2015. It was the opinion of the Expert Panel that the permanency options made available to adolescents who were unable to reconnect with their birth families were either too few or insufficiently explored by DCFS. Recent data show an uptick in the percentage of older children who are returned to their parents' homes. This is a welcomed change. On the other hand, the Report of the Expert Panel showed that less than 3% of adolescents who entered DCFS at age 12 or older were discharged to permanent guardianship arrangements within 5 years of case opening. Two years later, the update data show that the percentage has declined even further to 2%. This compares to 7% that was the norm during the mid-2000s. Placement of older youth in adoptive homes has also declined. Even though more should be done to find adoptive homes for older youth in care, the termination of parental rights (TPR) and reassignment of legal responsibilities to another set of parents have always been a difficult transition for older youth to accept.



*Figure 5—Permanency Outcomes within Five Years of Case Opening, Children Aged 12 and older at Case Opening*

Regular teleconference calls regarding the status of B.H. projects with DCFS project managers, the Expert Panel, and the parties have reinforced the need for expanding the permanency options available to older youth. One of the explanations for the decline in the use of subsidized guardianship was the restriction of eligibility for federal kinship guardianship assistance to only youth in licensed kinship care. Prior to the enactment of the federal Fostering Connections Act in 2008, guardianship assistance was available to all kinship caregivers regardless of their licensing status as well as to non-related foster parents. The changes to the State Funded Guardianship Program and the redefinition of relatives to include current foster parents if the youth has been in the home for one year and has developed a family-like

connection will restore these permanency options to families. Each initiative is discussed separately below.

**G.**     **Panel Recommendation # 3:  Amended Definition of "Fictive Kin"**

**1.**     **Project Goals/Target**

The Implementation Plan contemplates that amendments to expand the definition of fictive kin will improve permanency options and lead to improved well-being.  DCFS committed to updating its administrative rules with the expanded definition of fictive kin after January 1, 2017, which was the effective date of the statutory change to the Children and Family Services Act.  Implementation Plan, pp. 39-40.

**2.**     **Status Report:**

DCFS is currently engaged in rulemaking for DCFS Rules 300, 301, 302, 304, 309, 315, 328, 337, 338, 359 and 402, which includes the updated definition of fictive kin.  The First Notice period was completed on April 3, 2017 and DCFS received no comments on the proposed changes.  DCFS is proceeding in Second Notice and anticipates this will be completed within approximately 60 days.  Exhibit M, Four Month Status Report Amended Definition of Fictive Kin and Expanding State Funded Guardianship.

Training on revised Procedure 315, Permanency Planning, includes training on the expanded definition of fictive kin.  All immersion site permanency and adoption staff have completed Procedure 315 training.  Additional staff throughout the state are also engaged in revised Procedure 315 training, which was scheduled for completion by May 31, 2017.  Exhibit M, Four Month Status Report Amended Definition of Fictive Kin and Expanding State Funded Guardianship.

DCFS continues to track placements with fictive kin.  As previously reported, from January 1, 2015 to December 31, 2016, there were 1236 youth placed with fictive kin.  From

January 1, 2017 to May 1, 2017, 650 youth statewide have been placed with fictive kin, with 37 of those placements made after February 28, 2017. At the present time, DCFS is unable to identify how many of the 650 fictive kin placements made through May 1, 2017 are attributable to the expanded definition of fictive kin. However, DCFS is currently developing business rules which will be able to identify those fictive kin placements due to the expended definition of fictive kin. Exhibit M, four Month Status Report Amended Definition of Fictive Kin and Expanding State Funded Guardianship.

3.     **Revised Targets / Goals:**

**Tracking Outcomes.** DCFS will continue tracking placements and outcomes of youth in fictive kin homes to monitor for safety, stability and permanency. The mechanism for tracking youth in fictive kin is a dashboard in the Mindshare platform. Safety and permanency will be measured by no moves being recorded for those youth who have been placed in the home of fictive kin. The permanency for those youth will be tracked via discharge to either home of parent/home or home of guardian of home of adoptive parent where a previous home fictive kin was recorded. Any placement move from fictive kin will be provided in a report for regional review and follow-up for stability.

**Training – Procedure 315.** The completion date for DCFS training on Procedure 315 has been revised. Per the DCFS Training Division, there are approximately 160 staff that still need to be trained and some newly hired staff who will also need this training. Based on this information, the anticipated timeline for completion is June 30, 2017. The anticipated date for the self-directed web based training for investigative and intact staff is also June 30, 2017.

**Data Collection.** Project management staff are working on clarification and completion of business rules and data elements for Family Finding and state-funded guardianship/Kin Gap.

Once those rules and data elements are completed, the project managers will review them with the Expert Panel to ensure that the appropriate information is being collected.

H.   **Panel Recommendation # 3:  Expanding State Funded Guardianship**

**1.   Project Goals/Target:**  The Implementation Plan contemplates that DCFS will amend its administrative rules to expand the eligibility for state funded guardianship.  DCFS committed to completing the amendments by December 2016. Implementation Plan, p. 39.

**2.   Status Report:**  DCFS is currently engaged in rulemaking for DCFS Rule 302.410 which includes the expanded definition of state funded guardianship.  The First Notice period was completed on April 17, 2017 and DCFS received no comments on the proposed rule change.  DCFS is proceeding to Second Notice and anticipates this will be completed within approximately 60 days.  Exhibit M, Four Month Status Report Amended Definition of Fictive Kin and Expanding State Funded Guardianship, p. 1

Effective April 1, 2017, Administrative Case Review (ACR) staff are required to implement questions during every ACR to assure that state-funded guardianship is being pursued for all eligible youth 12 years of age and older where the goals of return home and adoption have been ruled out.  Information on the responses will be included in the ACR feedbacks and the ACR reporting system.  Eventually, data will also be collected through the dashboards of the Mindshare platform.

Initial data from the ACR system, as an example, indicates that state funded guardianship is being pursued for youth in eleven of 16 applicable child cases reviewed where a child is placed in a non-licensed relative home and in 15 out of 19 cases in which the youth was placed in a licensed non-relative home during the ACR process in April 2017. State funded guardianship should have been pursued for all of those cases but was not because the question of

whether state funded guardianship was not being asked at the ACR in all cases where a youth might be eligible.  To address this, effective July 1, 2017, the question of whether state funded guardianship is being pursued with be asked at ACRs for all youth age 12 and older who have permanency goals other than adoption. Previously, the question of whether state funded guardianship was being asked only for those youth age 12 and older who have a goal of guardianship.  To be eligible, youth also must be placed in a non-licensed or licensed relative home.  Siblings under the age of 12 who are placed in the same home as an eligible youth are also afforded the state funded guardianship option.  Exhibit M, Four Month Status Report Amended Definition of Fictive Kin and Expanding State Funded Guardianship.

