UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| B.H., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 88 C 5599 |
| | ) | Hon. Jorge L. Alonso |
| MARC D. SMITH, Director, | ) | Judge Presiding |
| Illinois Department of Children and | ) | |
| Family Services, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' STATUS REPORT ADDRESSING
DEVELOPMENT OF A SUPERSEDING IMPLEMENTATION PLAN**

Plaintiffs B.H., et al., by their undersigned counsel, respectfully submit this written report in advance of the status hearing set for April 7, 2022 at 9:00 a.m. Plaintiffs recognize that the Court did not request written reports in advance of this status but have prepared this submission in the hope it will be helpful given the breadth, severity and significance of the problems that the Illinois Department of Children and Family Services ("DCFS") must address in its long-promised superseding implementation plan. As set forth more fully below, such a plan is essential, and in Plaintiffs' view it must be of a quality that the Expert Panel deems acceptable in content and scope before it can be submitted for the Court's review. The following is Plaintiffs' assessment of the need for a transformational plan and the principal barriers encountered in the extensive efforts to draft an appropriate plan during the last two years.

**I.      Inadequate Care for High-Needs Youth Persists.**

There has been significant public reporting of DCFS's abject failure to provide appropriate care and services to DCFS youth with acute mental and behavioral health issues. This is a chronic, multi-faceted problem that inflicts severe harm to youth in several ways that now are all too

familiar.[1] Youth are stranded in psychiatric hospitals for weeks or months beyond the date they should have been discharged.[2] Youth remain improperly housed in institutional facilities for months or years beyond the date they should have been "stepped down" to live with relatives or other foster caregivers.[3] Youth are sent far from their families to out-of-state facilities when DCFS cannot secure admission to Illinois institutional care.[4] And over the last 18 months, we learn of ten to 20 youth each month who are assessed as needing immediate psychiatric hospitalization but who cannot access that care.[5] The Cook County Public Guardian's most recent correspondence to the Court gives gruesome detail illustrating how youth suffer when they are not provided with the healthcare and services they need.

## II. The Expert Panel Has Given DCFS Clear Direction for Improvement.

There can be no question that comprehensive, systemic change is needed to "right" the DCFS ship. Plaintiffs have been calling for transformational change since 2015, when we sought appointment of experts to analyze how DCFS was serving high-needs youth and to recommend necessary change. *See* Dkt. 469 at ¶ 31. And since the Court's appointment of Marci White and

---

[1] Plaintiffs have not supplied copies of the data reports referenced herein because those materials contain protected and private information of children. Plaintiffs stand ready to supply copies of pertinent data to the Court, either in redacted form or under seal, if the Court so requests.

[2] According to the most recent data from DCFS, 37 youth remain in psychiatric hospitals beyond medical necessity ("BMN"). One has been in that status for 313 days. Eleven have been in that status for more than 100 days.

[3] According to the most recent data supplied by DCFS, there currently are approximately 70 youth in institutional care in Illinois who are ready to "step down" to less restrictive settings, such as foster care or group homes.

[4] According to the most recent data supplied by DCFS, there currently are 36 youth placed in out-of-state institutional care settings.

[5] In February of this year, 21 youth were taken to an emergency room after being assessed as needing inpatient hospitalization for a mental health crisis and had to spend more than one day in the emergency room before either gaining admission or being "deflected" from the hospital. Only ten youth were hospitalized. The wait times these youth experienced prior to admission or ultimate "deflection" ranged from two to ten days.

Dr. Mark Testa to the *B.H.* Expert Panel, the Expert Panel has given the Department consistent and clear direction[6] regarding the basic, essential features that a transformed system must include:

- **Community-Based Services.** Build a comprehensive system of community-based services to support high-needs youth *and* their caregivers while youth live close to family and are living in the most family-like setting appropriate for their needs.

- **Decouple Services From "Placement."** Eliminate the practice that requires "placement" of youth in specific – and increasingly restrictive – settings before the youth can access specified levels of mental / behavioral healthcare.

- **Support and Value Relative Foster Care.** Recognize that relative foster care is *and should be* the backbone of the foster care system, and ensure that relative caregivers receive the service and financial supports they need.[7]

- **Involve Youth and Families in Planning.** Ensure that casework and service planning for youth is done in collaboration with youth (as age appropriate), the youth's family, and other adults with whom the youth has important relationships.

