# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| B.H., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 88 C 5599 |
| | ) | Hon. Jorge L. Alonso |
| MARC D. SMITH,  Director, | ) | Judge Presiding |
| Illinois Department of Children and | ) | |
| Family Services, | ) | |
| | ) | |
| Defendant. | ) | |

## SUPERSEDING IMPLEMENTATION PLAN

# Table of Contents

**Introduction** ................................................................................................ 1

**Superseding Implementation Plan Commitments** ..................................... 2

I.      **Conceptual Structure** ..................................................................... 2
   A.  The Experimentalist Approach and Implementation Science ........... 2
   B.  The Meta Model ........................................................................... 4
   C.  Piloting the Meta Model ................................................................ 6

II.     **The Seven Interventions** ................................................................ 8
   A.  Resource Development .................................................................. 8
   B.  Quality Family Engagement ......................................................... 11
   C.  Child and Family Team Meetings ................................................ 12
   D.  Home of Relative / Fictive Kin Licensure .................................... 15
   E.  Residential Monitoring ................................................................ 17
   F.  Subsidized Guardianship ............................................................. 19
   G.  Administrative Case Review ........................................................ 21
   H.  Key Outputs and Outcomes to Be Reported to the Court ........... 23

III.    **Implementation Leadership Structure** ........................................ 26
   A.  DCFS Leadership ....................................................................... 26
   B.  Implementation Teams ................................................................ 27
   C.  The Expert Panel ........................................................................ 27
   D.  The Meta Council ....................................................................... 28

IV.    **Measurement and Evaluation** ...................................................... 29
   A.  The Illinois Standards as Performance Metrics ........................... 29
   B.  Data and Data Analysis .............................................................. 32

V.     **Reporting** ..................................................................................... 32
   A.  Content of Reports ..................................................................... 32
   B.  Reporting Schedule ..................................................................... 33
   C.  Preparation of the Reports ......................................................... 34
   D.  Additional Reporting to Plaintiffs and the Expert Panel ............. 35

VI.    **The Satisfaction Criteria for Plan Termination** ........................ 35

VII.   **Dispute Resolution** .................................................................... 38

**Appendix** ................................................................................................ 40

This Superseding Implementation Plan (this "Plan") fully supersedes and replaces all commitments and obligations set forth in the Amended and Revised DCFS *B.H.* Implementation Plan (the "2016 Implementation Plan," Dkt. 531).[1]

## INTRODUCTION

In April 2015, this Court appointed a panel of experts (the "original panel") pursuant to Federal Rule of Evidence 706. Dkt. 484. The original panel was charged with responsibility for evaluating the services and placements DCFS was providing to Plaintiff Class Members with psychological, behavioral, or emotional challenges. Dkt. 484. In July 2015, the original panel submitted a Report to the Court (the "2015 Expert Panel Report") outlining its findings and providing six recommendations for systemic change. Dkt. 490-1. This Court adopted the original panel's findings in October 2015, subject to certain revisions proposed by the Parties, and reappointed experts (the "Expert Panel") to assist DCFS in the development of an implementation plan for reform. Dkt. 507. The 2016 Implementation Plan was then developed by DCFS and approved by the Court in October 2016 upon joint motion of the Parties. Dkt. 531.

The 2016 Implementation Plan specified metrics and a set of child well-being indicators for tracking DCFS's performance. Dkt. 531. It then laid out pilot programs, initiatives and actions DCFS would pursue. After several years of implementation efforts under the 2016 Implementation Plan, and for the reasons set forth in the Joint Motion for Approval of a Superseding Implementation Pan, the Parties and Expert Panel now agree that DCFS's reform strategies under the 2016 Implementation Plan have run their course, and that it is time for DCFS to pursue new and updated strategies building on lessons learned from its prior implementation efforts.

---

[1] To the extent DCFS is renewing its commitment to obligations originally set forth in the 2016 Implementation Plan, those terms are fully restated herein to ensure clarity regarding the scope of DCFS's obligations under this Plan.

This Plan sets out the next phase of DCFS's efforts to address the recommendations in the 2015 Expert Panel Report. There are seven strategies in this Plan that are designed to interrelate and produce the combined result of improving care for all Class Members, and particularly those with psychological, behavioral, or emotional challenges. DCFS has agreed that this Plan cannot be terminated until DCFS has met improvement goals specified in three "Satisfaction Criteria": (i) sustained statewide improvement in achieving permanency for youth who have been in care for two years or more; (ii) sustained statewide improvement in reducing occurrences of maltreatment of children in DCFS custody; and (iii) timely provision of services and supports to a key cohort of youth whom the Expert Panel identified as having significant unmet mental and behavioral health needs and substantially elevated risk of long-term stays in foster care.

Part I of this Plan describes the conceptual framework for DCFS's new reform strategies. Part II sets out the seven interventions DCFS will pursue. Part III explains the leadership and organizational structure supporting DCFS's reform efforts. Part IV describes how DCFS's progress will be measured and evaluated. Part V details how DCFS will report its progress to the Court and additional reporting it will provide to Plaintiffs and the Expert Panel. Part VI sets out the Satisfaction Criteria DCFS must meet before it can seek termination of this Plan. Finally, Part VII describes the process for resolving disputes that may arise during the implementation process.

## SUPERSEDING IMPLEMENTATION PLAN COMMITMENTS

I.    **Conceptual Structure**

A.    **The Experimentalist Approach and Implementation Science**

Consistent with the Expert Panel's recommendation, this Plan is based on an "experimentalist" approach to reform, meaning that instead of ordering DCFS to comply with a fixed set of solutions, the Parties have agreed to an evidence-building and accountability process. Dkt. 801 at 16. There are three "essentials for success" under this approach. Dkt. 801 at 4. The

first is to create an enabling environment in which it is "safe" for DCFS staff to test newly conceived programs and determine whether they do, *or do not*, have the intended positive effect. *Id.* The second is to select for expansion those evidence-supported interventions that have a demonstrated chance to succeed based on prior, rigorous testing. *Id.* The third is to implement those chosen interventions with adequate fidelity to the recommended design. *Id.* Deficiencies in any of these areas can jeopardize the success of attempted reform.[2] *Id.*

Logic models provide the structural framework for developing and implementing reform strategies under the experimentalist approach. Here, DCFS has developed a logic model for each intervention to depict how the intervention is intended to improve service to youth. Each logic model contains: (i) a description of the population that is the target of intervention; (ii) a statement of DCFS's underlying "theory of change" supporting planned positive action; (iii) a description of the intervening action to be taken; (iv) the comparison group or action against which the intervention's impact will be tested; (v) a list of services, activities or products to be delivered to the target population; and (vi) specific results – in the form of outputs[3] and outcomes[4] – anticipated as a result of the intervention. *See* Logic Models, attached as Exhibit A.

For each logic model, DCFS developed a work plan that sets out the "nuts and bolts" steps required to execute the reform strategy envisioned in the logic model. Each work plan contains

---

[2] DCFS will secure expertise in the field of implementation science throughout the time this Plan is in effect. DCFS previously engaged Dr. Allison Metz, formerly of the National Research Network (NIRN) and now a professor of practice at the University of North Carolina School of Social Work, for this purpose.

[3] These outputs may be specified services or activities, or may consist of measures of the extent to which service delivery adheres to the program model and best practice outcomes.

[4] Each logic model identifies three different types of outcomes: "proximal," which describe short-term changes in the population that are intended to result from the program outputs; "intermediate," which specify the intermediate processes and outcomes that link proximal to distal outcomes; and "distal," which describe the long-term changes in the population that are intended to result from the proximal outcomes.

action steps and timelines, identifies individuals accountable for the work required, and specifies outputs that may be modified as necessary if, despite DCFS's faithful implementation of a strategy with fidelity to the work plan and program models, the evidence demonstrates that these strategies are not achieving the anticipated outcomes or goals.[5]

The broad framework for reform envisioned in this Plan begins with an overarching "meta" logic model (the "Meta Model") that identifies seven key reforms (the "Interventions") DCFS is undertaking. The Meta Model shows the interrelation between each Intervention to generate systemic improvement.[6] DCFS further has developed a separate logic model and associated work plan for each of the seven Interventions. It is expected that if implemented with fidelity, the Interventions will build upon one another synergistically in order to change day-to-day practice in the field in a sustainable and effective manner.

B.      The Meta Model

The seven Interventions comprising the Meta Model for reform are: (i) Resource Development; (ii) Quality Family Engagement; (iii) Child and Family Team Meetings; (iv) Home of Relative Licensure; (v) Residential Monitoring; (vi) Subsidized Guardianship; and (vii) Administrative Case Review. The following diagram depicts the Meta Model:

---

[5] The work plans for the Interventions are intended to and will evolve over time as actions are completed and evaluated, and as strategies are honed based on those evaluations. The work plans accordingly are not incorporated as a part of the Plan itself, but rather are ancillary to it. However, DCFS stands ready to provide the Court with current versions of the work plans for the Interventions upon the Court's request.