DCFS previously committed to developing a dashboard in the Mindshare platform that will allow program managers to be able to identify youth eligible for specific subsidies, such as the state funded guardianship program, in order to move them to permanency.  To date, the dashboard has not been developed and no target completion date has been set.

### 3. Revised Targets / Goals:

Completion of the rulemaking process for state funded guardianship should be completed by July 31, 2017. Commencing in this reporting period, regular monthly reports will be generated on youth eligible for state funded guardianship and the KinGAP program.  Exhibit M, Four Month Status Report Amended Definition of Fictive Kin and Expanding State Funded Guardianship.  Youth eligible for the programs will be identified by a review of the youth's age, permanency goal and type of living arrangement.  The monthly reports will contain identifying information regarding the youth in care, including the age of the youth, the type and date of the current placement, the current permanency goal and the date the current permanency goal was set.  Cases with potential eligibility for state funded guardianship and KinGap will be identified

by ACR reviewers, Adoption Specialists and Agency Performance Team staff. ACR still send an alert or critical notice to the assigned caseworker, supervisor, regional adoption supervisor and regional agency performance staff. Adoption staff, along with agency performance staff, will be responsible for addressing eligibility for guardianship with the assigned caseworker and supervisor.

The Mindshare dashboard for state-funded guardianship and KinGAP will be completed during the next reporting period and the date for the completed validation of the dashboard will be determined once the dashboard has been finalized. The finalization of the dashboard in the Mindshare platform will eliminate the need for multiple monthly reports.

Tripling the percentage of youth who attain permanence after entering foster care at ages 12 and older from its current level to 6% at the end of an entry cohort's third year in foster care is a reasonable goal. Work will commence on achieving this object first in the immersion sites.



*Figure 6 Permanency Outcomes for Children Aged 12 and Older at Entry into Foster Care, Immersion Sites*

Figure 6 compares the permanency outcomes within five years of case opening for youth who entered care at ages 12 years old and older in the four immersion sites. The utilization of subsidized guardianship has fallen off in all immersion sites, with the exception of Rock Island. In spite of the slight uptick in reunification rates in East St. Louis and Mt. Vernon, the overall trend has been downward in all immersion sites. As a result, the percentage of youth who turn 18 years old while in care has doubled in all immersion sites from 15% in the 1980s to 30% in the 2010s. As the prospects for legal permanence diminish sharply for youth who attain majority age while in care, the chances that these young folks will age out of care without the support of a

permanent family is highly probable. Some of these former youth in care will find their way safely back to their families of origin, but a substantial fraction will experience bouts of homelessness, fall prey to sexual trafficking, or end up in toxic relationships. For these reasons, it is extremely important to prevent these adverse experiences to the extent possible by embedding youth in relationships of both relational and legal permanence before they reach the age of majority,

I.     **Panel Recommendation # 3:  Family Finding**

1.     **Project Goals/Target:** One of the initiatives DCFS is undertaking to ensure that no youth ages out of foster care without some permanent family connection is Family Finding. The Implementation Plan requires DCFS to implement specific "family finder" strategies as part of permanency planning for adolescents who do not have an obvious reunification plan. Implementation Plan, p. 40.  The goal of DCFS's Family Finding strategy is to improve permanency outcomes for all youth by identifying family that can serve as potential placements, supports or resources for youth.  Implementation Plan, pp. 40-42. Per DCFS procedures, a goal of "independence" should never be assigned to children under the age of 16 years old. But even for older children, the independence goal should be used sparingly. It is extremely difficult for youth to establish and maintain lifelong supports and connections on their own, even after family finding activities have taken place. Thus every effort should be made to explore adoption and subsidized guardianship options with a youth's current caregiver or identify through family finding efforts other individuals who are willing to make a permanency commitment as a legal guardian to whom the youth can look to for guidance, encouragement, and membership as they transition to adulthood.

DCFS committed to revising its rules and procedures to enhance family finding efforts on all levels. Family finding efforts are to be conducted for all children and youth entering care with

a return-home goal. The revised rules and procedures will require all child protection, intact and permanency staff to seek out non-custodial parents, relatives and fictive kin when placing a child or youth.

DCFS further committed to requiring Permanency Achievement Specialists within each DCFS region to conduct family finding tasks, and that these Specialists would be available to both DCFS and private agency staff to provide technical assistance on complex or difficult cases to identify barriers to permanency through methods of file mining, family meetings, trainings or other assistance. The self-directed web-based training for Family Findings began in March 2017 and is available to DCFS staff, private agency staff, and administrators via the DCFS Virtual Training Center. The web-based training currently is a component part of the Foundations training for new permanency staff, and will be included in the Foundations training for child protection staff as well.

 Additionally, the Plan states that ACR staff will flag cases where family finding is not occurring or where there is a barrier to permanency so that DCFS and private agency staff can be made aware of the issues and take steps to rectify the problems.

No dates for the above commitments were specified in the Implementation Plan. During the next reporting period, DCFS will set target dates for accomplishing these objectives now that is has a concrete plan.

**2.      Status Report:**

**Refocused Efforts on Youth 12 and Older.**  In the prior Report, DCFS committed to refocus its family finding efforts on adolescents with emotional and behavioral health in order to locate additional placements or supports for those children.  DCFS has identified youth over the age of 12 to determine whether any family finding activities were completed for the child.

Relying on DCFS form 151-H or through a case note, DCFS has identified 698 youth out of 31,547 youth to date who have had family finding activities documented in their case files through the DCFS 151-H form or through a case note. This data was pulled from all youth who entered care at age 12 or who became 12 years of age or older from July 2010 to April 30, 2017. Exhibit N, Four Month Status Update, Family Findings. DCFS has a number of strategies to address those cases where no family findings efforts are documented. For those youth, when an ACR is held on the case, the ACR reviewer will send a feedback to the assigned caseworker and supervisor. A feedback is a narrative report used by the ACR to provide case status information in relationship to permanency, safety and well-being of the children in care and their families. There are three types of feedbacks:

1) The Monthly Feedback which is a written summary of the status of a case after it has been administratively reviewed. The Monthly Feedback documents that DCFS policy is being followed, that there is a plan for permanency, that the youth's needs are being met and that the youth are safe while in the custody of DCFS;

2) The Monthly Feedback with Alert issues is a written summary of a lack of needed services to children and/or families and/or unmet needs that jeopardize a child's safety, well-being and/or timely achievement of permanency. The alert feedback is also used to address specific issues that have not risen to a critical level, but need the attention to present the issue from rising to a critical level. The alert feedback is designed to address moderate risk issues requiring further action and resolution by the worker and supervisor.

3) The Critical Feedback is a written summary of issues where there is a violation of DCFS rules, procedures or policies, laws or court orders that endanger the safety,

well-being and/or permanency of children and youth for whom DCFS is responsible, including neglect of a child's mental health, medical or safety needs.

4) The interim Feedback is a written narrative indicating the status of resolution for a previously identified critical issue. This feedback is only written on cases following an interim ACR which is required within one to three months following identification of a critical issue. This interim feedback is to help ensure that the critical issue is being address for resolution expeditiously.