- **Prioritize Permanency.** The Department does not prioritize achieving permanency for youth. As a result youth unnecessarily languish in the system. As a first step the Expert Panel has recommended intensive work to identify youth in the system for two years or more, and to explore subsidized guardianship for those who have been in stable placements for extended periods.

DCFS should have made substantial progress on every one of these goals well before the COVID-19 pandemic hit but did not do so.

### III. DCFS Did Not Achieve the Change Promised in its 2016 Implementation Plan.

The Department submitted an extensive implementation plan in 2016 intended to address each of the above recommendations. *See* Dkt. 531. Among other things, the Department committed to developing hundreds of therapeutic foster homes for high-needs youth to reduce its historic, heavy reliance on institutional care and spent millions to contract for development of those

---

[6] *See* Dkt. 490.
[7] DCFS data as of February 28, 2022 shows that of 20,994 youth currently in DCFS care, more than half (11,271) are in relative foster homes, and 8,568 youth are in "traditional" or non-relative foster placements. DCFS has a poor record of helping relatives to become licensed, however, and as a result, the supportive funding they receive is far lower than payments to licensed caregivers.

3

resources. That and the other initiatives set out in the Department's prior plan did nothing to materially change DCFS's practices or operations. By 2019 DCFS had agreed to negotiate a new and "superseding" implementation plan to reform basic features of its operations.

### IV. DCFS Has Not Yet Developed a Plan For Transformational Change.

As this Court is well aware, no superseding plan has been presented for the Court's review in the last two years. That is because (i) the Department to date has not developed an implementation plan that adequately addresses the transformational change components the Expert Panel identified, and (ii) the Department is still working to develop realistic and acceptable work plans to achieve those transformational goals. In Plaintiffs' view the cause for this is twofold – Department leadership is not sufficiently committed to system transformation, and the Department does not have the capacity to independently develop executable plans for operational change.

#### A. The Department Continues to Revert to Old Solutions in the Face of Crisis.

The Department has faced enormous pressure following public exposure of its inability to properly care for high-needs youth. The Director has been held in contempt numerous times since January for failure to place individual youth in least restrictive and clinically appropriate settings. Public outcry for solutions has taken the form of demands that DCFS immediately develop more shelter beds, and more institutional "beds" for youth. In response the Department jumped on the "institutional beds" bandwagon as the quickest and easiest "fix" it can achieve, and its familiar way of doing business – put high-needs youth in an institution and equate that with youth receiving "appropriate care" and being "safe." The Department rushed to issue "Calls for Proposals" to the provider community asking all to submit whatever variety of institutional care they chose, regardless of location, profile of youth to be served, or "bed" count. In Plaintiffs' view that response was reactionary, ill-conceived, and 100% ineffective.

4

We have asked the Department for a data analysis showing that the number of institutional "beds" it already has under contract, *if fully staffed*, would be insufficient for the number of youth who *actually need* care in an institutional setting. No such data has been supplied.

Further, DCFS's records regarding high-needs youth who have not received appropriate care show that institutional placement for many is *not* appropriate. For example, of the 37 youth currently identified to us as BMN, the living arrangement recommended for nearly one-third is a group home or foster care. Placing these youth in an institution just substitutes one violation of their Constitutional rights for another – *both* the psychiatric hospital *and* institutional care are unlawful as overly restrictive.

Finally, treating placement in an institutional setting as proper "care" is the very conflation of "bed" or "placement" types with specific levels of service that the Expert Panel has panned and the Department has promised to eliminate. Even assuming that youth may on occasion need institutional care for brief periods of time, the child's bed does not provide the child with treatment. If the institution's service array does not make available what the child needs, the child will not fare any better in that setting simply because it is an institution. This point has recently been highlighted by Marci White's ongoing work in preparing a supplementation to her study of the first 34 youth who were left stranded in emergency rooms for lack of access to psychiatric hospitalization once DCFS youth began receiving their healthcare through the YouthCare managed care organization ("MCO") in September of 2020. *See* Dkt. 757. To the extent Ms. White can access healthcare data for these youth, Ms. White has shown that several of those 34 youth were already *in* institutional care when they required emergency care, and that several others who were placed in institutional care after being released from the emergency room still fared very poorly. Some ran away from their placement, and others bounced back and forth from institution to

hospital to institution in a cycle clearly revealing that the youths' needs remained unsatisfied despite the institutional providers' efforts to provide care.[8]