[6] DCFS developed the Meta Model in consultation with the Expert Panel, and it has been reviewed by a consultant having expertise in implementation science. *See* n.2, *supra*.



1. The social and emotional wellbeing of children is best assured within the context of safe and permanent family relationships with birth parents, legal guardians, or adoptive parents who participate in the planning and delivery of individualized permanency and treatment plans crafted by child and family teams.

4. Promising innovations and evidence-supported practices that are translated to child welfare from related fields should first be pilot-tested for usability, and if deemed replicable, should be rolled-out in a phased approach that allows for structured implementation and evaluation of effectiveness prior to scaling the program up statewide.

2. Assessing and treating the social and emotional needs of children with psychological and behavioral challenges preferably should begin at the earliest point of contact with the child welfare system and certainly no later than their removal into state custody. The process of assessment and treatment should continue regularly after the children are transitioned to permanent homes with birth families, adoptive parents, and legal guardians.

3. Services and treatments that are conducted outside the context of home and community-based settings should be temporary and delivered in the least restrictive, most normalized setting responsive to the child's needs.

(1) Improved provision of community supports for youth regardless of living arrangements

(2) Improved Caseworker Engagement lays a foundation for CFTM as an intervention

(7) ACR provides a feedback loop to monitor progress on quality services to children and families

(A) Reduced Maltreatment in Foster Care; (B) Increased Permanency in 12 mos. for 24+ mos. & (C) Decreased moves to youth w/4+ moves and psych hospitalization

(3) CFTM lays a foundation for identifying appropriate living arrangements and supports

(6) Increased use of Subsidized Guardianship to move youth to permanency when it is in their best interest to remain with their current caregiver

(4) HMR Licensure and (5) Residential Monitoring improve the quality of care in these living arrangements and promote permanency

The four statements surrounding the hexagons in the diagram set out the theories of change underlying the Meta Model. Those theories of change align with recommendations in the 2015 Expert Panel Report. The center hexagon sets out the core outcomes – the Satisfaction Criteria – DCFS must achieve to demonstrate that the goals of this Plan have been satisfied. *See infra* at Part VI. The text in the surrounding hexagons identifies the Interventions DCFS will be pursuing to achieve the goals of this Plan. More detailed descriptions of each Intervention are set forth in Part III hereof.

DCFS's Meta Model approach for this Plan is a key differentiation from the stand-alone reforms pursued under the 2016 Implementation Plan. DCFS is confident that each of the seven Interventions, even taken independently, is focused on an important area requiring change and improvement. For example, there is no question that developing community-based resources, increasing the percentage of relative caregivers who become licensed, and improving casework

practice will have some positive impact. But DCFS is looking for more than that under the Meta Model. Through this Plan, DCFS will be testing whether the changes called for through each Intervention have the combined effect of accelerating improved outcomes for children (as is expected), and what further coordination and systemic refinements may be needed to clear barriers to achieving real and systemic improvement in the way DCFS serves children. The Meta Model structure and the broad change it envisions thus feed directly into the sustained systemic improvement that DCFS must demonstrate to meet the Satisfaction Criteria for eventual termination of this Plan.

### C. Piloting the Meta Model

Successful implementation requires thoughtful phasing, teaming, and continuous data monitoring in cycles. It also requires careful examination of those organizational structures that may help or hinder innovation, and which must be changed to provide the organizational capacity for addressing the challenges that accompany reform. It is essential to pilot test and evaluate proposed reform strategies so that overall effectiveness can be determined and necessary refinements to the strategy can be made before significant time and financial resources are invested in a statewide rollout.

This Plan requires that DCFS use pilot testing as part of its implementation process. Even as DCFS is beginning foundational, statewide work on all seven of the Interventions, DCFS is piloting the Meta Model by beginning intensive integrated implementation of all seven Interventions in selected sites (the "Pilot Teams").[7] The Pilot Teams and comparison teams to be

---

[7] The six Pilot Teams will include two DCFS permanency teams and four private provider permanency teams. Each team consists of one supervisor and approximately five caseworkers, serving approximately 60 – 75 youth. That totals to six supervisors and 30 caseworkers who collectively serve approximately 360 – 450 youth overall. DCFS has selected six comparable teams to serve as a comparison group for the pilot test.

used for evaluation purposes were selected with the Expert Panel's assistance.

Part of the Meta Model pilot involves implementation of the Child and Family Team Meeting ("CFTM") Intervention within the Pilot Teams. DCFS currently expects all caseworkers to conduct CFTMs with youth, their families, their caregivers, and other people important to the youth in a manner consistent with DCFS's Core Practice Model and DCFS policy.[8] CFTMs, however, are not consistently conducted with fidelity to the CFTM model. The CFTM Intervention is intended to address that by, among other things, providing Pilot Team caseworkers and supervisors with CFTM training, and providing Pilot Team supervisors with extensive coaching and support in building and applying their CFTM skills.[9]

As the Pilot Teams implement full CFTM practice in the Meta Model pilot, they will be expected to integrate and use the benefits and improvements offered under each of the other Plan Interventions as well. Within their caseload they will be expected to identify youth living with unlicensed relative caregivers and use all available tools to encourage those families to become licensed. They will be expected to identify youth with mental and behavioral health needs who are struggling and to use flex funds to secure appropriate community-based services and supports needed to help the youth and stabilize the youth's placement. When their casework is evaluated by DCFS, that evaluation will look beyond task completion and focus heavily on the quality of the caseworker's engagement with the youth and family, and on evidence that all involved with the youth have a shared understanding of the youth's strengths, needs, and goals.

---

[8] CFTMs are a key component of the Core Practice Model that DCFS adopted under the 2016 Implementation Plan. DCFS has worked with the Child Welfare Group to develop an Illinois model of CFTM training. The Illinois model of CFTM training focuses on significant preparation work for the CFTM and ensuring that both the youth and the family voice are a key part of the meeting and the development of the services and supports that the youth needs. The required elements of a CFTM are described *infra* at n.14.

[9] *See* discussion *infra* at 12-15 for a full description of the CFTM Intervention.

DCFS fully anticipates that as the Meta Model pilot proceeds, there will be instances where Pilot Teams encounter barriers in accessing what they need for their work. DCFS is committed to addressing those barriers, whether they take the form of service resource shortages, breakdowns in communication among departments within DCFS, deficits in availability of data, or otherwise. Chapin Hall at the University of Chicago will perform the evaluation of the Meta Model pilot using key Intervention output and outcome data and metrics for the Pilot Teams. Ultimately, the test for success of the Meta Model will be achievement of the Satisfaction Criteria for this Plan.

## II.      The Seven Interventions

As noted above, each of the seven Interventions is supported by a logic model, copies of which are attached as Appendix A. Those logic models outline with specificity how DCFS intends to measure whether the Intervention is producing the results intended, what data DCFS will use to track progress under the Intervention, and various interim and long-term goals DCFS has set for progress. The summaries of the Interventions provided below are intended to provide context and a high-level overview of each Intervention.

### A.      Resource Development

Assessment data show that 40-45% of youth entering DCFS care experience serious psychological, behavioral, or emotional challenges at some point during their stay in foster care. An overall higher percentage of youth with psychological, behavioral or emotional challenges currently are placed with relative caregivers and fictive kin. Meeting the needs of youth residing with families will require developing necessary supports and services in community settings. At the same time, DCFS also must improve youths' ability to timely access services, supports and appropriate living arrangements when they cannot be served safely and effectively in family settings. The theory of change underlying the Resource Development Intervention is that enhancing the capacity of community and home-based placements and services will increase

placement stability, reduce the need for congregate care, and decrease lengths of stay in care for all youth, including those with psychological, behavioral or emotional challenges.

DCFS will address the need for community-based services by developing evidence-based supports and services included within the "SAMHSA 8" framework.[10] Among other things, DCFS will substantially increase the number of youth served through Intensive Placement Stabilization Services ("IPS"),[11] which provides a mix of formal and informal supports to both the youth in care and their caregivers. IPS services include therapy, respite services, in-home family support, crisis intervention and psychosocial education as well as recreational supplies, tutoring and school advocacy. DCFS will also increase the amount of flex funds available to caseworkers and increase the number of youth for whom such funds are used. Flex funds are used to address highly individualized needs of the child and family by securing mentors and other para-professional services, respite services, transportation, and for paying fees for enrichment activities such as camps, YMCA programs, and non-traditional therapeutic-like services such as art classes.