DCFS project management staff will also provide reports to Regional Administrators for cases in their region who have had no family findings work completed. The Regional Administrators will review the reports and provide them to assigned caseworker and supervisory staff to ensure that the family findings work is being completed.

**Mindshare Dashboard**. DCFS staff completed work on the Family Finding dashboard in the Mindshare platform. Exhibit N, Four Month Status Update, Family Findings. That dashboard, which still requires validation, went live on April 14, 2017. The dashboard encompasses all youth in care, however, specific measures for youth ages 12 and older are being reviewed and validated. Those specific measures include: the number of youth ages 12 and older with noted relative or fictive kin supports; the type of living arrangement where the youth resides, such as placement with relatives (HMR), fictive kin (HFK) or home of relative (HMP), after family finding efforts were completed; the length of stay in each type of placement (indicating stability) and legal permanency type. Exhibit N, Four Month Status Update, Family Finding.

**Inclusion of Family Finding in ACR.** Effective April 1, 2017, ACR staff are required to ask questions at every ACR to assure that family finding activities have been completed. This

information will be contained in ACR feedbacks and in the ACR reporting system. Initial data indicates that family finding activities, through a review of the case by the ACR reviewer, were completed in 632 of 864 applicable child cases that had an ACR review in April 2017.  Exhibit N, Four Month Status Update, Family Findings.

**Webinar Training.**   On March 2, 2017, the Family Finding webinar training was released.   It is mandatory on-line training for all child protection and permanency staff and supervisors.   As of April 28, 2017, 1,045 staff completed or are in process of completing the training.  Exhibit N, Four Month Status Update, Family Finding.

**Procedure 315 Training**.  DCFS began offering training on Procedure 315 in its revised format, which addresses family findings issues, in December 2016.  A separate, self-directed web based training on Family Findings, which provides an overview of the family finding philosophy and direction on how to complete and record family findings activities, was implemented in March 2017 on the DCFS Virtual Training Center.  DCFS previously anticipated that by May 31, 2017, all permanency staff would have completed the training.   During the next reporting period, DCFS will report on whether that goal was met.

3.    **Revised Targets / Goals:**

**Refocused Efforts on Youth 12 and Older.**  DCFS is currently completing the plan for refocusing its family findings efforts for youth in care who are ages 12 and older.  This plan will be completed by the end of June 2017.

**Efforts Addressed to Remaining Youth.**  The B.H. Expert Panel suggested inclusion of the 0-3 population to family finding/sub guardianship/expanded KinGap. The Mindshare dashboard will have fiscal year entry cohorts, so DCFS will be able to review if the youth who are entering care have family finding activities completed. These dashboards encompass all

youth in care regardless of their age. The reports will permit data sorting by DCFS region, POS agencies and DCFS offices. It will also allow for the isolation of the targeted population of those youth over the age of 12 and those youth ages 0-3.

**Mindshare Dashboard.** DCFS will complete validation of the Family Finding dashboard by June 30, 2017. A meeting is scheduled for June 8, 2017 to discuss finalization and determine if other business rules are required since family finding, fictive kin and state-funded guardianship were combined into one project as they are interrelated. These were combined after review by the B.H. Expert Panel and the decision that family finding is an activity that will help assist in the identification of relative or fictive kin, which may lead to permanency through the state funded guardianship and KinGap options for youth.

**Inclusion of Family Finding in ACR.** Family finding questions were added to the ACR review packet effective April 1, 2017. These reports will be sent to the Regional Administrators to be disseminated to both DCFS permanency staff as well as POS permanency staff. This information will also be sent via feedback system described above. The DCFS Regional Administrators will be responsible to ensure staff are completing the family findings work in accordance with DCFS procedures

**Webinar Training.** The target date for completion of the Webinar training has been extended to June 30, 2017. The web-based training is now a part of Foundations training for all permanency/placement staff/and will remain on the VTC for all other disciplines.

**Procedure 315 Training.** The target date for completion of this training has been extended to June 30, 2017.

**J.      Panel Recommendation #4:**

Retain an organizational consultant to aid DCFS in "rebooting" a number of stalled initiatives that are intended to address the needs of children and youth with psychological,

behavioral or emotional challenges" (Implementation Plan, pp. 42-43). Recommendation #4 addresses two points - DCFS reorganization, and "rebooting" stalled initiatives intended to meet the needs of specific youth. DCFS identified two initiatives that needed to be "rebooted." DCFS's reorganization and those two programs – Birth to Three (IB3) and Safe Families for Children (SFC) – are discussed below. In addition, DCFS identified various IT projects, including updating or expanding certain information systems and applications and implementing a data analytics system intended to alert investigators of children at exceptionally high risk of serious harm, as part of its response to this Recommendation. Those projects are also addressed below.

   **K.   Expert Panel Recommendation # 4:  Reorganization**

   **1.    Project Goals / Target:** The Implementation Plan called for DCFS to create a high level unit with cross-organization authority to develop an implementation plan, manage the implementation and resolve system barriers. It also noted that the organizational consultant should evaluate the organizational structure and culture of DCFS; the effectiveness of DCFS' policies, procedures and programs; the effectiveness of DCFS's leadership and managerial structure and function and to assess the supervisory functions of the agency.  Implementation Plan at pp. 42-43.

   **2.    Status Report:**  Director Sheldon has announced his resignation effective June 15, 2017.  DCFS General Counsel Lise T. Spacapan has been named the Interim Director.  The Governor's Office has advised that a nationwide search for a new Director will be undertaken.

   **3.    Revised Targets / Goals:**  None at this time.

   **L.   Panel Recommendation # 4:  Illinois Birth Thru Three (IB3)**

   **1.    Project Goals / Target:**

The Illinois Birth Thru Three (IB3) is a five-year federal demonstration project that began in 2012 which DCFS will complete within the original timeframe specified in the terms and conditions of its IV-E waiver agreement with the federal government. The project provides two evidence-based interventions, singly or in combination – Child Parent Psychotherapy (CPP) and Nurturing Parenting Program (NPP) – to parents and children in Cook County, regardless of Title IV-E eligibility, in order to reunify children with their parents more quickly and reduce the risk of re-entry to the child welfare system.  Implementation Plan, pp. 22-26.

2.      **Status Report:**  DCFS still intends to complete the pilot by September 30, 2018, and seek renewal of the waiver for an additional year.  The target number of children to be served through the program is 2,400.  Since the last reporting period, an additional 50 children were added to the program, which increases the total to 1,816.  It is anticipated that another 580 children will be enrolled when the 5-year enrollment period ends on June 30, 2018. Exhibit O, Four Month Status Report:  Illinois Birth Through Three Project, p. 1.