The Department's reactive response to the current resource crisis for high-needs youth does not reflect a commitment by Department leadership to developing a robust network of community-based services and caring for youth in the way that the Constitution requires: in the least restrictive (most family-like) setting appropriate for the child. And although we have asked for the last two years, Plaintiffs have yet to see any documents from the Department showing any analysis of what community-based resources are needed and where, which are covered under Medicaid (and thus to be provided through YouthCare) and which are non-Medicaid (and thus must be built by the Department), or how DCFS intends to go about building those for which it is responsible.

Our disappointment with Department's planning progress extends to other core initiatives the Department pledged to develop but has yet to adequately plan. The Department pledged to improve licensure of relative families but has yet to produce a workable draft of a plan. The Department began "transformation" of its case service model in 2016 but has yet to fully implement it in a single test site, much less throughout the State. The Department promised to reform its residential facility monitoring system, but we still do not even have a list identifying what facility monitors will be inspecting or evaluating, much less the design of a new model. In each of these and for other promises, we simply do not see Department leadership taking action to show that they embrace the concepts underlying the promised change or are dedicated to achieving that change.

---

[8] These youths' experience is no anomaly. Of the 21 youth taken to the emergency room in February 2022 after being assessed as requiring psychiatric hospitalization, three had one additional emergency room visit in February due to a mental health crisis, and two had *two* such additional emergency room visits in February. One youth is noted as experiencing a cycle of hospitalization and return to institutional care.

B. The Department Has Not Demonstrated Capacity to Plan for or Achieve Change.

Throughout the last two years the Expert Panel has made innumerable recommendations to the Department. They have emphasized that the Department's plans for change must be evidence-based, concrete and realistic. They have offered extensive help and guidance. From Plaintiffs' perspective the Expert Panel's overtures have been met with resentment and resistance, and as a result, the Department has yet to develop a new superseding plan appropriate for this Court's consideration.

The extent of the Department's struggles to plan cannot be overstated. First, the Department is not accustomed to using data and is not proficient at sound data analysis. It is routine for the Expert Panel to ask the Department what data analysis has been done to support a proposed initiative and to be told that the Department "does not have" whatever data the Expert Panel expected the Department to consider. For example, in one draft work plan, the Department set a high goal for an initiative that would have required extensive caseworker time (much of which would have fallen to private agency workers) as well as extensive resources from licensing staff. Only after questioning by the Expert Panel did it become clear that the Department's plan required extensive modification to take account of "real world" factors like available workforce resources. There was no quarrel with DCFS setting a high goal, but if that high goal was to be pursued, the Expert Panel deemed it critical for the Department's plan to develop workforce resources it could not currently access.

Another critical defect in the Department's planning process is that the Department does not have a regular practice of assessing how it will spend available funds for specific reforms or changes. This was sharply illustrated recently, when the Expert Panel asked the Department about prior spending for specific care and services delivered to high-needs youth, and what portion of its

anticipated FY23 budget would be used to develop community-based services. The Department to date has not adequately answered either question.

Planning within the Department is further complicated by the fact that the Department frequently begins with one set of goals and a general planning outline that it then presents to the Expert Panel, but then changes critical features without informing the Expert Panel. This requires frequent backtracking to address new foundational questions the Expert Panel has about the change in focus and strategies, and then the cycle repeats itself. As a result months go by without any meaningful adjustment to DCFS "business as usual" practices.

A final barrier to effective reform planning within the Department is the absence of meaningful involvement by the Director himself or a specific designee with authority to make high-level management decisions. The Director has said he relies on a "team" management approach, but the people identified as "leads" for the reforms DCFS has promised to undertake do not effectively communicate as to existing operations or in planning. For example, one dangerous information silo that we have flagged repeatedly for the Department, but which remains a problem, is when the residential monitoring arm of DCFS has identified a particular residential facility as unsafe for youth with particular behaviors or diagnoses, but the child placement arm of DCFS nevertheless pushes the facility to accept the very youth they have been told by DCFS monitoring that they should not accept. This same non-communication exhibits itself in planning as well, and when it is flagged by the Expert Panel as a problem in the draft work plans DCFS presents for review, we have more delay while DCFS attempts to close these loops and address feedback from each Department area who will have to contribute resources to a particular goal.