DCFS's second focus for resource development addresses youth with significant behavioral and mental health needs who are experiencing significant instability in their living arrangements. The Expert Panel found an association between youth experiencing four living

---

[10] *See* Joint CMCS and SAMHSA Informational Bulletin, "*Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions*," issued by the Substance Abuse and Mental Health Services Administration ("SAMHSA") and the Center for Medicaid and CHIP Services, May 7, 2013, available at: https://www.hhs.gov/hhs-guidance-documents/CIB-05-07-2013_222.pdf. The SAMHSA 8 are categories of services from major federal demonstration projects that, when provided in conjunction with traditional mental health services, were beneficial in maintaining children in their home communities. The SAMHSA 8 categories are: (i) intensive care coordination and wraparound approach; (ii) peer services: parent and youth support services; (iii) intensive in-home services; (iv) respite services; (v) mobile crisis and response stabilization services; (vi) flex funds (customized goods and services); (vii) trauma-informed systems and treatments; and (viii) other home and community-based services.

[11] The IPS program is consistent with the intensive in-home and the mobile crisis and response stabilization categories of the SAMHSA 8.

arrangement moves within a 12-month period, when one of those living arrangements included a psychiatric hospitalization, and poor permanency outcomes. The Expert Panel then performed a more in-depth case review, beyond data analysis, for youth with living arrangement instability. DCFS anticipates that if it provides intensive intervention upon identifying a youth with living arrangement instability, performs a case review, and promptly provides services identified as a result of a subsequent CFTM, the youth will have improved outcomes, greater stability, and an enhanced chance of achieving a permanent home rather than aging out to independence. Implementation of this intensive intervention, including demonstration that youth involved in the intervention have received the recommended services and have improved living arrangement stability after the intervention, is one of the three Satisfaction Criteria for this Plan (*see* discussion *infra* at 35-38).

DCFS has set several improvement goals for the Resource Development Intervention. One is to achieve a year-over-year increase in the number of youth who receive IPS from a current baseline of 997 youth (3.73% of youth in care). It is anticipated that increasing this number will lead to improved living arrangement stability for youth and increase their likelihood of achieving permanency. Another goal is to achieve a year-over-year increase in the expenditure of flex funds from a current baseline of $1.6M (state Fiscal Year ("FY") 2022). Improvement benchmarks for both of these goals will be set in consultation with the Expert Panel and provided to the Court as part of DCFS's October 2023 reporting under this Plan. DCFS will also be tracking the number of living arrangement moves for youth experiencing four moves in a 12-month period when one of the moves includes a psychiatric hospitalization, with the goal of reducing the current baseline rate of 9.57 moves per year for these youth to fewer than 4.0 living arrangement moves per year.[12]

---

[12] This outcome is further described in the third Satisfaction Criteria for this Plan. *See* discussion *infra* at 35-38.

### B.    Quality Family Engagement

DCFS currently is not meeting the federal benchmark (95%) for monthly in-person caseworker contacts with youth. https://dcfs.illinois.gov/apsr-fy23-addendum-f.pdf.  In addition, casework practice generally has been focused on meeting compliance measures rather than prioritizing quality engagement and relationship building with children and their families.  The theory of change underlying the Quality Family Engagement Intervention is that caseworkers and supervisors can best assess and address the needs of youth and their families, and accelerate youth achieving permanency, through frequent and high-quality contacts with youth, their parents, and their caregivers.

One target for this Intervention is to achieve and maintain the federal benchmark requiring 95% of youth to have monthly in-person contact with their caseworker.  U.S. Department of Health and Human Services, Administration for Children and Families, Program Instructions, ACFY-CB-PI-23-01 (2023), Program Instruction for the June 30, 2023 State submission of: (1) the fourth Annual Progress and Services Report (APSR), at 25.  It is expected that this increased frequency of contacts will be important in improving youths' safety and reducing maltreatment.

This Intervention, however, requires more than compliance with numerical benchmarks.  DCFS recognizes that quality engagement and relationship-building with youth and families are key to assessing youths' needs, identifying the appropriate services, reducing living arrangement instability, and improving timeliness to permanency.  DCFS accordingly is implementing practice-focused coaching and new systems for accountability for supervisors and caseworkers.  This change is intended to promote skill-building and improve caseworkers' effectiveness in identifying and securing appropriate services and supports for youth.

DCFS will use Administrative Case Review ("ACR") quality ratings to help determine the quality of caseworker engagement with families.  Interviewing family members and youth through

the ACR process is important to gaining an understanding of their perspective. In addition, quality case record reviews performed by the Agency Performance Monitoring and Execution ("APME") team will be used to measure and assess changes in quality practice, with a focus on areas most essential for practice improvement. The results of these reviews will be displayed on user-friendly dashboards, which will be used to monitor improvement in the quantity and quality of caseworker contact with families. APME will also use these reviews to identify programmatic corrective actions that are needed by the private agencies and DCFS permanency teams, and to ensure corrective action is taken. DCFS is further developing its internal processes for ensuring that identified poor performance is addressed.

DCFS's improvement goals for this Intervention include increasing the percentage of monthly in-person quality caseworker contacts with youth that are rated as a strength in the ACR from a baseline of 85.5%. DCFS has also set an interim goal of improving collaboration with families as reflected by an increase in the percentage of youth with case plan development and content rated as a strength in the ACR. DCFS's current baseline is 36%. Improvement benchmarks for both of these goals will be set in consultation with the Expert Panel and provided to the Court as part of DCFS's October 2023 reporting under this Plan.

### C. Child and Family Team Meetings

CFTMs are an essential component of the Illinois Core Practice Model that DCFS adopted as part of its reform efforts under the 2016 Implementation Plan.[13] Care coordination through

---

[13] The Illinois Core Practice Model was part of DCFS's efforts under the 2016 Implementation to create a set of child welfare practices that put children and families at the center of service planning and to build community and home-based resources to serve children and families. Key to the Illinois Core Practice Model are the use of CFTMs, along with enhanced training through the Model of Supervisory Practice (which trained supervisors on how to coach permanency workers) and the Family Centered, Trauma Informed and Strength Based training (which established guidelines for caseworkers and supervisors for improving family engagement, assessment, and case planning). *See* Dkt. 531.

CFTMs is designed to engage youth and family members in planning to ensure that the services, supports and living arrangements youth need are identified and provided. Although DCFS implemented the CFTM practice statewide, it has not seen significant improvements in the quality of CFTMs being conducted.[14] The theory of change underlying this Intervention is that improving the practice of CFTMs supports the voice of youth and family in the care that youth receive; invites participation from supportive family, friends, and community partners; and provides families with an opportunity to identify their strengths, needs, challenges and alternative solutions in service planning and development of placement and permanency options for the youth. CFTMs also provide an opportunity to discuss the benefits of licensure for relative caregivers, the supports available to maintain the youth in a home setting rather than institutional care, and ways to ensure youth can maintain connections to positive and supportive adults.

For this Intervention DCFS is undertaking intensive coaching for supervisors within the six Meta Model Pilot Teams so that the supervisors can provide better guidance to caseworkers. The goal is to enhance the frequency and quality of CFTMs until CFTMs meeting DCFS's policy requirements becomes a regular casework practice within the Pilot Teams. DCFS will also evaluate integration of improved CFTM practice with the rest of the Interventions of the Meta Model.

Initial work for the CFTM Intervention has already begun. DCFS has worked with outside consultants to provide updated CFTM training to supervisors and caseworkers in the Pilot Teams.

_____

[14] DCFS Procedure 315.105 includes five elements that are required in order for a CFTM to meet established fidelity standards: (i) preparation with the family / youth / team in advance of the meeting; (ii) an identified team of participants (minimally parent(s) / youth, caseworker, supervisor, formal and informal supports identified by parent(s) / youth); (iii) supportive and responsive to the "voice and choice" of the parent(s) / youth; (iv) develop / review case plan, progress toward permanency, and effectiveness; and (v) coordination of care among providers, implementation of case plan goals, and removal of implementation barriers.

Regional Practice Directors ("RPDs") are providing "at the elbow" support to supervisors, who are the primary coaches helping caseworkers with both the technical and practical application of CFTM principles and skills. DCFS will continue to develop mechanisms to collect and track data on a timely basis to monitor the number and quality of CFTMs in the Pilot Teams. Monthly data will be gathered and shared with DCFS and private agency stakeholders, and DCFS leadership will take steps to address identified barriers to implementation.

Proper use of the CFTM strategy will be reinforced through the ACR case reviews conducted every six months for each youth in care. ACR reviewers are receiving coaching on CFTM practice so they can appropriately assess CFTM performance as part of the ACR quality scoring process. ACR review data further will be used to create a monitoring tool specific to CFTMs through which feedback will be given to DCFS and private agency caseworkers.