**Loss of Credentialed Staff.**  DCFS previously noted that one challenge to the program was that participating agencies were having difficulty retaining credentialed staff.  The project now employs a CPP consultant who can support linking newly hired staff with Learning Collaboratives as well as provide support as they gain experience. Similarly, the statewide expansion of NPP will allow for ongoing training of new providers.  The program is now fully staffed.

**Lack of Engagement by Birth and Foster Parents.**   Another difficulty with the program has been encountered due to a lack of engagement by some birth and foster parents. DCFS developed a model of on-site field support for participating agencies, with a support specialists assigned to each agency.  The specialists were on-site on a monthly basis to provide

62

coaching and support.  In addition, specific offices and agencies were targeted for case status reviews[7] and permanency plans for IB3-involved families.    These services continue and will be expanded. The primary lesson has been that it is important to distinguish parental compliance with IB3 services from progress in all domains addressed by the service plan. Key parent risk/safety factors (rooted in trauma history) and level of progress in addressing these concerns including: mental health, substance abuse, domestic violence, housing, and low or unstable income were the common barriers that continued to adversely impact permanency.

A significant issue for the program has been a lack of engagement by participants.  In the last reporting period, DCFS committed to providing a 10% increase in the implementation support for this program, and that support was to be provided for 10 agencies providing casework services to children enrolled in the IB3 program.  This increased commitment was intended to improve engagement in the program.  The additional support DCFS promised was provided.

There are currently three Nurturing Parenting Program (NPP) groups for birth parents and all provider agencies are fully staffed.  NPP is one of the evidence-based interventions upon which the waiver is premised.  A total of 54 parents have completed the service during Fiscal Year 2017.  Exhibit O, Four Month Status Report:   Illinois Birth Through Three Project, p. 1. There is also a NPP in process for foster parents. A total of 27 foster parents have completed an NPP program during Fiscal Year 2017.  Of the 104 foster parents that have completed NPP, 48% completed during the current fiscal year. The program attributes this to efforts of the implementation team to engage agencies to commit to enhancing outcomes for this population.

---

[7] The focus of these reviews is permanence, and the case under review is used to help illustrate and discuss parent / foster parent engagement and the available evidence-based interventions that should be undertaken.

The strategy for developing foster parent engagement is the addition of an on-site support specialist for each agency that provides coaching and other supports. Exhibit O, Four Month Status Report: Illinois Birth Through Three Project, p. 1.

DCFS has implemented a continuous quality improvement plan in a further effort to increase the engagement rates for foster and birth parents served by the two agencies with the lowest engagement rates. Exhibit O, Four Month Status Report: Illinois Birth Through Three Project, p. 2. The first phase of Child Parent Psychotherapy Continuous Quality Improvement meetings has taken place. Exhibit O, Four Month Status Report: Illinois Birth Through Three Project, p. 1. Data demonstrates that current engagement rates (of natural or foster parents or both?) vary across the providers from a low of 41% to a high of 82%. Data demonstrate that current engagement rates of natural and foster parents has substantially improved with a mean of 71%. The Support of the CPP consultant and the development of specific CQI plans for CPP will continue.

3. **Revised Targets / Goals:** Permanency outcomes have finally begun to improve for the better for the intervention group compared to the comparison group. The most notable difference is the higher combined rate of reunification or placement into subsidized guardianship with kin in the intervention (+8.8 percentage points), which exceeds the statistical threshold of significant difference ($p < .010$). Excluding guardianships, however, the difference in reunification rates (+5.0 percentage points) drops below the conventional threshold of significance but still is trending in the desired direction ($p < .132$). The higher rate of guardianship in the intervention group is offset to some extent by a higher rate of adoptions in the comparison group, which narrows the difference in overall permanency rate to +4.4

percentage points. While not statistically significant, the difference is trending in the expected direction (p < .143).

Despite these improvements, only 25% of the 268 infants and toddlers who were screened and referred to IB3 interventions during fiscal year 2014 had been reunified with their parents or permanently placed through adoption or guardianship after 24 months in care. This constitutes only a marginal improvement over historical baselines and falls far short of the desired goal of closing the permanency gap with downstate counties. Historical data show that children who enter care between the ages of birth through 3 years old in Cook County spend an excessive amount to time in DCFS custody compared to similarly aged children who enter care in downstate counties. There is a 20 percentage-point gap in permanency outcomes between Cook County and downstate counties, which emerges after three years since case opening. Even though the gap narrowed during the mid-2000s due largely to a surge in adoptions of infants and toddlers, the gap has widened again in recent years.

Based on historical trends, the likelihood that this permanency gap can be closed by reunifying children with their birth family after the third year in foster care is extremely slim. Less than 6% of infants and toddlers reunify with their birth families after 36 months in care. This is true for children in both Cook County and Downstate counties. The slim chances of reunification after an extended period of out-of-home care is borne out by over 50 years of permanency planning research. Concurrent planning should in some cases continue, but permanency goals must begin to shift toward adoption and guardianship by the end of a child's third year in care. Therefore, the IB3 quality improvement team will be offering support to the 10 intervention agencies that provide casework services to children enrolled in the IB3 program in an effort to improve engagement of relative caregivers and foster parents in IB3 services.

To support further improvement in permanency outcomes, Dr. Steve Budde, Juvenile Protection Association, initiated a reunification viability review of cases with a special focus on families who completed the parenting programs but have not received their children back into their custody. Supervisors have reported that the review has been helpful in support of case conceptualization and permanency planning. Three hundred cases will be used to test the new protocol to assess the viability of alternative permanency options for children enrolled in the IB3 interventions.

**M.**     **Recommendation # 4:  SAFE Families for Children (SFC)**

**1.**     **Project Goals / Target:**  The core objectives of SFC include deflection of youth from child welfare custody, child abuse prevention, and family support and stabilization. As noted in the First Interim Triannual Report to the Court, the program cannot be evaluated until there are a total of 475 families in the control group and 475 families in the comparison group. Due to low engagement, DCFS has reexamined and modified the process for engaging families in SFC so that the evaluation can be completed.  SFFC has been in place in northern Illinois for over ten years and was expanded statewide in October 2015, but even after that participation in the program has lagged behind expectations. Implementation Plan, pp. 44-46.

**2.**     **Status Report:**

In the last reporting period, DCFS committed to continue making individual contact with families referred to the program in order to increase engagement and participation.  For the month of February, referrals were down to only 4 families (compared to 12 and 11, respectively, for the prior months of December and November. But current projections are that referrals for March will match the earlier levels, but still are below the desired target of 20 new families per month.