The Department previously committed to creating a new position and hiring an individual who would have primary responsibility for at least coordinating reform planning and

implementation efforts across all areas of the Department. To the best of our knowledge that position was posted, but the posting was left open for less than a week, and the position remains unfilled at this point. In the meantime, a designated person within the Department has attempted to fill the coordinator role. While we appreciate the high level of dedication and effort this individual has exhibited, we continue to see a debilitating impact on the Department's ability even to develop a plan for change where there is no senior level executive with decision-making authority to push the reform process forward and coordinate activities across divisions within the Department's structure.

V.    **Further Action Required to Develop the Superseding Implementation Plan.**

In an effort to streamline the arduous process that has proven necessary for development of a superseding implementation plan, Plaintiffs have stepped back to avoid interfering with the Expert Panel's work and reduce the potential for delay. As a result, Plaintiffs are not reviewing the Department's draft papers until the Expert Panel deems the materials ready for such review, and the Expert Panel has had extensive private meetings with Department leadership and staff as the planning materials are developed. Plaintiffs deeply appreciate the extensive time, energy, and effort the Expert Panel already has given and that we hope they will continue to provide until a plan is complete and fully implemented.

We consider the Expert Panel's approval essential both in terms of the substance of the plan and the work plan elements DCFS must develop to demonstrate commitment to change and a realistic path for success. Our confidence has only been heightened by the Expert Panel's recent announcement that no plan will receive approval until after DCFS is able to provide information showing FY23 funds the Department will dedicate for particular aspects of reform, including

development of community-based resources. We understand that the Department has stated it will not be in a position to provide that information to the Expert Panel until June, 2022 at the earliest.

One final issue that may further delay presentment of a proposed superseding implementation plan arises from a data dispute that the parties are attempting to resolve with the Department of Healthcare and Family Services ("HFS"). There are two data analyses that the Expert Panel is undertaking and which will impact the Department's planning for development of services for high-needs youth. Ms. White is attempting to supplement her earlier study[9] of 34 youth who could not access psychiatric hospitalization to determine how those youth have fared thereafter emergency room in terms of placement stability and receipt of appropriate supportive mental and behavioral healthcare. Dr. Testa proposes to conduct an analysis of care provided to 527 youth who previously were included in a Well Being Survey (which was conducted at the Expert Panel's suggestion and was an initiative in the Department's 2016 Implementation Plan) in order to determine how well services the youth received line up with their clinical needs as assessed. In both of these studies, the Expert Panel needs full information regarding healthcare services provided to the youth throughout their time in DCFS custody. HFS has raised privacy concerns about data for any youth who have left DCFS care, even if the care was provided during the youth's tenure with DCFS, absent issuance of a subpoena and modification of the *B.H.* protective order. The parties and HFS are continuing efforts to resolve this data issue and anticipate prompt presentment of a proposed amendment to the pertinent *B.H.* protective order.

### VI. Conclusion.

Plaintiffs appreciate the Court's consideration of the matters set forth here and will stand ready to answer any questions the Court may have during the status hearing set for April 7, 2022.

---

[9] *See* Dkt. 757.

Dated: April 6, 2022                                        Respectfully submitted,

                                                            By: /s/ Heidi Dalenberg_____
                                                            *One of Plaintiffs' Attorneys*

Heidi Dalenberg                                             Allison N. Siebeneck
Allyson M. Bain                                             Riley Safer Holmes & Cancila LLP
Roger Baldwin Foundation of the ACLU, Inc.                  Three First National Plaza
150 N. Michigan Ave., Suite 600                             70 W. Madison, Suite 2900
Chicago, IL 60601                                           Chicago, IL 60602

J. Michael Showalter
ArentFox Schiff LLP
Willis Tower, Suite 7100
233 S. Wacker Drive
Chicago, IL 60606

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on April 6, 2022, she caused a copy of the above and foregoing Plaintiffs' Status Report Addressing Development of a Superseding Implementation Plan to be served on all counsel of record via the Court's electronic filing system (CM/ECF).

By: /s/ Heidi Dalenberg