As discussed above, DCFS is testing this intensive approach to improvement of CFTMs as part of the Meta Model pilot to determine how to achieve improved use of CFTMs by caseworkers statewide. Implementation, testing and evaluation of this Intervention in the six Pilot Teams, alongside the rest of the Meta Model Interventions, will then inform any refinements of DCFS's approach to CFTMs and help DCFS identify when, under the principles of implementation science, the CFTM Intervention may be ready for statewide rollout. *See* discussion *supra* at 12-15.

DCFS's interim output goal for this Intervention include increasing the percentage of youth in the six Pilot Teams with a CFTM that meets DCFS policy fidelity standards (*see* n.14 *supra*) from a current baseline of 26% to above 50%. DCFS has a parallel interim outcome goal of increasing the percentage of youth in the Pilot Teams with a CFTM quality rating score of '1' (which is full implementation / outstanding performance), or '2', (which is substantial implementation / good performance), within the applicable six month period of review.[15] DCFS's

---

[15] A CFTM is rated '1' if all elements of the CFTM were evident and the CFTMs occurred at least

initial benchmark for improvement is 50% from a baseline of 31%. These two "greater than 50%" benchmarks are appropriate because DCFS's purpose here is to identify when this Intervention leads to "successful" implementation of CFTM practice in the Pilot Teams. Implementation science acknowledges that fidelity standards seldom reach 100% due to staff attrition, vacancies, training requirements, and other external factors over which programs exercise limited control, such as client compliance with treatment plans. Therefore, "above 50%" is a threshold fidelity standard for measuring "success" in implementation – whether a complex innovation has been implemented as intended and is ready for expansion to statewide use.[16]

### D. Home of Relative / Fictive Kin Licensure

The number of children in kinship homes rose from 7,232 as of June 30, 2018 to 11,186 as of June 30, 2022.[17] Currently, the majority of youth coming into care are placed with relatives or fictive kin. Licensing efforts by DCFS and its private agencies have struggled to keep up with the increased use of relative homes for placement. As the rate of placement in relative homes has increased, there has been a decline over the last four years in the percentage of relative homes that are licensed.[18]

---

quarterly. A CFTM is rated '2' if either (a) a CFTM occurred and all elements were evident to the reviewer, except there was no evidence of a prep meeting with the parents / youth before the CFTM; or (b) a CFTM occurred and all elements were present (or all elements except the preparation meeting) but CFTMs occurred less than quarterly during the applicable six month period.

[16] This assessment of the fidelity of CFTM implementation in the Pilot Teams enables DCFS to know that its innovations are being implemented as intended, attribute outcomes to the use of the innovations, and what to focus on to improve implementation. Integrating evidence-based practices into the delivery of child welfare services that meet a threshold fidelity standard of above 50% is a complex process that involves the selection of appropriate practices, the development of an enabling environment to support high-quality implementation of the practices, and systems changes that will ensure the practices are sustainable beyond the first 18 to 24 months of implementation. https://www.acf.hhs.gov/cb/guide_vol3.pdf.

[17] Dkt. 801 at 12.

[18] DCFS budget overviews show that the number of children placed with kin expanded from 7,640

The focus for this Intervention is to achieve a substantial increase in the percentage of relative caregivers' homes that are licensed. The theory of change is that by becoming licensed, relative and fictive kin caregivers will receive additional monetary and other supports, which will lead to improved safety and stability of children in relative foster care. Further, licensure opens up the permanency option of subsidized guardianship through the federal KinGAP program.

DCFS's implementation strategies to improve the rate of licensure for relative caregivers include clarifying the roles of all DCFS and private agency staff in the licensing process for relative caregivers, ensuring that such staff understand their role in that process, and ensuring that discussions about licensure take place at the initial placement of a youth and continue through the lifetime of a case. A licensing worker will be assigned to the relative caregiver and will maintain contact with the relative caregiver in order to assist with the licensure process.

DCFS also will increase monitoring and communication activities with private agency and DCFS staff in order to bring attention to this work. DCFS will support private agency and DCFS staff with ongoing consultation from APME staff. DCFS has taken steps to increase the number of private agency staff, including staff to conduct licensing work, and increased the pay for private agency workers with additional increases planned for future years. DCFS continues to examine licensing staff ratios and pay disparities in the private sector to evaluate whether additional efforts are needed. DCFS will be encouraging caseworkers to address individualized circumstances that some relative caregivers face in becoming licensed by using flex funds to secure appropriate services and supports.

---

as of June 30, 2018 to 11,538 as of June 30, 2022. During this period, the number of licensed homes declined from 52.1% to 37.6% as reported in the Department's Licensure Progress Reports for FY2020-2023. https://dcfs.illinois.gov/fy22_budget_proposal_overview.1.0.pdf, *and* budget-proposal-overview-fy2024.pdf (illinois.gov).

DCFS's improvement goals for this Intervention include increasing the number and percentage of licensing applications completed within 120 days of placement of a youth in the home (the current baseline is 105 or 23% as well as increasing the number of relative homes licensed within 270 days of placement of a youth in the home (the current baseline 97 or 21%).[19] Improvement benchmarks for these goals will be set in consultation with the Expert Panel and provided to the Court as part of DCFS's October 2023 reporting under this Plan.

E.      **Residential Monitoring**

The theory of change underlying this Intervention is that enhanced monitoring of residential treatment facilities by DCFS and its contracted external providers will improve safety for youth in those facilities and result in faster and more appropriate discharges to home and community settings.

DCFS's enhanced model for residential monitoring is a structured process. Monitors will collect information about the quality and safety of services delivered within each residential facility as required by their contracts with DCFS. Monitors will also summarize the information they have gathered, and will share that information and their assessments with residential facilities. Based on the information gathered, facilities will be referred for intervention to address deficiencies, when appropriate, and for follow up as required.

Monitoring activities will include review of performance data for the facility, on-site observations at the facility, periodic attendance at facility staffings and meetings, and review of facilities' files. A new data collection tool and review instrument is a critical component of the enhanced model and is being developed in collaboration with the Expert Panel and university

---

[19] For this Intervention, DCFS has identified cohorts of youth and will measure the rate and / or increase in licensure by each of these cohorts.

partners. It will be thoroughly vetted and tested prior to implementation. The new tool will focus on the following areas:

(i) the living environment at the facility;

(ii) the youth's experience at the facility;

(iii) the youth-guided and family-driven treatment at the facility;

(iv) the staff training and education at the facility;

(v) the milieu operations at the facility;

(vi) the clinical programs and program leadership at the facility;

(vii) the management of the facility; and

(viii) the quality improvement processes at the facility.

DCFS is also adopting Residential Performance Measures ("RPMs") based on administrative data. Quarterly RPM data reports and data from the new monitoring tool will be used to complete written quarterly assessments identifying the strengths and needs of the facilities and any necessary corrective action.

The enhanced residential monitoring model also includes a change in role for the existing external partners who are still working under the monitoring design from the 2016 Implementation Plan. The external partners currently serve as frontline monitors for a set of residential facilities. During the development stage of the enhanced model, the external partners will continue in that direct monitoring role while also providing consultation to DCFS. As the enhanced model is implemented, the external partners' responsibilities will gradually shift. Under the new model they will provide targeted programmatic consultation, at DCFS's request, to residential facilities to remediate identified deficiencies; conduct random unannounced inspections at selected residential facilities under contract with DCFS each year; and perform inspections at residential facilities when certain agreed-upon indicators are met. During the random inspections, the external partners will use DCFS's new data collection tool and instrument to summarize aspects of quality

and safety, recommend corrective measures where specific performance standards are not met, and provide any additional feedback regarding the performance of the facility not captured by the tool.

DCFS's key output goal for this Intervention is to produce written Quarterly Assessments based on results of the new monitoring tool, RPM quarterly reports, and summaries identifying strengths and weaknesses to guide corrective action. In addition, DCFS's outcome goal is to increase the percentage of residential treatment facilities with improved scores in the performance areas identified above. Because DCFS has not yet implemented the new monitoring tool, DCFS does not have baseline data for this key output and outcome. Improvement benchmarks for this Intervention will be set in consultation with the Expert Panel and provided to the Court as part of DCFS's October 2023 reporting under this Plan.

### F. Subsidized Guardianship

Subsidized guardianship is a safe and stable permanency option, but it has been underused in Illinois for the last several years. The underutilization of subsidized guardianship is significant in light of DCFS's performance in achieving permanency for youth in care for two years or more. When relative caregivers and youth prefer guardianship (a route that does not require termination of parental rights), honoring their choice leads to more children achieving permanency and fewer suffering the negative outcome of aging out of foster care without a permanent place to call home. The theory of change for this Intervention is that by increasing the use of subsidized guardianship, DCFS can increase the number of youth who achieve permanency and make substantial, system-wide progress in reducing youths' length of stay in care.