DCFS has fixed one major implementation glitch that was discovered during the pilot evaluation phase. There have been no duplicate assignments of cases to intervention and comparison groups since June of 2016. Unfortunately, the problem of identical cases being assigned independently by DCFS and SFC to different assignment groups has not been ameliorated. DCFS attempted to solve the problem by giving "read-only" access of the SACWIS assignment screens to SFC. This appeared to solve one of the reasons for the cross-overs of cases from comparison to intervention conditions. SFC was able to stop accepting referrals from already assigned cases by checking the SACWIS randomizer in advance. However, it was discovered that calls were being made to SFC prior to workers' making the assignment in SACWIS. As a result, two of the referrals since March 1, 2017 have resulted in mixed assignments because DFCS workers completed the case assignment in SACWIS *after* the call was made to SFC (which randomized the case on its own). In the hopes of eliminating the "dueling randomizers," Mike Ruppe and Nora Harms-Pavelski met with one of the Expert Panel members in April to explore the possibility of allowing SFC access privilege to use the SACWIS randomizer. This proved to be too drastic a departure from confidentiality rules so DCFS proposed another potential solution.

The current plan in the works is that SFC will not activate its own randomizer when a call is made directly to them within the hours of 8 am to 4:30 pm. Instead, a DCFS has identified a staff person whom SFC can call during work hours who will have access privileges to activate the randomizer. After hours, the SF randomizer will still be available for use and will override any assignments made by DCFS.

Another implementation problem has been the lack of follow-though on families assigned to the intervention group for whom DCFS has indicated in SACWIS that the family has agreed to

accepting SFC hosting services. Since the first triannual report was submitted, only one-half of the families (50%) who agreed to hosting services were put in contact with SFC. DCFS has arranged for the Associate Deputy for Child Protection to be informed of DCFS staff who were not responding to Safe Families inquiries regarding the status of referred families, so that appropriate action could be taken.  This process is in place and a tracking mechanism is being developed to track this information.

DCFS also committed to have developed a method for tracking family engagement, whether to create a referral form to assist with tracking, and whether and how expansion of the program will be needed to better serve children in the first four Immersion Sites.

Referrals for the period August 2014 through February 2017 are shown below:



### 3.     Revised Targets / Goals:

It is anticipated that if the DCFS plan to centralize the referral and allocation process can be implemented, that the change along with continued oversight of DCFS staff's responsiveness

by the Associate Deputy for Child Protection and SFC's continued practice of making individual contact with families will boost family participation in SFC hosting services sufficient to meet or exceed the target of 60 families per quarter.

By the end of the next reporting period, DCFS will either have implemented the modification of the referral / randomization process *or* will have developed and implemented alternative measures to increase participation in this program.  Further action clearly is required, as the current strategies have not resulted in a material improvement.  Since February 17, 2017, DCFS has only been able to restore the number of referrals from DCFS investigators to SFFC to its prior, inadequate volume of 11 families per month.  Exhibit P, SAFE Families Four Month Status Report.

N.     **Panel Recommendation # 4:  Information Systems**

1.     **Project Goals / Target:**

The Implementation Plan requires DCFS to take a number of steps to enhance or replace data systems to generate more timely, accurate and complete data.

Short term goals, with a targeted completion between March and September 2017, include enhancement of the existing SACWIS system to accept educational data provided by ISBE and unusual incident reporting from private agencies, as well as improvements in mobile technology through a mobile application for caseworkers, on-line foster parent licensing application, and a tablet application for licensing site inspections.  Implementation Plan, pp. 48-52.

Long-term goals, with a targeted completion date of September 2019, are replacement of the existing SACWIS system, and implementation of predictive analytics. Implementation Plan, pp. 48-52.  Regarding predictive analytics, DCFS committed to establishing an internal team in OITS to bring reporting needs and data analytics into a centrally managed organization. In the

short term, DCFS elected to use Mindshare as the platform for its data analytics. This product allows DCFS to merge and analyze data from multiple environments and produce reports for more informed decision making in a dashboard format. Ultimately, DCFS intends to establish a statewide enterprise data analytics platform ("Enterprise IT") to reduce reliance on external entities to collect and analyze data to drive outcomes. Implementation Plan, pp. 49-51. Achievement of that goal is not anticipated until December 2018.

 2. **Status Report:**

**Replacement of SACWIS**: Subsequent to the approval by U.S. Department of Health and Human Services Administration for Children and Families of DCFS' Planning Advance Planning Document, DCFS issued a request for proposal (RFP) for a feasibility study to replace SACWIS with a "Comprehensive Child Welfare Information System." On March 16, 2017, a bidder's conference was held. On March 21, 2017, vendor questions were due and on March 27, 2017, DCFS published responses to vendor questions. The RFP closed on April 11, 2017 and DCFS is in the process of a two-phase scoring model. DCFS remains on target for a July 1, 2017 start date for the contract on the feasibility study. Exhibit Q, Four Month Status Report, CCWIS RFP, p. 1. However, DCFS' current contract with an outside consulting group, Five Points, is set to expire on June 30, 2017. Five Points has provided critical technical support and expertise DCFS needs to oversee and evaluate the feasibility study. DCFS is currently evaluating various options with respect to the consultants employed by Five Points in an attempt to ensure that this initiative is not jeopardized.

**Mindshare**. The contract with Mindshare began in September 2015 and is in place through January 2018. B.H. Implementation Plan. At the present time, DCFS is exploring the possibility of developing a replacement for the Mindshare platform using POWERBI and MS

SQL server engines in house. DCFS recently hired a Victor O. Johnathan, MBA, PMP as its Chief Information Officer, who will be involved in the exploration of the development of the possible replacement for the Mindshare platform. DCFS anticipates that a decision regarding the Mindshare platform will be made within in the next reporting period and that a transition plan will be developed once that decision is made. Plaintiffs remain concerned regarding the expiration of the Mindshare contract, as set forth in their separate submission.

**Short Term Improvement of Existing SACWIS:** The Significant Event Report system was launched on February 24, 2017 and provides automated functionality in SACWIS. The Significant Event Report system captures significant occurrences that impact child and youth serviced by DCFS. Exhibit B, Four Month Status Report, IT Projects, pp. 1-2. Training of DCFS staff and private agency staff has begun but is not yet complete.

In the last reporting period, DCFS had regular contact with staff from the State Board of Education to further explore how education data maintained by the Illinois State Board of Education can be integrated into SACWIS. Those discussions are ongoing. To date, a solution for performing that integration has not been finalized. The remaining hurdle is developing a means for integration that does not require manual matching of records from ISBE.

**Mobile Applications:** On April 19, 2017, DCFS released version 2 of the Case Access mobile app. Updates include a new and improved user interface, industry standard design, android compatibility and auto-rotate enhancement for keyboard users and a larger photo display. Exhibit R, Announcement April 18, 2017, Mobile app version 2 to be released 4/19/17. Data reflects improvement in the timeliness of case note and photo data entry. Data as of March 31, 2017 show that the average baseline time for a child protection specialist to enter a case note in SACWIS was 7 days and the mobile app has decreased that time to one day; the average

baseline time for a child welfare specialist to enter a case note in SACWIS was 14 days and the mobile app has decreased that time to half a day. Exhibit B, Four Month Status Report, IT Projects, pp. 4.