DCFS already has completed important foundational work to set the stage for increasing the use of subsidized guardianship, including offering state-funded guardianship to youth in care aged 12 and older regardless of the licensing status of the foster placement, expanding the legal definition of 'relative' to include fictive kin, and eliminating the statutory requirement that

adoption be ruled out prior to courts' considering subsidized guardianship as a permanency goal.[20]
DCFS also has developed a targeted system to identify and track youth in care who may be eligible
for subsidized guardianship.

The Subsidized Guardianship Intervention addresses the next steps DCFS will be taking to
increase the number of youth in care who achieve permanency through subsidized guardianship.
The new DCFS strategies will include: (i) communicating the benefits of subsidized guardianship
to stakeholders involved in Juvenile Court cases, including that children placed in subsidized
guardianship homes remain as stable as youth who are adopted or remain in foster care; (ii)
informing relatives of the financial benefits of licensing and their eligibility for a subsidy when
they choose guardianship; and (iii) increasing the use of DCFS discretion to waive non-safety
licensure standards. DCFS will also identify DCFS teams and private agencies that are
successfully moving youth to subsidized guardianship in a timely manner. The strategies used by
those agencies will be identified and shared with agencies that have a low success rate in moving
youth to subsidized guardianship.

DCFS's initial output goal for this Intervention is to identify and track the number of youth
in care that meet the criteria for the guardianship permanency goal, and to increase the number
that have an assigned guardianship permanency goal from a baseline of 1,434, or 5%. DCFS
further has set an interim outcome goal of increasing the number of youth in care with an identified
permanency goal of guardianship who are discharged to permanency through subsidized
guardianship from a baseline of 395 youth in one year (July 1, 2021 to June 30, 2022).

---

[20] *See* Public Act 98-846 (adding 'fictive kin' to the definition of 'related') (eff. Jan. 1, 2015);
Public Act 99-0836 (expanding definition of fictive kin) (eff. Jan. 1, 2017); *see also* Public Act
102-0193 (eff. July 30, 2021) (eliminating requirement that adoption be ruled out as permanency
option prior to consideration of guardianship); *and* Ill. Admin. Code tit. 89, §302.410 (criteria for
state funded guardianship).

Improvement benchmarks for these goals will be set in consultation with the Expert Panel and provided to the Court as part of DCFS's October 2023 reporting under this Plan.

### G. Administrative Case Review

The ACR Unit reviews each youth in care's case every six months. In the past, the ACR process has focused on compliance with a youth's most recent service plan, rather than ongoing evaluation of permanency planning. In addition, key stakeholders (including youth and their families) were not participating in ACRs, the feedback process focused on case specific issues, and the feedback process did not yield data on casework practice strengths at a team or agency level. The theory of change for this Intervention is that providing actionable feedback broadly within DCFS and to private agencies (including caseworkers and supervisors) will lead to improved quality casework, increased family participation at ACRs, timely reunification where possible, assistance to kinship caregivers in adapting to DCFS policies, and expedited permanency for youth.

DCFS has created a new ACR model that focuses on quality of work in five priority areas that correlate with increases in youth achieving permanency:

(i)     Quality of Child and Family Team Meetings;

(ii)    Quality of Case Planning (whether the caregiver / child actually received the services / supports the plan that the team determined they needed in order to move toward permanency);[21]

(iii)   Quality of Caseworker In-Person Visits (with children in care, children at home, mother, father and foster parent or facility staff);

(iv)    Quality of Family Visitation (siblings, mother, father, and other important connections); and

---

[21] DCFS is in the process of replacing its current case management system, the Statewide Automated Child Welfare Information System, where youth "Service Plans" are currently entered. Once the new system is established, DCFS will switch to the use of "Case Plans", which will capture more information that can be used during the ACR process.

(v)     Quality of Caseworker Supervision.

The new ACR model was launched statewide in September 2022.[22]  A revised case review information packet is organized around these five priority areas.  A key feature of the new ACR model is the active participation and discussion with all attendees at the ACR, including solicitation of stakeholders' experience and perspective of how the case has progressed since the last ACR.  ACR reviewers have been trained and coached on how to solicit relevant information and rate each priority area.  The written feedback from the ACR reviewer to the supervisor and caseworker has also been enhanced to provide substantive information learned about the caseworker's performance in priority areas, and the caseworker's assigned supervisor is required to ensure that identified areas needing improvement are addressed.

Data collected from the new ACR process is disseminated at a variety of DCFS and private agency levels, and each private agency is able to review its own performance data on a performance dashboard.  APME monitors will use ACR data to inform their monitoring activities, including imposing corrective action where necessary.  One output goal DCFS has set for this Intervention is to increase the number of family and youth (as age appropriate) who attend and participate at ACRs from a baseline of 11% to more than 50%.  DCFS also has set an interim outcome goal of increasing ACR scores in the five Priority Areas noted above.  DCFS's current baseline for each of the five Priority Areas rated as a strength are: (i) Quality of CFTMs: 25%; (ii) Quality of Caseworker In-person Contacts: 79%; (iii) Quality of Family Visitation: 69%; (iv) Quality of Caseworker Supervision: 65%; and (v) Quality of Case Planning: 63%.  Improvement benchmarks for these goals will be set in consultation with the Expert Panel and provided to the Court as part of DCFS's October 2023 reporting under this Plan.

_____

[22] The new ACR model was tested in two pilot sites before it was launched statewide.

### H. Key Outputs and Outcomes to Be Reported to the Court

DCFS has identified one key output and one key outcome from the logic model for each Intervention that DCFS and the Expert Panel agree are strong indicators for evaluating DCFS's progress in implementing the reforms in this Plan. These key outputs and outcomes, as provided in the table below, will be included in the Progress Reports that will be filed with the Court as described in Section V hereof. DCFS has identified baseline data for each of the key outputs and outcomes, with the exception of residential monitoring. The baseline data is for July 1, 2022 – December 31, 2022, unless otherwise indicated below. DCFS, in consultation with the Expert Panel, has identified appropriate initial benchmarks for improvement for several of the key outputs and outcomes, as shown below. For the remainder, DCFS, in consultation with the Expert Panel, will develop appropriate benchmarks for improvement for those outputs and outcomes and report them to the Court as part of its October 2023 reporting under this Plan.

| Intervention | Key Output | Key Outcome |
|---|---|---|
| Resource Development | **Increase number and percentage of youth in care who receive Intensive Placement Stabilization (IPS) services and increase year-over-year expenditures for youth who receive flex funds as a means to reduce living arrangement moves and increase youths' likelihood of achieving permanency.[23]**<br><br>The baseline for youth receiving IPS is 997 youth based on FY 2022 data (3.73% of youth in care). | **Decrease number of living arrangement moves for youth experiencing four moves in a 12-month period when one of the moves includes a psychiatric hospitalization (as measured by 12 months following identification of meeting criterion).**<br><br>The baseline is 9.57 moves per 12-month period after identification. |

---

[23] DCFS currently is not tracking the number and percentage of youth who have received flex funds and therefore, for the statewide data, will report expenditures. Moving forward, DCFS will collect and report information about the number and percentage of youth who receive flex funds in the Pilot Teams for evaluating the Meta Model, with a goal to collect and report such information statewide as well.

| Intervention | Key Output | Key Outcome |
|---|---|---|
| | The baseline for flex fund expenditures is $1.6M based on FY 2022 data.<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* | The benchmark for improvement is fewer than 4.0 moves per 12- month period after identification. |
| **Family Engagement** | **Increase percentage of monthly in-person quality caseworker contacts with youth that are rated as a strength in the Administrative Case Review.**<br><br>The baseline is 85 %.<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* | **Improve collaboration with families as reflected by an increase in percentage of youth with case plan development and content rated as a strength in the Administrative Case Review.**<br><br>The baseline is 36%.<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* |
| **Child and Family Team Meetings** | **Increase percentage of youth in care in the six Pilot Teams with a qualifying CFTM that meets DCFS policy for fidelity.**<br><br>The Pilot Teams baseline is 26%.<br><br>DCFS's initial benchmark for improvement is above 50%. | **Increase percentage of youth in the Pilot Teams with an Administrative Case Review CFTM quality rating score of 1 or 2 for CFTMs within the applicable 6-month period of review.**<br><br>The Pilot Teams baseline is 31%.<br><br>DCFS's initial benchmark for improvement is above 50%. |
| **Home of Relative / Fictive Kin Licensure** | **Increase the number and percentage of licensing applications completed within 120 days of placement in the home (as measured by cohorts).**<br><br>The baseline is  105 or 23%.<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* | **From each cohort group identified in the key output, DCFS will increase the number and percentage of relative homes licensed within 270 days of placement in the home.**<br><br>The baseline is: 97 or 21%.<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* |
| **Residential Monitoring** | **DCFS will produce written Quarterly Assessments based** | **Increase the percentage of residential treatment facilities with improved** |