DCFS also created an on-line licensing application for foster homes. A controlled roll-out of the licensing application commenced which includes DuPage, Bloomington, McLean, Livingston, Peoria, Tazewell and Woodford counties. DCFS staff continue to work on the controlled roll-out of the licensing application and DCFS has received 38 online applications to date. Exhibit B, Four Month Status Report, IT Projects, pp. 4.

**Predictive Analytics**

The predictive analytics project developed by Mindshare, which tracks information from nine areas of practice and analyses that data to identify investigations with the highest probability of serious injury for children aged 0 to 8 known to DCFS, is up and running. DCFS anticipated that a reporting mechanism would be built into the Eckerd / Mindshare portal to allow the sharing of data with DCFS Administration, Regions, and Teams. That has not occurred..

DCFS has not yet decided whether to expand the predictive analytics model to intact family cases. If that expansion occurs, DCFS anticipates that the work can be done with current Eckerd staff within DCFS, and that the expansion could be available beginning in FY 18.

      3.      **Revised Targets / Goals:**

**Replacement of SACWIS.** DCFS has awarded the CCWIS Feasibility Study contract to a vendor and the project work will commence on July 1 2017. DCFS intended to receive support from an outside contractor, Five Points, to assist with the feasibility study. The DCFS's contract with Five Points ends on June 30, 2017, and DCFS will determine how to proceed.

**Short-Term Improvement of Existing SACWIS.** DCFS has implemented the Significant Event Report system into SACWIS. This new system replaces the prior Unusual Incident Report system. Training of DCFS and private agency staff began in the last reporting period and has been completed.

The target completion date for the second short-term improvement of SACWIS – the integration of ISBE data by October, 2017 – may not be met. DCFS has determined that these records can be loaded based on a manual matching process. In addition, critical technical expertise and support for this project presently is being provided by outside consultants from Five Points. As discussed above, DCFS' contract with Five Points expires on June 30, 2017, and it may not be possible to renew that contract.

**Mobile App for Caseworkers** – By the next reporting period, DCFS will have developed and implemented a plan for identifying caseworkers who are not using the mobile app and for providing the additional support those caseworkers need to adapt to this changed technology. In addition, DCFS will develop a process for evaluating whether supervisors' practices should be modified as the new technology is routinely used in the field. DCFS uses a computer application to monitor progress and other issues.

**Mobile App for Licensing**. Roll-out of the mobile app for licensing continues. A schedule for the roll out will be completed in the next reporting period.

**Predictive Analytics.** By the next reporting period, DCFS will determine whether the predictive analytics program will be expanded to include intact family services and will develop a plan for any such expansion. The Mindshare contracts began in September 2015 and will be in place until January 2018. The Implementation Plan contemplated that Mindshare would provide short term transitional assistance in developing dashboards to view key outcomes in real time.

Before expiration of the Mindshare contract, DCFS may be a in a position to bring this function in-house. DCFS is considering that and other potential options.

      **O.**    <u>**Panel Recommendation #5:**</u>

Restore funding for the Illinois Survey of Child and Adolescent Well-Being (ISCAW) that uses standardized instruments and assessment scales. (Implementation Plan, p. 53).

      **1.**    **Project Goals / Target:** The Implementation Plan contemplated restoration of funding for the ISCAW well-being study, which would be a point-in-time study of the

The well-being study was to replicate most of the methods of the Illinois Child Well-Being Year 3 launched in 2004, with additional new features including: updated methods to enhance caseworker participation and increase caseworker response rates, and a brief measure of child life satisfaction to enhance measurement of positive child well-being. Implementation Plan, p. 53. The report is projected for the second quarter of 2018.

      **2.**    **Status Report:** The Survey Research Laboratory of the University of Illinois at Chicago is developing the protocol for the study and the Institutional Review Board application. The information in the protocol and application will include: a description of all sampling procedures, communication plans for contact and recruitment of participants, development of procedures for study interviews, preparation of all instruments, descriptions of methods for preparation and protection of data files, descriptions of methods to provide for human subject protections and plans for analysis and dissemination of study results.

The protocol will be reviewed by the University of Illinois Chicago Institutional Review Board on June 15, 2017. An agreement was reached which provides that the University of Illinois Chicago Institutional Review Board will have primary review of the study protocol.

In addition to the above work, decisions were made regarding study participants. The sample will include 500 to 600 children and youth will be drawn from youth in care on June 30,

2017. The sample will include those children and youth in non-permanent substitute care placements for a minimum of three months and will only include one youth and child per caregiver. Exhibit V, Four Month Status Report, ISCAW.

3. **Revised Targets / Goals:** Data analysis is currently scheduled to commence in the first quarter of FY2018 and occur from July to September 2017. It is anticipated that the final report will be available during the third quarter of FY 2018.

P. <u>**Panel Recommendation #6:**</u>

Develop and implement a new plan for monitoring residential and group home programs, utilizing external partners. (Implementation Plan at p. 53).

1. **Project Goals / Target:** The goals set out in the Implementation Plan were for DCFS, with the University of Illinois at Chicago and Northwestern University, to develop a redesigned residential monitoring program, the goal of which is to increase the safety of youth placed at residential treatment facilities and to enhance the effectiveness of the residential services provided at the residential treatment facilities. As described in the Implementation Plan, the program called for development of regional multi-disciplinary monitoring teams that would assess residential programs' effectiveness utilizing multiple data sources and inputs. Residential monitoring teams were to have been identified and training was to have begun by December 2016. Implementation Plan, Exhibit YY [Dkt. 531-51]. DCFS partnered with Northwestern University and the University of Illinois at Chicago to develop an improved monitoring system – the Therapeutic Residential Performance Management Initiative (TRPMI). Chapin Hall was selected as the evaluator for this initiative. The TRPMI pilot is designed to enhance youth treatment, progress and well-being as well as to effectively monitor, evaluate and promote therapeutic residential program effectiveness.

2.      **Status Report:**  A comprehensive plan for the Therapeutic Residential Performance Management Initiative (TRPMI) was developed. Exhibit S, Summary:  Develop and Implement a New Plan for Monitoring Residential and Group Home Programs, dated April 30, 2017;  Exhibit T, DCFS TRPMI Logic Model (updated 3/30/17) and Outcomes Table (updated 3/2/2017).

**The Three Pilot Teams.**  The TRPMI pilot calls for three TRPMI teams. Two TRPMI teams were implemented on January 9, 2017. The first team is responsible for monitoring 11 program groups (made up of 34 programs from five residential treatment providers located in the Northern Region.  The second team is responsible for monitoring nine program groups (made up of 19 programs from seven residential treatment programs) located in the Southern Region.  The last TRPMI pilot team, which is for Cook County, was implemented as of March 1, 2017, 30 days ahead of schedule.  This team is responsible for monitoring six program groups (made up of six programs from five residential treatment providers.  With implementation of this team, the TRPMI pilot will be monitoring service provision to nearly half of youth in residential treatment programs in Illinois.