| Intervention | Key Output | Key Outcome |
|---|---|---|
| | **on results of monitoring tool, RPM quarterly reports, and identification of strengths and weaknesses to guide corrective action.**<br><br>*Because DCFS has not yet developed the monitoring tool, it does not have baseline data for the key output and outcome at this time. DCFS will provide updates in future reports to the Court.* | **scores in the following categories: (a) the living environment at the facility; (b) the youth's experience at the facility; (c) the youth-guided and family-driven treatment at the facility; (d) the staff training and education at the facility; (e) the milieu operations at the facility; (f) the clinical programs and program leadership at the facility; (g) the management of the facility and (h) the quality improvement processes at the facility.**<br><br>*See key output.* |
| **Subsidized Guardianship** | **Increase the number of youth in care that have an assigned permanency goal of guardianship.**<br><br>The baseline for July 1, 2021 – June 30, 2022 (FY 2022) is 1,434 youth (5%).<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* | **Increase the number of youth who are discharged to permanency through guardianship.**<br><br>The baseline for July 1, 2021 – June 30, 2022 (FY 2022) is 395.<br><br>*DCFS will work with the Expert Panel to establish benchmarks for improvement.* |
| **Administrative Case Review** | **Increase family and youth (as age appropriate) attendance at and participation int the Administrative Case Reviews.**<br><br>The baseline is 11%. | **Progressive improvement in ACR ratings of the overall quality for each of the five Priority Areas.**<br><br>The baselines for the priority quality areas are:<br><br>(i) CFTMs: 25%<br>(ii) Caseworker In-Person Contacts: 79%<br>(iii) Family Visitation: 69%<br>(iv) Caseworker Supervision: 65%<br>(v) Case Planning: 63%[24] |

---

[24] Baseline data for each priority area is from July 1, 2022 – December 31, 2022, except for quality

| Intervention | Key Output | Key Outcome |
|---|---|---|
| | DCFS's initial benchmark for improvement is above 50%. | *DCFS will work with the Expert Panel to establish benchmarks for improvement.* |

## III.    Implementation Leadership Structure

### A.    DCFS Leadership

The direct involvement of DCFS senior leadership is a key component in the implementation of this Plan.  DCFS accordingly has established and filled the position of Executive Administrator for the *B.H.* Consent Decree (the "*B.H.* Administrator"), a Senior Public Service Administrator who reports directly to the DCFS Executive Deputy Director.  DCFS agrees to maintain this position while this Plan is in effect.

The Director has empowered the *B.H.* Administrator to design systems to implement this Plan at DCFS.  Specifically, the *B.H.* Administrator has the following duties and responsibilities, among others: (i) oversee, coordinate and direct implementation of the work plans that relate to this Plan; (ii) serve as the point of contact for reform activities related to the *B.H.* Consent Decree; (iii) ensure that staff remain in synergy and focused on project goals and objectives; (iv) direct and oversee the review and evaluation of DCFS services as set out in this Plan and other efforts to comply with the *B.H.* Consent Decree; (v) work directly with the Expert Panel to review the work plans supporting this Plan and, when necessary, modify the work plans or develop additional long- and short-term plans to support the goals set out in this Plan; (vi) supervise continuous quality improvement and rigorous evaluation; and (vii) serve as a liaison to various stakeholders, including the Expert Panel, private child welfare agencies, other state agencies, and DCFS partners, such as

---

of case planning.  For that area, data is only available for the period from September 1, 2022 to December 31, 2022.

university staff working on various DCFS projects.

The *B.H.* Administrator position shall not remain unfilled for more than 30 days in any 12-month period. In the event of a vacancy, DCFS shall designate a person with the requisite qualifications to serve in the position on a temporary basis in accordance with the State of Illinois personnel rules. DCFS shall move expeditiously to fill the *B.H.* Administrator position once there is a vacancy in accordance with the State of Illinois personnel rules. DCFS shall advise Plaintiffs' counsel and the Expert Panel within five business days when there is a vacancy in this position.

### B. Implementation Teams

The work plan for each of the seven Interventions identifies an Implementation Team and its DCFS leader. The Implementation Teams are accountable for implementing and tracking the various strategies, actions, data, and results of the work DCFS is undertaking. The *B.H.* Administrator works directly with and oversees the Implementations Teams to implement their specific work plans. The Expert Panel members are advisors to each Implementation Team.

### C. The Expert Panel

The Expert Panel will continue to play an integral role under this Plan. The Expert Panel provided extensive consultation to DCFS in the development of the Meta Model and Intervention logic models and supporting work plans. The Expert Panel ultimately approved the logic models and work plans as sufficiently developed for DCFS to begin its work, though several in the Expert Panel's view will require significant additional development as reform efforts – which are already underway – proceed.

In their recent report, the Expert Panel emphasized that "[a]s the Department embarks on the testing of multiple new initiatives, that implementation must demonstrate rigorous fidelity to their designs. There must be sufficient real time monitoring, documentation, and analysis to determine the level of fidelity. The challenging work of removing barriers, getting over or around

obstacles, changing processes, creating more enabling environments, etc., must be tried and documented as a basis for determining what, if any, modifications must be made to the [I]nterventions the Department has chosen and the detailed work plans it has developed." Dkt. 801 at 8-9. Going forward, the Expert Panel will remain actively involved in observing DCFS's progress and providing ongoing consultation during implementation. Among other things, the Expert Panel will serve as advisors to the Implementation Teams for each Intervention, they will regularly consult with the *B.H.* Administrator, and they will be invited to all convenings of the Meta Council (*see infra* at Part III.D).

Further, through the *B.H.* Administrator, DCFS will consult with the Expert Panel when making any determination that a work plan must be changed. If the Expert Panel believes that DCFS's actions under a work plan for an Intervention are not trending toward achieving the essential purpose of the Intervention as set forth in its logic model, and DCFS and the Expert Panel cannot resolve the Expert Panel's concerns by agreement, the dispute will be resolved according to the dispute resolution process set forth below (*see infra* at Part VII).

## D.    The Meta Council

To support the Director's ultimate responsibility to implement this Plan and its Meta Model, the *B.H.* Administrator created and chairs the "Meta Council." The Meta Council was developed in consultation with an expert in implementation science. The composition of the Meta Council will include those individuals who the *B.H.* Administrator determines can provide insight and support to the *B.H.* Administrator in implementing the Meta Model.[25] The Meta Council currently consists of a group of high-level leaders, including DCFS executive leadership,

---

[25] It remains the role of the Expert Panel, consistent with their appointment by the Court, to inform DCFS of their views regarding the implementation processes and evaluation of progress and to report to the Court if any areas of disagreement cannot be resolved. *See* discussion *supra* at 27.

representation from private agencies involved in the six Pilot Teams, and DCFS leads of each of the Implementation Teams for the seven Intervention work plans.[26]

The Meta Council's purpose is to advise the *B.H.* Administrator in implementing and assessing the six Pilot Teams' progress in their work, as set forth in the Meta Model, to ensure there is cross-agency engagement and consistency. The *B.H.* Administrator may also consider the advice of the Meta Council in tracking the implementation of the Intervention work plans statewide, providing direction, and facilitating the integration of the Meta Model within DCFS.

## IV.    Measurement and Evaluation

### A.    The Illinois Standards as Performance Metrics

While implementing this Plan, DCFS will continue to focus on improving its statewide performance on six performance measures – the "Overarching Outcome" measures – that were used to track DCFS's performance under the 2016 Implementation Plan. The Overarching Outcome measures track metrics that were developed by the United States Department of Health and Human Services Administration for Children and Families for purposes of federal oversight of child welfare agencies' performance.[27] Over the last several years, however, federal regulators have amended the definitions for these measures, and further have used different approaches when setting the benchmarks against which state child welfare agencies' performance would be evaluated. *Id.*

In light of the changing nature of the federal evaluation process, in 2021 DCFS began working with the Expert Panel to develop "Illinois Standards" that would serve as fixed and consistent performance targets for DCFS to achieve for several of the Overarching Outcome

---

[26] The Implementation Team leads sit on the Meta Council at the request of the *B.H.* Administrator to assist in overall efforts to execute this Plan.

[27] *See* Dkt. 800 at 2.

measures. As explained in detail in the Parties' Joint Motion for Approval of Illinois Standards, the Illinois Standards were developed based on a review of DCFS's past performance on the various outcome measures, the performance levels other states have managed to achieve, and any Illinois-specific factors shown by evidence to impact the performance level Illinois can achieve. DCFS has been working with the Expert Panel and representatives from the University of Illinois at Urbana-Champaign, Chapin Hall, and the University of North Carolina to ensure that each Illinois Standard is based on sound evidence and sets a goal that is both reasonably attainable and appropriately aspirational.