**Staffing.**  As implementation of TRPMI proceeds, DCFS has concluded that current team composition may be inadequate to address the full scope of the work, especially with respect to the activities associated with individualized and intensive discharge planning. Consequently, early indications are that TRPMI teams are overextended and some of the traditional monitoring activities focusing on agency compliance issues and effectiveness require greater attention.  The TRPMI Steering Committee has agreed that a third Clinical Specialist should be added to the Cook TRPMI Team.

None of the three TRPMI teams are fully staffed.  A total of six Clinical Specialist positions are vacant (two FTE per team). Additional vacant positions include 1.5 CQI Specialist positions (.50 FTE per team) and one statewide QI Specialist.  A variety of full time and part-time temporary staff who are "borrowed" primarily from the DCFS Clinical Division are in place on the Southern TRPMI team and the Northern TRPMI team to function as Clinical Specialists while the permanent staff are being hired.   There are approximately five temporary FTEs (consisting of eight individuals).

**Step-Down and TRPMI Involvement in CFTs.**   One of the goals of the TRPMI program is to identify youth who are ready or approaching readiness for stepdown, to improve step-down decision-making and planning, and to assist in securing appropriate step-down placements.  To complete these functions, TRPMI staff typically collaborate with the youth and relevant stakeholders (including case management, residential and immersion site staff) individually and in the context of staffings to complete comprehensive planning

Another goal of the TRPMI pilot is to promote the development of CFTMs to replace the staffing process as the driver of discharge planning. Because few CFTMS have been convened to date for youth with the completed CASIIs (i.e., priority youth), TRPMI staff encourage treatment teams to start taking small steps toward identifying potential CFTM members to assist in expediting and convening the CFTMs.   To support these efforts, a draft Communication Protocol/Procedure was developed on February 22, 2017, and was tested in March, 2017.  The Communication Protocol is intended to provide a means of effectively communicating, coordinating, collaborating and problem-solving within CFTMs to promote effective and timely transition and discharge planning.  The protocol was tested with four Choices youth current placed in TRPMI residential programs (during the end of March and early April) and whose

teams were not in consensus regarding critical discharge planning decisions. Debriefing occurred with the CHOICES and TRPMI teams and both provided positive feedback regarding the use of the Communication Protocol. TRPMI will continue to follow the youth to assess effectiveness of the protocol. DCFS has decided to roll out the protocol, and a roll-out plan is under development for the three pilot sites.

TRPMI intends to eventually develop processes to monitor youth stability and wellbeing post-discharge to confirm the effectiveness of the discharge planning process.

TRPMI teams completed 61 CASIIs through March 2017 and anticipated an additional 33 would be completed in April 2017 for a total of 94 CASIIs. Targets have been established for completed CASIIs in May and June 2017.

### 3. Revised Targets / Goals:

**Staffing.** Permanent positions for six full-time clinical specialists, one quality improvement specialist, and one statewide quality improvement manager have been approved and posted at Northwestern University. Hiring is anticipated by June 30, 2017. Once these positions are filled, all teams will be fully staffed according to the original staffing design.

Now that the hiring process is well underway, an overall evaluation of staffing resources will be completed based on lessons learned during the initial implementation period. The third Clinical Specialist that was approved by the Steering Committee for the Cook County team will be included in the evaluation. It is anticipated that any revision to the staffing planning based on the resource evaluation will require approval by DCFS. The TRPMI team will complete the evaluation and present a plan to DCFS by July 1, 2017.

**Step-Down and TRPMI Involvement in CFTs.** In this reporting period, in addition to implementation of the Communication Protocol, more focused efforts to schedule and convene

CFTMs will be initiated. There may be multiple reasons why CFTMs are not currently being convened more frequently, if at all. TRPMI staff and residential teams are now partnering with CIPP staff, which facilitate the CFTMS to increase the number of CFTMs being convened. This will include partnering with the CIPP program to assign facilitators who will assist in planning and facilitating the initial CFTM and a limited number of subsequent CFT meetings. This partnership will be tested in May 2017 with a small number of youth who require development of CFTMs.

**Dashboard.** The TRPMI SharePoint team is working on a CASII data collection function for release in early June 2017. A CASII status dashboard and a CASII recommendations data collection function are currently under development and are expected to be delivered in early July 2017**.**

Another dashboard showing Congregate Care youth information is currently being designed in collaboration with the DCFS OITS team using the Mindshare application**.**

**Program Evaluation.** At the suggestion of the BH experts, the critical program outputs[8] that presently are being tracked and monitored will be refined so that the tracking process is more manageable. To ensure fidelity to the TRPMI program design is maintained, however, some [output metrics will be reclassified and treated as process indicators.[9]

The plan for evaluating TRPMI is in the process of being modified. The initial plan for evaluating the TRPMI pilot was to use a cross-sectional pre-test / post-test design with calendar year 2016 (CY16) defined as the baseline year (pre-test) and calendar year 2018 (CY18) defined as the post-test year. Due to the changes in monitoring residential facilities, the feasibility of

---

[8] A program output is the product or deliverable produced by a program activity.
[9] A process indicator is the unit of service or program activities delivered.

adopting an interrupted time series design is being explored. Interrupted time series designs are commonly used to examine change in outcomes during a period of time preceding a program or policy change and a similar period of time after such a change. Adopting this design will allow evaluators to better control for changes over time that are independent of the TRPMI intervention. It will also allow more flexibility in defining a baseline time point or points, which should allow the evaluation design to more accurately reflect the implementation milestones (i.e. hiring of full time clinical staff). The Expert Panel supports this change in evaluation design.

Once the Interrupted Time Series design is fully adopted by the pilot leadership, Chapin Hall will provide data regarding the effectiveness of the pilots – accounting for implementation milestones that may impact outcomes – on a quarterly basis with a one quarter lag. Upon successful completion of the pilots, the TRPMI strategies will be used to build the internal capacity of DCFS staff to effectively monitor the safety, well-being and permanency of youth receiving residential treatment. The TRPMI monitoring model will then be implemented statewide.

A time frame for rollout of the pilot statewide remains uncertain at this time. A timeframe will be developed based on the development of DCFS' internal capacity to monitor residential programs, either independently or in partnership with outside specialists.

**IV.    Communication Plan:  Implement a Defined Communication Plan with the B.H. Expert Panel and Plaintiffs' attorneys.  (Implementation Plan, p. 55).**

**1.    Progress Goals / Target:**  A Communication Plan, entered by the Court on September 28, 2016 [Dkt. 530], provides for bi-weekly conferences with the Expert Panel and the Parties, during which the pilots and programs identified in the Implementation Plan are discussed.  The plan provides for DCFS to provide a monthly report to the Expert Panel and Plaintiffs' Counsel which details the specific steps that have been taken in actual implementation

of each initiative set forth in the Implementation Plan, the actual results achieved, any barriers that exist and strategies to eliminate or resolve the barriers, and an evaluation of program results. The Plan also provides for DCFS to make efforts proactively to share information "beyond that which directly relates to the specific initiatives described in the Implementation Plan" that nevertheless is significant.