DCFS has established four Illinois Standards to date. These Illinois Standards provide DCFS with a reliable means for evaluating its system-wide improvements throughout duration of this Plan. The four Illinois Standards are:

Maltreatment in Care: The Illinois Standard for maltreatment of youth in care is no more than 9 victimizations per 100,000 days in care.[28] That is a performance level DCFS has achieved in the past; it is slightly more demanding than the national average performance on this measure at the time this Standard was set, and achieving the Standard will require substantial improvement in DCFS's current performance. Dkt. 748 at 3.

Permanency for Youth in Care 24+ Months: The Illinois Standard for permanency in 12 months for Children in Care 24 months or more is 31%.[29] This Illinois Standard is set at a level well above DCFS's best statewide performance in the last several years, but DCFS has achieved this target on a regional level several times in the last few years. Further, the 31% Illinois Standard measure essentially matches the national average performance for this measure (31.8%) at the time

---

[28] DCFS has been reporting on the Illinois Standard for this outcome measure since February 2021. Dkt. 748 at 3.

[29] DCFS has been reporting on the Illinois Standard for this outcome measure since February 2021. Dkt. 748.

DCFS set the Illinois Standard.  Dkt. 748. At 3-4.

Placement Stability:  The Illinois Standard for placement stability during the first year in care is no more than four moves per 1,000 days in out-of-home care.[30]  Dkt. 764 at 8-9.  This rate is actually more demanding than the national average performance for this measure at the time DCFS set the Illinois Standard, yet Illinois has been out-performing the Illinois Standard for the last three years.

Re-Entry into Care:  The Illinois Standard for reentry into foster care within 12 months of permanency is 8%.[31]  Dkt. 764 at 9-10.  This rate also is more demanding than the national performance on this measure at the time DCFS set the Illinois Standard.  Illinois has performed better than the 8% rate in the past, and the Expert Panel expects that the current rate of 10.1% on this measure as the rate of youth entering DCFS care will continue to drop from high rates experienced 2017-2019.

There are two Overarching Outcome Measures, both relating to youths' achievement of permanency, for which Illinois Standards have not yet been developed.[32]  The Expert Panel has opined that more analysis is needed to understand the reasons underlying DCFS's historical underperformance on these measures before an appropriate Illinois Standard can be set.  While that investigation continues, DCFS will gauge and report on its performance for the two remaining measures by reference to its own historical performance.

---

[30] DCFS has been reporting on the Illinois Standard for this outcome measure since October 2021. Dkt. 764  at  8-9.

[31] DCFS has been reporting on the Illinois Standard for this outcome measure since October 2021. Dkt. 764 at  9-10.

[32] The two remaining measures are permanency achieved for youth in the first 12 months of care and permanency achieved for youth in their second year in care.

### B. Data and Data Analysis

Accurate and accessible data are an essential component to support all aspects of DCFS's work. DCFS is committed to ensuring the accuracy of and alignment of data and data definitions, and to increasing both the availability and use of data across DCFS and private agencies.

DCFS has successfully developed the internal capability to produce and display the data for Illinois's outcomes under the federal performance measures and the Illinois Standards DCFS has developed to date with the assistance of the Expert Panel. *See* discussion at Part IV.A hereof. DCFS has developed user-friendly dashboards within a Power BI Platform for tracking its performance on these metrics. These data are readily accessible at state and regional levels and are used frequently by DCFS and the Expert Panel.

DCFS has or is developing a reliable data source for each of the key outputs and outcomes that will be provided in the regular reporting to the Court as referenced below. *See supra* at 23-26. For other outputs and outcomes identified in the logic models, DCFS will develop additional data sources and systems for reporting and tracking to the extent they are not already available. DCFS will report to the Court on the status of data collection and data sources as part of DCFS's October 2023 reporting under this Plan.

## V. Reporting

### A. Content of Reports

While this Plan is in effect, DCFS will be providing three types of reports to the Court: Overarching Outcome Reports, Progress Reports, and Integration Reports.

Overarching Outcome Reports: DCFS will file "Overarching Outcome Reports" addressing its performance on the Overarching Outcome measures regarding the safety, permanency and well-being of children in DCFS care. The Reports will be in substantially the

same form as the Interim Report on Overarching Outcome Measures previously provided to this Court.  *See*, *e.g.*, Dkt. 719.

Progress Reports:  Six-month "Progress Reports" will provide and interpret statistical and other data for the key outputs and outcomes outlined in the Logic Model for each of the seven Interventions under this Plan.  *See supra* at 23-26.

Integration Reports:  Six-month "Integration Reports" will address the integrated implementation and impact of all seven Interventions on the desired outputs and outcomes for a specific subset of youth – those served by six Pilot Teams and their comparison teams.  *See* n. 7, *supra*.  The Integration Reports will be prepared on the same six-month cycle as the Progress Reports, and will address, at a minimum:

- the steps that DCFS has taken for addressing system barriers and for rolling out and assessing the fidelity of DCFS's implementation of all of its proposed Interventions and identified evidence-based Interventions for youth served by the six Pilot Teams;

- the results of its formative evaluation and any summative evaluations of impacts following the guidelines in the Children's Bureau's "Framework" publication and using appropriate comparison groups and the key metrics and other measures identified in each Intervention's logic model; and

- the various quality service reviews undertaken for ensuring that children are being fully served as intended and learning when specific initiatives should be sustained, discontinued, or revised when the desired goals are not being achieved.

The Progress Reports and Integration Reports will be developed based on data available as of the close of the latest six-month review period preceding the Report due date.[33]

**B.    Reporting Schedule**

The schedule for reporting to this Court will be as follows:

**April and October**:  On the 15th day (or next business day thereafter) of these months,

---

[33] There are two review periods per year, with the first running from January 1 through June 30 and the second running from July 1 through December 31.

DCFS shall file (i) a six-month Integration Report, and (ii) a six-month Overarching Outcomes Report, which will include the Progress Report as an Appendix. The Parties and Expert Panel will appear at the Court's discretion for status on a date set by the Court shortly after these six-month Reports are filed to address any questions or concerns the Court may have regarding the content of the Reports.

**July and January**: On dates set at the Court's convenience, the Parties and Expert Panel shall appear for a status hearing before the Court. At least two weeks prior to each status hearing, the Parties shall file an agreed agenda listing the general topics that the Parties and / or Expert Panel intend to cover with the Court, and further shall be prepared to address any additional or other topics of interest or concern to the Court.

### C. Preparation of the Reports

DCFS's draft of each Overarching Outcome Reports, Progress Report, and Integration Report shall be provided to Plaintiffs, the Special Master, and the Expert Panel at least four weeks in advance of the deadline for filing with the Court. Plaintiffs shall have one week to identify in writing any questions or concerns regarding the Progress Reports and Implementation Reports to the Special Master, DCFS, and the Expert Panel. DCFS shall respond to all reasonable requests the Expert Panel may make to verify the accuracy, reliability, and validity of the information and findings contained in the Reports.

For all Reports to the Court, the Parties and Expert Panel will join in filing a single Report and will strive to reach a mutually acceptable resolution of any disputes regarding the content of the Report. If agreement cannot be reached regarding any disputes with the assistance of the Special Master, the Report will reflect the areas of dispute and the Parties' or Expert Panel's respective positions as to such disputes.

### D. Additional Reporting to Plaintiffs and the Expert Panel

DCFS will provide additional reporting to Plaintiffs and the Expert Panel regarding the full set of outputs and outcomes reflected in the Logic Model for each Intervention. These reports will be provided regularly on a mutually agreeable cycle.

## VI. The Satisfaction Criteria for Plan Termination

DCFS may seek termination of this Plan by submitting evidence demonstrating that all components of the following three Satisfaction Criteria are being met concurrently as of the time that termination is sought.

Criterion 1: DCFS has met the Illinois Standard for the overarching outcome measure for Maltreatment in Foster Care or, alternatively, has demonstrated 24 months of sustained past incremental improvement that trends toward achieving the Illinois Standards within the next 18 months.[34]

Criterion 2: DCFS has met the Illinois Standard for the overarching outcome measure for Permanency In 12 Months for Children In Care 24 Months or More or, alternatively, has demonstrated 24 months of sustained past incremental improvement that trends toward achieving the Illinois Standard within the next 18 months.[35]

Criterion 3: DCFS has successfully implemented its new Wellbeing Improvement Review and Linkage ("WIRL") program of enhanced assessment and service delivery, and further has improved living arrangement stability, for an identified subset of youth experiencing significant living arrangement instability due to high mental or behavioral health needs (hereinafter the

---

[34] Operationally defined as the fitted linear trend line to the past 24 months of data, which extrapolates to reaching the relevant Illinois Standard at the end of the next 18-month period. *See* Appendix at 40 (providing an explanation and exemplar diagram).