Additionally, DCFS staff participate in quarterly meetings with the Office of the Cook County Public Guardians office. A DCFS representative with knowledge of the status of the B.H. Implementation Plan will attend those meetings to address issues with the B.H. Implementation Plan and status updates. The next quarterly meeting is scheduled for June 14, 2017.

**2.     Status Report:**  During this reporting period, all required telephone conferences and meetings have been held. DCFS is of the view that there are no communications issues. Plaintiffs disagree.  In their view, though communication has improved, communication issues continue to arise.

First, there continue to be instances in which the Experts have flagged a potential problem or issue and have asked questions, but have not received timely response (or any response at all) to those inquiries.

Further, in Plaintiffs' view, DCFS (i) has shown a growing tendency to use the improved level of communication with the Experts as a means to relinquish decision-making to the Experts in the first instance; (ii) DCFS has failed to acknowledge developing problems in a timely manner and only discloses those issues when they have reached crisis proportion; and (iii) information DCFS has provided in recent meetings regarding the failures in the investigation process, a new (and untested) program for accelerating investigation closures, and investigator

caseloads was, at best, materially incomplete.  Plaintiffs' views on these issues are set forth more fully in their Additional Submission, which is filed contemporaneously herewith.

**Revised Targets / Goals:**  DCFS will continue in its efforts to comply with all requirements of the Communication Plan.

## V.     Project for a Target Group of Children and Youth/Enhanced IPS Program Beyond Medical Necessity Pilot

### 1.     Progress Goals / Target

In the September 28, 2016 Implementation Plan, DCFS committed to a pilot targeted to serve fifty (50) children and youth from Cook County who are in psychiatric hospitals beyond medical necessity (BMN). Fifty (50) youth were to be served, and 100 youth were to be used for two comparison groups of 50 youths each.

As of September, 2016, when the Court entered the Implementation Plan, the logic model for this pilot had not been refined.

The BMN pilot was scheduled to begin in September 2016 with a review of five cases and scheduled to be operational in November 2016.  Amended and Revised Implementation Plan, pp. 56-57.

### 2.     Status Report:

**Contract Modification and Hiring.**  In the last reporting period, DCFS committed to amendment of its current contract with Kaleidoscope for intensive stabilization services.  The amendment was to allow Kaleidoscope to hire additional staff, including positions for Stabilization Consultants.  The position was posted in January 2017. Initially, there were very few candidates due to the requirement of a master's level degree, child welfare experience and the salary range.  DCFS agreed to increase the salary range.  On May 14, 2017, the first Stabilization Consultant began employment at Kaleidoscope.   Interviews for the second

Stabilization Consultant position are ongoing. Exhibit U, Four Month Status Report, Target Group of Children and Youth in Psychiatric Hospitals beyond Medical Necessity Pilot, p. 1.

**Children Served.** It previously was agreed that until Stabilization Consultants were retained, no more than three youth would be served through the pilot.[10] As those positions are filled, additional youth will be served. It was anticipated that by April 30, 2017, at least five new youth would be assigned to the pilot. The goal regarding the number of children to be served in this project has not yet been determined and is dependent on the completion of the hiring process.

3. **Revised Targets / Goals**

**Contract Modification and Hiring.** Kaleidoscope intends to add a Stabilization Consultant for every 5 to 8 children added to the pilot. The target is to hire two additional Placement Stabilization Consultants in FY 2018 and potentially to add two additional Placement Stabilization Consultants in the future. The Stabilization Consultants must receive training in the Child and Family Team process.

**Children Served.** The goal regarding the number of children to be served in this project has not yet been determined and is dependent on the completion of the hiring process. The current goal is for five to ten youth to be assigned to every Placement Stabilization Consultant who is hired. The three current youth in care are transitioning to the newly hired Placement

---

[10]There are three youth assigned to the pilot. The first youth was initially recommended for a residential placement, but a home-based setting with the previous foster parent's adult sisters was located. Despite the work of the Kaleidoscope, the youth has been re-hospitalized twice since Kaleidoscope's involvement. Kaleidoscope continues to work very closely with the family ensuring that all needed supports are in place. A second youth has done well since his discharge from the psychiatric hospital. Due to his stability and successful service delivery, Kaleidoscope is no longer servicing this case. The third youth was placed in a relative home from the psychiatric hospital. There was a change in the child welfare specialist assigned to the case after the hospitalization. Exhibit U, Four Month Status Report, Target Group of Children and Youth in Psychiatric Hospitals beyond Medical Necessity Pilot, p. 1.

Stabilization Consultant and she will be assigned an additional two to seven youth. With the two additional hires, ten to 20 youth will be assigned to this pilot.

**Program Enhancement.** DCFS is enhancing processes under the pilot. Kaleidoscope will be invited to CIPP staffings in Cook County for all youth who are psychiatrically hospitalized to allow intervention to occur as soon as possible and Kaleidoscope will attend their first CIPP on June 5, 2017. Participation in the CIPPs will be randomized. At this time, participation occurs when a CIPP occurs on a particular day (randomized) with the youth's identification number ending with an odd number. DCFS is using the month of June to determine if this is a good process to determine the amount of youth eligible for this pilot. If the future research shows that Kaleidoscope's participation in the staffing and service delivery supports the pilot's Theory of Change, then the intent would be to expand the program to include most (or all) CIPPs. DCFS anticipates having all necessary research regarding the pilot by December 2017.

As of March 3, 2017, DCFS will also enhance board payments for the caregivers as needed while receiving case management from an agency that does not have a specialized contract. Exhibit U, Four Month Status Report, Target Group of Children and Youth in Psychiatric Hospitals beyond Medical Necessity Pilot. DCFS will be able to back date this rate to the relative caregivers that were already involved in the pilot to the date of placement.

Finally, control and comparison groups have been better defined. Assignment to the pilot will be random and will be determined according to the last digit of the youth's DCFS ID number and the day that the youth's CIPP occurs. Kaleidoscope is scheduled to attend its first CIPP on June 5, 2017. Chapin Hall, Kaleidoscope and DCFS representatives have agreed that the control and comparison group will be formalized with a July 1, 2017 date to ensure that the

identified assignment will reflect a good portion of youth that Kaleidoscope will be able to provide services for.

**Dashboard.**   The dashboard in the Mindshare platform has not yet been finalized.   That will occur during the next reporting period. The additional time was necessary for DCFS to better define the pilot.   Chapin Hall's involvement has also assisted in better defining outcomes.

**Pilot Completion and Evaluation.**    At this time, DCFS anticipates that the pilot will be in effect until the end of fiscal year 2019 (June 30, 2019).  The formal evaluators for this project are still not identified however Chapin Hall is currently being explored as an option.  DCFS will have the evaluator identified by the next reporting period.