[35] Operationally defined as the fitted linear trend line to the past 24 months of data, which extrapolates to reaching the relevant Illinois Standard at the end of the next 18- month period. *See* Appendix at 41(providing an explanation and exemplar diagram).

"Youth Needing Intervention" or "YNI Youth"). The YNI Youth are those youth in care who move to a fourth living arrangement in a twelve-month period when one of those four living arrangements includes a psychiatric hospitalization.[36] The evidentiary showing to satisfy Criterion 3 must be sufficient to demonstrate each of the following:

(a)    DCFS has improved Living Arrangement Stability for YNI Youth to a rate of below 4.0 moves per 365 days or, alternatively, has demonstrated 24 months of sustained past incremental improvement that trends toward achieving that standard within the next 18 months;[37] and

(b)    Once subpart (a) is achieved, an outside Neutral shall be appointed and shall independently validate that DCFS has achieved the following in respect to a statistically significant, representative, random sample of youth who were YNI Youth during the one-year period preceding DCFS's achievement of part (a) hereof and who were not diverted from the WIRL case review process:[38]

    i.    95% of the sample received a case review based on DCFS's standardized WIRL review tool and had a CFTM or other staffing that meets the standards for a CFTM in DCFS policy[39] and is recorded as a CFTM in DCFS's case

---

[36] This Satisfaction Criterion focuses on YNI Youth in light of the Expert Panel's data analysis and conclusion that youth who experience four living arrangement moves in a single year, where one of the moves involving psychiatric hospitalization, are at much higher risk for long stays in foster care when compared to other youth in care.

[37] An explanation of the methodology for calculating this rate is included at Appendix at 42. A rate of 3.99 moves per 365 days would satisfy this measure.

[38] DCFS may determine that a WIRL review was not appropriate, necessary or practicable for a particular YNI Youth. DCFS shall document its determination and the reasons supporting this determination. The unavailability of services or resources for a YNI Youth shall not be deemed a sufficient reason for determining that the WIRL review is not appropriate, necessary or practicable. DCFS shall provide information to the Court regarding instances where it determines that the WIRL review is not appropriate, necessary or practicable for a particular YNI Youth. This reporting shall be provided as part of DCFS's Progress Reports described in Part V.

[39] Staffings that would qualify as CFTMs according to the standard in DCFS policy would include staffings or team meetings under the following programs: Wraparound, Pathways to Success, and work performed under the LSSI "Families Together" model presently being piloted by DCFS.

management system (i.e., SACWIS or its successor) to develop a plan (the "YNI Plan," which is included with the individual child's Service / Case Plan) identifying needed services and supports within 35 days after the Youth was identified as a YNI Youth;

ii. 95% received their YNI Plan within 42 days after the Youth was identified as a YNI Youth;

iii. 95% of the YNI Plans reviewed in the sample satisfy a quality review to be conducted by the Neutral, which shall consist of confirmation of the following: (1) the YNI Plan was developed following a documented CFTM or equivalent staffing as described above; (2) the YNI plan identified both the current needs of the YNI Youth and the Youth's path toward stability and permanency; (3) the YNI plan identifies services, supports or interventions that are clinically appropriate to meet the identified needs of the YNI Youth, as determined by the CFTM; and (4) the YNI plan is specific, measurable, relevant and sets appropriate timeframes for achievement.

iv. 90% of YNI Youth are either receiving or have received all services and supports identified, and are in the identified living arrangement recommended in their YNI Plan within six months or less after the Youth was identified as a YNI Youth, as clinically appropriate based on the current needs of the YNI Youth; and

v. All cases reviewed contained documentation that notification was provided to the DCFS Deputy Director responsible for resource development for any instance where a service, support or living arrangement that was identified for a YNI Youth was unavailable.

For purposes of appointment of the Neutral evaluator referenced in Criterion 3, the Parties shall attempt to identify a mutually acceptable person or entity with appropriate credentials and experience to serve as the Neutral. Unless otherwise mutually agreed upon by the Parties, the Neutral shall not have any other contractual relationship with DCFS. The nomination for the Neutral shall be submitted to the Court for approval. If agreement on a proposed Neutral cannot be reached, the Parties may submit competing proposals to the Court with brief submissions in support thereof. The expense for retaining the Neutral and for the Neutral's evaluation process shall be borne entirely by DCFS. The Neutral may retain child welfare professionals solely for the purposes of satisfying the Neutral's responsibilities under this Plan. Before retaining such professionals, the Neutral shall provide written notice to the Parties identifying the proposed

professionals to be retained, as well as their fees and relevant experiences. If any Party objects, that Party shall submit a written statement describing the objection to the other Party and the Expert Panel within seven calendar days of receipt of the notice. Within seven calendar days of receipt of the objection, the Parties and the Expert Panel shall meet and confer. If an agreement is not reached, any Party or the Expert Panel may file a motion with the Court within seven calendar days of the meeting, otherwise any objection is waived. The Neutral and anyone retained by the Neutral for purposes of the evaluation shall review and sign the Protective Orders entered in this case.

## VII.    Dispute Resolution

For any unresolved disputes under this Plan other than those regarding Reporting, as described above, the Parties and the Expert Panel shall, prior to seeking judicial relief, notify the Special Master in writing of the dispute and the bases for the notification. Within 30 calendar days of notification, those responding to the notification shall submit a written statement to the Special Master, copying the Expert Panel and any other Party, specifying: (i) whether they disagree with any of the facts and issues raised in the written notification; (ii) the basis for each such instance of disagreement; and (iii) what actions, if any, they propose to take with regard to the issue of alleged non-compliance. Regardless of whether the Parties and Expert Panel all agree with the assertion of noncompliance, all shall meet with the Special Master within 15 calendar days of the written response.[40] The purpose of this meeting shall be for the Parties and Expert Panel to engage in good faith negotiations with the assistance of the Special Master to determine whether additional actions are necessary to address the assertion of non-compliance. At the conclusion of the dispute resolution process, if there is no agreement, either Party or the Expert

---

[40] This date may be extended by mutual agreement of the Parties, the Expert Panel, and the Special Master.

Panel may request the Special Master to prepare and issue a report with recommendations concerning the dispute. This Report and Recommendation shall be provided to the Parties and Expert Panel and filed with the Court. Once the Report and Recommendation is filed by the Special Master, the procedures set forth in Fed. R. Civ. P. 72 shall apply.

# APPENDIX

In respect to improvement on the selected "satisfaction" components for this Plan, "satisfaction" is defined as either achieving the Satisfaction Criterion or, alternatively, that linear extrapolation (which allows for some minor deviations from consistent incremental improvement) shows that DCFS is on a path to reach the Satisfaction Criterion within 18 months. The three figures below illustrate the linear extrapolations.



**Maltreatment in Care per 100,000 days (lower is better)**

The observed data for Maltreatment in Care per 100,000 days (red boxes) shows incremental improvement over the last 24 months, but the amount of improvement is not yet on a linear path that extrapolates to reaching the state standard of 9.0 at the end of the next 18 months. Hence the improvement would not be assessed as "satisfaction." All red squares would need to fall at or *below* (lower is better) the green satisfaction trend line for 24 consecutive months in order to demonstrate sustained past incremental improvement.



**Permanency in 12 Months for Children in Care 24 Months or More**
**(higher is better)**

Similarly, all observed data points for Permanency in 12 Months for Children in Care 24 Months or More (red boxes) would need to fall at or above (higher is better) the satisfaction trend line for 24 consecutive months in order to be assessed as "satisfaction." Sustained widening of the gap between observed data and the satisfaction trend line, as shown in the Permanency figure, is a clear signal that implementation is not progressing as expected.



**Living Arrangement Moves in Next 365 Days for Youth with Four Moves Plus Psychiatric Hospitalization in Past 12 Months (lower is better)**

Average Moves through Next 12 Months — Satisfaction Trend Line — Satisfaction Standard

Lastly, the observed data for Living Arrangement Moves in the Next 365 Days for YNI youth as defined above (*see supra* at 35-38) demonstrates urgent need for corrective action. All data points for the last 24 months of observed data (red boxes) would need to fall below the green satisfaction trend line (lower is better) for 24 consecutive months in order to trigger the appointment of an outside Neutral as discussed above. It should be noted that the satisfaction standard of less than 4.0 moves per 365 days is an aggregate rate. It is calculated by computing the total sum of moves (which can vary from 0 to higher than 4.0) that all YNI experience in the next 365 days and dividing this sum of moves by the total sum of days youth spent in care during this period. If this rate multiplied by 365 days is less than four (e.g., 3.99 or less) for 24 consecutive months, then the appointment of an outside Neutral is warranted.