IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| B.H., et al., Plaintiffs, v. HEIDI E. MUELLER, Director, Illinois Department of Children and Family Services, Defendant. | ) | No. 88 C 5599 Hon. Jorge L. Alonso Judge Presiding |

**April 2026 Progress Report**

The *B.H.* Superseding Implementation Plan (Supplemented) (hereinafter the "SIP") requires submission of a Progress Report every six months. Dkt. 834-1 at 33. This Progress Report is jointly submitted by the Parties with the agreement of the Expert Panel.[1] The reporting period for this Report is calendar year 2025 ("CY25") based on data available as of February 2, 2026.

In this Progress Report, the Department continues to provide statewide data for each SIP Intervention as outlined in the current SIP Logic Models. The data consist of identified Key Outputs, such as new services or a change in practice, and Key Outcomes, or improvements in the conditions of children and their families that one would expect to see as a result of the Interventions.[2] These metrics were intended to provide a means for gauging whether the Department is making progress toward achieving its reform goals. Dkt. 834-1 at 34. The first

[1] For ease of reference, the Department of Children and Family Services is referred to herein as the "Department" or "DCFS," and this Court's appointed experts are referred to as the "Expert Panel." Dkt. 819.

[2] The terms "outcome" and "output" are defined in greater detail in the SIP. *See* Dkt. 834-1 at 3, nn.3-4.

section of this Progress Report presents data in the same format used in prior Progress Reports: (i) an overview of the demographics of youth in care; (ii) a summary of the Department's statewide performance data as called for under the current Logic Models for the seven SIP Interventions, and (iii) statewide performance data for the three SIP Satisfaction Criteria.

The second section of this Progress Report is new. It provides updates on matters highlighted in the Joint Status Report the Parties filed in late 2025 (Dkt. 897), including pertinent data regarding the Department's ongoing performance on SIP Interventions and the SIP Satisfaction Criteria. The Department sets out the commitments it made in the Joint Status Report, the progress it has made toward those commitments to date, and the next actions it will undertake under the SIP.

## I. Demographic and Performance Data

### A. Youth in Care / Demographics

From January 1, 2025 through December 31, 2025, there were 22,638 youth with active child cases for eight days or longer. The demographics of these youth in care are as follows: 51% are male, 44% are non-Latino White, 38% are non-Latino Black, 12% are Latino, 5% are multiracial, and 1% are other races and nationalities. Approximately 31% of these youth were under five years of age, 28% were between five and ten years of age, 19% were between 11 and 15 years of age, and 22% were over the age of 15. These demographics have remained relatively consistent. *See* Dkt. 845 at 2; Dkt. 876 at 2; Dkt. 895 at 2.

### B. Statewide Data for the Seven SIP Interventions

#### 1. *The Resource Development Intervention*

The Resource Development Intervention calls for DCFS to expand the capacity of community- and home-based placements and increase and enhance services to address the needs

of children, particularly those youth in the care of relatives. Dkt. 834-1 at 8-10. The following tables provide the statewide data for the two current Key Outputs for this Intervention.[3]

***Logic Model Key Output***: *To increase both the number and percentage of youth receiving Intensive Placement Stabilization ("IPS") services.*

Number and Percentage of Youth in Care Receiving IPS

| | FY22 | CY22 | FY23 | CY23 | FY24 | CY24 | FY25 | CY25 |
|---|---|---|---|---|---|---|---|---|
| Number | 924/ 26676 | 942/ 26189 | 968/ 25918 | 1032/ 25699 | 1132/ 25276 | 1203/ 24499 | 1248/ 23615 | 1300/ 22603 |
| Percentage | 3% | 4% | 4% | 4% | 4% | 5% | 5% | 6% |
| Benchmark | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |

In CY25, six percent of youth received IPS services. There has been a gradual increase in youth receiving IPS services since FY22, and DCFS exceeded its performance improvement benchmark of 5%.

[3] The data for the Key Outcome (decrease the number of living arrangement moves for Youth in Need of Intervention ("YNI")) relates to one of the three Satisfaction Criteria for the SIP and is provided below. *See infra* at 16–17.

***Logic Model Key Output***: *To increase use of "flex funds"[4] when youth need financial assistance for highly individualized supports in order to remain stable in a community-based setting.*

| | FY22 | FY23 | FY24 | FY25 |
|---|---|---|---|---|
| FY22 | $1,588,326 | | | |
| FY23 | | $955,352.74 | | |
| FY24 | | | $1,413,441.07 | |
| FY25 | | | | $1,617,114.39 |

DCFS committed to "increase year-over-year expenditures for youth who receive flex funds as a means to reduce living arrangement moves and increase youths' likelihood of achieving permanency." Dkt. 834-1 at 23. To date, DCFS has only reported flex funds spent through the "Flex Cash Assistance Program," which also disperses funds for the purposes described above. In the next reporting period, DCFS will report on expenditures under both the Flex Cash Assistance Program and a newly-developed program, the Youth Enrichment & Support Funds ("YES Funds"), also intended to facilitate flex fund spending. The Department will explain how these

[4] These funds can be used to cover such items, among others, as mentor services, camps or other enrichment activities, and respite services for the youth's caregiver. Dkt. 834 at 1.

two programs providing flexible funding for children differ in their disbursement mechanisms. *See infra* at 21. Because complete CY25 flex fund data is not currently available for both the YES Funds and Flexible Cash Assistance Program, this Report only provides data for the Flexible Cash Assistance Program through June 30, 2025.

### 2. *The Child and Family Team Meetings Intervention*

The SIP called for the Department to test its strategies for this Intervention in the Partner Teams. The final performance results for the Partner and Comparison Teams' progress was provided in the now-discontinued Integration Report. Dkt. 834-1 at 7-8. The Department has not been reporting statewide data for this Intervention. The Department is revising its strategies under this Intervention, as stated in Part II of this report. *See infra* at 18-20.

### 3. *The Quality Family Engagement Intervention*

The Quality Family Engagement Intervention requires intentional and consistent engagement with families, youth, and caregivers through improved casework. Dkt. 834-1 at 11-12. The following tables provide the statewide data for the current Key Output and Key Outcome for this Intervention.

***Logic Model Key Output***: *To increase the percentage of monthly in-person caseworker contacts that are rated as a strength in the Department's Administrative Case Review ("ACR") process.*[5]



| | Baseline (July 2022 - Dec 2022)* | January 2023 - June 2023** | CY23 | CY24 | CY25 |
|---|---|---|---|---|---|
| Performance | 85% | 87% | 87% | 91% | 94% |
| Benchmark | 91% | 91% | 91% | 91% | 91% |

During CY25, the percentage of monthly contacts with youth rated as a strength increased to 94%, which exceeds the Department's improvement benchmark of 91%.

---

[5] All youth in care are reviewed by ACR every six months, therefore a six-month period of ACR data captures all youth in care.

***Logic Model Key Outcome***: *To increase the percentage of youth with case plan development and content rated as a strength in the ACR process.*

| | Baseline (July 2022 - Dec 2022)* | January 2023 - June 2023** | CY23 | CY24 | CY25 |
|---|---|---|---|---|---|
| Performance | 28% | 30% | 31% | 30% | 26% |
| Benchmark | 35% | 35% | 35% | 35% | 35% |

During CY25, there was a decrease in the percentage of youth with case plan development and content rated as a strength. The Department has not achieved its improvement benchmark.

### 4. *The Home of Relative/Fictive Kin Licensure Intervention*

The goal of the Home of Relative/Fictive Kin Licensure Intervention has been to substantially increase the percentage of relative and fictive kin homes that are licensed. The following tables provide statewide data for the current Key Output and Key Outcome for this Intervention.

***Logic Model Key Output***: *To increase the number and percentage of foster parent licensing applications completed within 120 days after a youth is placed in a home.*[6] Dkt. 834-1 at17.

| | CY 2021 | CY 2022 | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|---|---|
| Performance | 19% | 16% | 18% | 25% | 18% |
| Benchmark | 25% | 25% | 25% | 25% | 25% |

During CY25, 18% of licensing applications were completed within 120 days of placement of the youth. This is a decrease from 25%, which was achieved in CY24.

[6] Both the Key Output and Key Outcome for this Intervention are tracked by six-month cohorts of placements to address the volatility of kinship placements during the early months of care. The six-month cohorts are determined based on children who were placed for 270 days at a kinship home placement during the six-month period. The baseline and progress data each comprise two full six-month cohorts. The baseline counts those kinship homes in which the 270th day of placement occurred between July 1, 2021, and December 31, 2021 (cohort 1) or between January 1, 2022, and June 30, 2022 (cohort 2) representing all of FY 2022.

***Logic Model Key Outcome***: *To increase the number of homes licensed within 270 days after a youth is placed in the home*. Dkt. 834-1 at 17.

| | CY 2021 | CY 2022 | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|---|---|
| Performance | 18% | 16% | 17% | 20% | 11% |
| Benchmark | 23% | 23% | 23% | 23% | 23% |

During CY25, 11% of foster home licenses were approved within 270 days. Going forward, performance goals for licensing kin caregivers will be reevaluated in light of the expected impact of kin caregiver certification under the Illinois Kinship in Demand Act ("KIND Act"). *See* Dkt. 897 Joint Status Report at 14-16. Further discussion of how the KIND Act implicates both this and the Subsidized Guardianship Intervention is included in Part II of this Progress Report.

**5. *The Subsidized Guardianship Intervention***

The Subsidized Guardianship Intervention calls for DCFS to increase the number of youth that achieve permanency through guardianship, thereby achieving substantial, system-wide progress in reducing youths' length of stay in care. Dkt. 834-1 at 19. The following tables provide statewide data for the current Key Output and Key Outcome for this Intervention.

***Logic Model Key Output***: *To identify youth in care who meet the criteria for the permanency goal of guardianship and increase the number of those youth with guardianship assigned as a goal.* Dkt. 834-1 at 20.

| | Baseline (FY22)** | CY23 | CY24 | CY25 |
|---|---|---|---|---|
| Performance | 5% | 7% | 8% | 9% |
| Benchmark | 5% | 5% | 5% | 5% |

During CY25, 9% of youth in care statewide had a permanency goal of guardianship. DCFS continues to exceed the current benchmark for this measure.[7]

[7] As stated in the October 2025 Progress Report, at the recommendation of the Expert Panel, DCFS is not revising its goal for this metric until it closes the gap between the number of youth who have a goal of subsidized guardianship and the number of youth who actually exit care through subsidized guardianship. Dkt. 895 at 9.

***Logic Model Key Outcome**: To increase the number of youth discharged to permanency through guardianship.*

| | Baseline (FY22)** | CY23 | CY24 | CY25 |
|---|---|---|---|---|
| PGH | 69 | 41 | 25 | 28 |
| SGH | 336 | 387 | 556 | 607 |
| Benchmark | 480 | 480 | 480 | 480 |
| Total | 405 | 428 | 581 | 635 |

In CY25, 635 youth were discharged to permanency through guardianship, 607 of which were subsidized guardianships. The Department continues to exceed the incremental benchmark of 480 discharges through subsidized guardianship per year.

**6. *The Administrative Case Review Intervention***

The Administrative Case Review Intervention requires DCFS to improve follow-up by DCFS and private agency caseworkers who receive actionable feedback through the ACR process. Dkt. 834-1 at 21-22. The Department's ACR model is organized around determining the quality of five priority casework practices relating to improved permanency and other positive outcomes. The following tables provide statewide data for the current Key Output and Key Outcome for this Intervention.

***Logic Model Key Output***: *To increase family and youth attendance and participation at ACR.*

| | Baseline (July 2022 - Dec 2022)* | January 2023 - June 2023** | CY23 | CY24 | CY25 |
|---|---|---|---|---|---|
| Performance | 23% | 27% | 23% | 26% | 28% |
| Benchmark | 50% | 50% | 50% | 50% | 50% |

During CY25, the Department's performance on this measure remained relatively steady and below the improvement benchmark.

***Logic Model Key Outcome***: *To achieve progressive improvement in ACR for overall quality for each of the five priority areas in the ACR evaluation system.*

| | Quality of CFTM | Quality of Caseworker Contact | Quality of Family Visitation | Quality of Supervision | Quality of Case Planning |
|---|---|---|---|---|---|
| Baseline (July 22 - December 22)* | 25% | 79% | 69% | 65% | 63% |
| Jan 23 - June 23** | 30% | 81% | 75% | 66% | 61% |
| Jan 23 - Dec 23 | 30% | 82% | 69% | 67% | 61% |
| July 23 - June 24 (FY24) | 32% | 85% | 70% | 70% | 62% |
| January 2024 - December 2024 (CY24) | 35% | 87% | 72% | 70% | 63% |
| July 24 - June 25 (FY25) | 39% | 88% | 73% | 70% | 65% |
| January 2025 - December 2025 (CY25) | 41% | 88% | 72% | 71% | 66% |
| Benchmark | 50% | 91% | 85% | 85% | 85% |

The priority areas for the ACR Intervention are: (i) Quality of CFTMs; (ii) Quality of Caseworker In-person Visits; (iii) Quality of Family Visitation; and (iv) Quality of Caseworker Supervision; (v) Quality of Case Planning.[8] The Department's performance has remained relatively steady for this Key Outcome.

### 7. *The Residential Monitoring Intervention*

The Residential Monitoring Intervention requires DCFS to enhance monitoring of residential treatment facilities. The Department worked with its external partners to develop and finalize a new Residential Contract Performance ("RCP") Model in August 2025. The new RCP Data System went live in December 2025 and is currently in use, but further review and

[8] For the Quality of Case Planning component, the baseline period is September 1, 2022 to December 31, 2022. The period is shortened because the Quality of Case Planning component of the new ACR process was not implemented until September 2022.

refinements will be needed before data reporting to the Court can begin and before the data are used to rate provider performance and determine any follow-up monitoring actions.

**C. Statewide Data for the SIP Satisfaction Criteria**

The Department is making progress on reaching the Satisfaction Criterion for reducing maltreatment in care. The Department has met the Satisfaction Criterion for permanency for youth in care two years or more, and continues to work with the Expert Panel to address the Satisfaction Criterion for placement stability and the timely provision of services and supports for youth with unmet mental and behavioral health needs.

**1. *Maltreatment in Care (lower is better)***



The DCFS provisional maltreatment in foster care rate for the rolling 12-month time period of November 1, 2024 to October 31, 2025 is 13.8 victimizations per 100,000 days.[9] Though the rate has been gradually trending downward, the Department's performance remains above the Illinois Standard (9%).

The Department's improved performance is a positive step and follows implementation of a series of improvement strategies. The Department's efforts to analyze and understand this trend are addressed in Part II of this report.

### 2. *Permanency in 12 Months for Children in Care 24 Months or More (higher is better)*

[9] The graph for this measure accordingly now depicts the newest data as a hollow box to reflect that the reported data is provisional until a longer follow-up period can be observed. Dkt. 894.

Of all children who had been in care for 24 months or longer on November 1, 2024, including those aged 18 and older, the percentage of children who achieved permanency within the ensuing one-year period was 32.8%. When limited to youth under the age of 18, the Department's performance is 37.7%.[10] The Expert Panel has certified that the Department continues to meet this Satisfaction Criterion for both age groups.

### 3. *Reduced Instability for YNI Youth*

The Satisfaction Criterion for YNI youth has two components, the first of which requires reduction in the rate of change in their living arrangement to fewer than 4.0 moves per 365 days. *See* Dkt. 834-1 at 36-38. [11]

---

[10] As explained in the October 2025 Overarching Outcomes Report, the Department is reporting its performance on this measure for two groups of youth – first, for all *B.H.* class members (which includes youth in care aged 18 and older), and second, for youth under the age of 18.

[11] Once the living arrangement stability metric is achieved, an outside neutral evaluator will independently validate whether the Department met the criteria set forth in the SIP regarding the development of YNI plans that identify the youths' needs and paths to permanency, as well as the timely provision of clinically appropriate services and supports necessary to address the youths' mental and behavioral health needs in the identified living arrangement recommended in their YNI plans. Dkt. 834-1 at 37-38.



Decrease Number of Living Arrangement Moves for Youth Experiencing 4 Moves in a 12-Month Period When One of the Moves Including a Psychiatric Hospitalization (as Measured by 12 Months Following Identification of Meeting Criterion)
12
11
10
9
8
7
6
5
4
3
2
1
0
9.57
8.34
8.22

| | Baseline (FY22 per October Progress Report) | CY24 Average Placement Moves per 365 Days in 12-months post-threshold (Chapin Hall) | CY25 Average Placement Moves per 365 Days in 12-months post-threshold (Chapin Hall) |
|---|---|---|---|
| Performance | 9.57 | 8.34 | 8.22 |
| Benchmark | 5.4 | 5.4 | 5.4 |

During CY25, there has been a slight increase in the number of living arrangement moves for YNI youth, to 8.22, though the number remains below the FY22 baseline of 9.57. With the assistance of the Expert Panel, the Department is substantially revising the Department's approach to serving YNI youth as discussed in Part II of this Report.

## II. Implementation Update

### A. Explanation of New Reporting Format

As the Parties set forth in the Joint Status Report filed in late 2025, the Department is modifying its strategies for achieving the performance improvement goals embodied in the SIP and is working with the Expert Panel and Plaintiffs to develop new reporting metrics for addressing these proposed changes. *See* Dkt. 897; Dkt. 834-1. DCFS is pursuing these changes in light of its

achievement of one SIP Satisfaction Criterion, progress it has made toward meeting a second, and the difficulties it has encountered in trying to address the third.

Below, the Department first summarizes the work it has done to meet the commitments it made in the Joint Status Report and then outlines the actions it will take in the next reporting period. *See* Dkt. 897, Joint Status Report. The Department anticipates that future Progress Reports will follow this structure, such that initial demographics about youth in care will be provided, followed by statewide data for metrics relating to SIP Intervention strategies, and concluding with an Implementation Update that sets out the following information for each reform strategy:

- Prior DCFS Commitments
- Implementation Work Since Prior Report
- Commitments For Next Reporting Period

**B. Progress Update Since Joint Status Report.**

In the November 2025 Joint Status Report, the Parties identified certain activities and approaches that DCFS would give heightened attention as the first phase of SIP implementation concluded. Following the Joint Status Report's structure, an update on each of these identified priority areas is provided below.

***1. Implementing Child and Family Teams.***

The Department recognizes the ability to meet and sustain the goals of the SIP turns on an effective Child and Family Team ("CFT") that meets regularly and works collaboratively together to achieve the youth and family's goals. Team practice requires continuous engagement to ensure team members – the child, parents, family members, caseworkers, caregivers, and treatment providers, among others – will participate, express their desired goals, feel heard, understand the plan and their specific roles and assignments in it, and work with the entire team to achieve the plan's goals. To this end, the Department is turning its focus toward improving caseworkers'

adoption of the full array of teaming strategies encompassed within its Child and Family Team practice model.

*Prior DCFS Commitments*

In the November 2025 Joint Status Report, DCFS committed to:

- Updating the policies, training, and resource materials regarding Child and Family Team practice, including remediating gaps identified in the previous audit of the Foundations training and ensuring that procedures prioritize and reinforce the required elements of the core practice model;
- Improving data systems to better track, guide, and document the work of Child and Family Teams; and
- Utilizing technology to address administrative challenges in scheduling Child and Family Team meetings and communicating with the Team.

Dkt. 897 at 11.

*Implementation Work Since Prior Report*

DCFS originally intended to redraft its procedures for CFTMs relating to how and when Child and Family Team Meetings should occur but paused that process after acknowledging that its focus instead should expand and include broad teaming practices beyond the conduct of CFT meetings. DCFS' initial work reconfirmed that current training and guidance materials do not contain clear and consistent messaging and direction. The Department retained University of North Carolina Collaborative for Implementation Practice ("UNC") to (1) survey the best available research, evidence, and practices regarding effective child and family teaming; and (2) to identify team building and engagement skills necessary for team practice that effectively facilitates care and support for youth with high acuity. The information provided by UNC will inform Department's policy, training, coaching and tool updates.

The Department has made progress on its data system and technology solutions. The DCFS data system of record, SACWIS, has been updated to better prompt and track CFTMs. DCFS has

built and is using a prompt system to "nudge" caseworkers to conduct CFTMs on the appropriate schedule and insert notes on CFTMs. The prompt only disappears once the objective is met.

Finally, DCFS is evaluating technology systems that would assist in scheduling and providing stakeholders with reminders for CFTMs and other important events. If current DCFS systems cannot be used to accomplish this objective, the Department will evaluate whether to procure or build technology to assist with this scheduling.

*Commitments For Next Reporting Period*

The Department commits to:

- Identify the technology that will be used to assist stakeholders with communications and scheduling for child and family team activity and provide a timeline for implementation of that technology.
- Analyze with the Expert Panel the conclusions from the final evaluations due in May 2026 addressing the Partner and Comparison Team results from the initial phase of SIP implementation. [12]
- Work with the Expert Panel and its external partners, develop an initial action plan for implementing high quality teaming practice focusing first on a small number of high acuity YNI youth.
- Work with external research partners to evaluate methodologies for identifying, measuring, and reinforcing quality Child and Family Team practice by caseworkers statewide, and provide a timeline for action (including development of practice improvement strategies and addressing data collection and reporting) based on the results of that evaluation.

**2. *Resource Development***

During the first phase of the SIP, the Resource Development Intervention focused on two resources: increasing the use of flex funds, which caseworkers can access in order to provide individually customized supports and resources to swiftly meet a youth's unique needs; and

[12] The Expert Panel and Parties are awaiting the evaluation reports from Chapin Hall and UNC, the two entities charged with preparing those evaluations. Dk. 897 at 5, 10.

increasing the availability and provision of Intensive Placement Stabilization ("IPS") services. Dkt. 897 at 12-13. As shown above, use of IPS services has increased, but the Department has not achieved its goals regarding flex funds usage. The Parties and Expert Panel agree that the Department now must expand its resource development efforts.

*Prior DCFS Commitments*

DCFS committed in the prior report to:

- Develop a system for tracking the use of flex funds in a more timely and granular way to ensure that funds are used effectively to serve children and families.
- Revisit the resource development efforts set forth in the SIP and begin new service array improvements to serve high acuity youth in the community.

Dkt. 897 at 13.

*Implementation Work Since Prior Report*

For the purpose of the SIP, "flex funds" are any funds "used to address highly individualized needs of the child and family by securing mentors and other para-professional services, respite services, transportation, and for paying fees for enrichment activities such as camps, YMCA programs, and non-traditional therapeutic-like services such as art classes." Dkt. 834-1 at 8. In short, they are funds caseworkers, who know the child, can spend quickly and flexibly to stabilize placement, assist with permanency, and enrich the lives of youth in care. To date, as noted above, DCFS has been reporting the use of Flex Funds issued through the Flex Cash Assistance Program. To better facilitate the use of flex funds for children, DCFS instituted a new, additional program in FY 26 for Child Welfare Contributing Agencies ("CWCA"), private entities which provide case management services to 70% of DCFS youth in care. This program is referred to as "YES Funds." The Department's goal was to promote use of the funds while introducing a streamlined and technology-based reimbursement system that can easily track expenditures.

For its second resource development commitment in the Joint Status Report, DCFS engaged Dr. Richard Epstein at Northwestern University Feinberg School of Medicine to build a statistical model for two purposes: first, to identify youth meeting YNI criteria ("YNI youth") or youth at risk for later meeting YNI criteria ("Pre-YNI youth"); and second, to identify risk and protective factors, which DCFS intends to use in order to identify and secure resources and services to address the YNI youth or Pre-YNI youth's needs and strengths. This is a significant research undertaking that is already in progress and is being undertaken in collaboration with the Expert Panel.

*Commitments For Next Reporting Period*

The Department commits to:

- Increase the YES Funds advances to CWCAs from 10% to 20% of overall funds to eliminate administrative barriers to use.
- Complete development of and implement the DCFS technology tool to request and track the use of flex funds offered through the YES Funds, the Flex Cash Assistance Program, or other similar programs, including who receives them, the youth being served, for what reason, and the amount.
- Develop a communication strategy to message within DCFS and CWCA the importance of flex funds and how to access them (through the multiple programs referenced above).
- Consult with the Expert Panel to identify and plan for development of living arrangements and other resources youth need to avoid placement in or step down from institutional settings, with a particular focus on YNI youth.
- Northwestern University will finish the initial stage of the study DCFS intends to use to identify pre-YNI youth and to provide tailored services to improve their stability and well-being. DCFS will report pertinent results from that study and actions to be taken in the next six months for the pre-YNI youth initiative.

### 3. ***Relative Caregiver Supports and Subsidized Guardianship***

DCFS's implementation of the KIND Act implicates the Relative/Fictive Kin Licensure and Subsidized Guardianship Interventions in the SIP. Dkt. 897 at 14-16. Because the relative

certification process is less burdensome than current licensure requirements, it is expected that the vast majority of relative caregivers will opt to pursue certification instead of licensure.[13] The increase in certification means that more relatives will be eligible to serve as subsidized guardians, making that permanency goal more readily available for youth than it was prior to KIND Act implementation.

*Prior DCFS Commitments*

DCFS committed to:

- Finalizing Procedure 415 related to relative certification, raising the board rate for uncertified relative caregivers to 90% of the foster care maintenance payment from July 1, 2025 onward, and adopting a system to track relative certifications.
- Launching the certification process.
- Developing and launching training on the KIND Act and certification and developing a communication strategy for internal and external audiences concerning caregiver certification.
- Establishing the KIND Act decision review panel to review denials of certification, denials of placement, and denials of a plan for visitation.
- Establish a Kinship Navigator program and launch a pilot no later than July 2027.

*Implementation Work Since Prior Report*

The Department increased foster care maintenance payments to relatives and made necessary catch-up payments for relatives at the increased rates effective July 2025; issued DCFS

[13] The Department will continue to inform relatives of the option to pursue licensure and assist those who choose to proceed with that option. However, even assuming the Department continues its recruitment efforts at the same level as pre-KIND Act, it is expected that fewer relative caregivers will choose to pursue licensing given the availability of the certification process.

Procedure 415 (Home of Relative Certification) on December 4, 2025; and can now track caregiver certifications.

On December 4, 2025, Director Heidi E. Mueller hosted a DCFS-wide town hall with 3,100 attendees focused on the KIND Act and Relative Caregiver Certification. DCFS then conducted initial testing of the administrative processes for certification using a small number of Child Protection and Permanency teams throughout the state. These teams completed certifications for 77 youth in care, and administrative changes were made as needed in advance of the statewide launch, which began on March 9, 2026.[14] As of April 28, 2026, 248 youth had been certified to 177 unique caregivers. DCFS expects the number of children who have been certified to their relative caregiver to rise quickly in the next several months, particularly given its nation-leading use of relative caregivers. [15]

The Department began offering relative certification training for caseworkers on December 4, 2025. The Department launched the Decision Review Panel when home of relative certification was rolled out statewide. The Department's communication strategy has also been launched and included release of a Frequently Asked Questions document, How To documents, and multiple flyers for relative families and staff. The Department has hosted weekly Office Hours with a live facilitator to answer questions, including 18 sessions in March 2026, and 12 sessions in April 2026.

---

[14] Development of the certification progress required coordination throughout the agency, including Child Protection, Permanency, Agency Performance, Monitoring, and Execution, Budget and Finance, Federal Financial Participation, Procurement, Learning and Professional Development, Communications, Advocacy, and Child and Family Policy.

[15] Illinois was recently recognized by the Department of Health and Human Services, Administration for Children and Families as first in the nation for relative placements. *See* https://aspe.hhs.gov/sites/default/files/documents/9d9d8dc846e4e26acbab86c8d7e80ac8/Kinship%20Care%20Brief.pdf

For Kinship Navigation, the Department's Kinship Navigator workgroup reviewed the models of Kinship Navigator programs currently in the Title IV-E Prevention Services Clearinghouse established by the Administration for Children and Families ("ACF") and identified three models for consideration.[16] The Kinship Navigator workgroup has interviewed representatives from the jurisdictions implementing these models to gather feedback and completed a crosswalk of the available models.

*Commitments For Next Reporting Period*

The Department commits to:

- Select and a Kinship Navigator model in consultation with the Expert Panel and provide an action plan with milestone dates for implementation with the expectation that the new Kinship Navigator program plan will be finalized by November 2026 and implemented on or before July 2027.

- Develop and implement a plan to convert current unlicensed relatives into certified homes.

- In consultation with the Expert Panel, identify and develop specific strategies for improving ongoing family finding and maintaining youths' connections to family and fictive kin for purposes of relational permanence.

- Continue to conduct permanency reviews of youth cases with permanency goals of adoption and guardianship and intervene, where necessary, to allow the cases to proceed toward finalization.

- Complete a statewide communication outreach with all chief judges to emphasize the importance of timely permanency and offer adoption and guardianship finalization assistance.

- Target uncertified relative homes with a guardianship goal for priority certification, including a direct communication campaign and enlisting permanency leadership to move the cases from the field into Subsidy Unit.

---

[16] DCFS will consult with the Expert Panel on this effort, because Kinship Navigator programs potentially impact youth in care. Prevention services, which are services provided to children and family to avoid their coming into care, are not, however, within the scope of this decree and consulting with the Expert Panel on Kinship Navigator programs does not alter that scope.

**4. *Residential Monitoring***

The Residential Monitoring Intervention requires DCFS to enhance monitoring of residential treatment facilities. In this new model, DCFS staff monitor residential facility programs on a monthly basis, which includes a data review, observations, attendance and participation in a sample staffing, and file review. The DCFS monitors summarized their findings in the new Residential Contract Performance Review tool, which will highlight strengths and areas for improvement around contractual performance standards and develop a rating. The rating will drive monitoring levels and guide intervention activities to improve ratings. Dkt. 897 at 16-17.

*Prior DCFS Commitments*

DCFS committed to:

- Advance the design of the role and responsibilities of external advisors and monitoring partners. These external partners are meant to provide targeted programmatic consultation to remediate identified problems and conduct random inspection of residential facilities.
- Develop and bring online the external component of residential monitoring in FY26.

*Implementation Work Since Prior Report*

In December 2025, the Department launched the new Residential Contract Performance ("RCP") tool that was finalized in August 2025. The new RCP data system, which contains monitoring information, went live in December 2025 and is currently in use.

Due to the time and resources needed to accomplish the rollout of the tool, the Department has not made the progress it intended to develop the external partner role. This will be a priority in the next reporting period.

*Commitments For Next Reporting Period*

DCFS commits to:

- Establish a steering committee and achieve three deliverables: a) develop a question-by-question resource to better define each rating level and refine ratings, incorporating feedback from the provider community; b) solidify the inter-rater reliability approach with Chapin Hall; and c) create a rubric for the Department to implement a coordinated response for contracted residential providers with deficiencies.

- Work with Illinois Department of Innovation and Technology ("DoIT") to provide Chapin Hall with access to the Residential Contract Performance Review tool data system, initiate the Chapin Hall evaluation process, and report a timeline for completion of an initial evaluation.

- With input from the Expert Panel, finalize the roles and responsibilities of external monitoring partners, including activities for targeted programmatic consultation and inspections, as outlined in the SIP. *See* Dkt. 834-1 at 20. The Department will establish a timeline for completing rollout of the external partner functions, with the rollout targeted on or before December 2026.

**5. *Maltreatment in Care***

The third Satisfaction Criterion under the SIP is reducing the Maltreatment in Care rate to less than 9.0 victimizations per 100,000 days. The Department continues to work toward achieving that goal.

*Prior DCFS Commitments*

DCFS committed to:

- Work to dispel the mistaken belief that every violation of a visitation order is *per se* neglect and that youth must be removed from a placement whenever a maltreatment in care report is made.

- Provide support to investigators who were treating visitation order violations as *per se* neglect as they adjust their practice.

- Evaluate whether additional categories of maltreatment in care allegations may be appropriate for the Panel's review.

Dkt. 897 at 17-20.

*Implementation Work Since Prior Report*

Addressing the first two commitments, the Department has continued the operation of the Maltreatment in Care Panel. That Panel was convened to allow prompt intervention in situations where maltreatment in care was alleged, both to ensure that youth would not have a placement disruption pending completion of the investigation unless safety concerns warranted that action and so that the Department could develop a better understanding of maltreatment in care reports arising from contacts between youth in kinship care and those youths' parents. Since July 31, 2025, the Panel has issued notifications, received final findings, and reviewed 100 investigations involving 113 youth in care for reports involving Allegation 74, Allegation 60, and unauthorized or unsupervised contact. Common themes across the reviewed reports include caregivers experiencing sudden emergencies that result in youth being left in the care of a biological parent for short periods, parents being present in relatives' homes outside of scheduled visitation, and biological parents staying overnight in relative homes.

The Maltreatment in Care rate has declined since peaking at 17.3 in August 2024, reaching 13.8 during this reporting period. The Department asked its partners at Northwestern University to identify actions that might reasonably be expected to have contributed to the decline in the rate. Northwestern University identified several changes in practice that may have contributed to these results. Notably, preliminary analysis suggests that the decline in the rate appears to be most significant for investigations involving the Allegations of Harm 60 and 74, which are the allegations most likely to include situations – such as a family visit in violation of a visitation order – where a youth did not experience any actual harm and was not, in fact, at imminent risk of harm.

In light of the Panel's current workload, the Department has not yet begun evaluation of a possible expansion of the scope of cases to be reviewed by the Panel.

*Commitments For Next Reporting Period*

DCFS commits to:

- Continue operation of the Maltreatment in Care Panel.
- Develop recommendations from the Maltreatment in Care Panel for action (e.g., training, policy changes) based on the results of their work to date.
- Develop and implement improvements to administrative systems to ensure that placement moves of youth in care are pre-reviewed by the Maltreatment in Care Panel in non-emergency situations as intended.
- Work with Northwestern to further analyze potential factors contributing to the decline in the Maltreatment in Care rate.

**6. *Redevelopment of WIRL for YNI***

The Well-Being Improvement Review and Linkage ("WIRL") has been through prior iterations, and DCFS is actively engaged in another substantial change. "WIRL" has now become shorthand for a system or an approach that will creatively and promptly meet the needs of Youth in Need of Intervention ("YNI").

*Prior DCFS Commitments*

In the Joint Status Report, DCFS committed to:

- Conduct initial steps to retool the WIRL process using a new and intensive review by the Department and Expert Panel of a small subgroup of Youth Needing Intervention ("YNI").

Dkt. 897 at 20-24.

*Implementation Work Since Prior Report*

Beginning in December 2025, DCFS and the Expert Panel began an intensive review of several YNI youth, including their placement and care history while in DCFS custody, their pertinent health history and diagnoses, and their current needs. This was a labor-intensive effort for DCFS and the Expert Panel.

For the selected YNI youth, DCFS piloted an initial strategy for meeting the youths' needs. While case management activities largely remained the responsibility of the caseworker/supervisor and previously existing case team, a *B.H.* "Lead" worker was assigned for each youth. Further coaching and support was to be provided by CWG. The *B.H.* Lead had the authority to facilitate CFT meetings and approve appropriate services requests on an expedited basis, and was expected to:

- Complete targeted file reviews for selected YNI youth.
- Provide feedback to the *B.H.* Team on next steps.
- Participate in case-level staffing as needed.
- Participate in and provide feedback during weekly meetings with the Expert Panel.
- Conduct research on identified areas.
- Review and provide feedback on written reports.
- Collaborate with internal and external divisions to reduce barriers for identified youth.
- Identify systemic and case-level trends.
- Identify service array gaps and needs.

Based on initial testing of this model, the Department and the Expert Panel are in agreement that this structure was not effective in confronting or removing systemic barriers to the prompt provision of resources and supports for the YNI youth in the test group.

*Commitments For Next Reporting Period*

DCFS commits to:

- Continue working with the Expert Panel to design and pilot a revised structure and approach for YNI that directly addresses the needs identified through the in-depth review. The next model to be tested is under development and will use one or more highly experienced caseworkers with very small YNI-only

caseloads (fewer than 5 YNI youth per worker).[17]  Rather than layering resources on top of the existing case team, this strategy will assign and equip an experienced and connected caseworker with the capacity and resources needed to support the youth.  This approach is a variation of a strategy the Expert Panel has previously identified as promising.  These YNI caseworkers will have full case responsibility and will also have latitude to seek and secure individualized supports and living arrangements directly.  The caseworkers will have the authority to invite experts, as needed, into the Child and Family Team.  The Department anticipates having this refined YNI test strategy operational for a small number of YNI youth by Summer 2026.

- Report on the initial results of this model in the next reporting period.  If the model shows promise, the Department further will provide its plan and a timeline for developing a set of specialized teams to serve YNI youth.

- Prepare and provide a plan for more effective use of the extensive clinical expertise available for YNI youth and other youth in care, with a timeline for implementation actions.

### 7. *Data Integrity and Analysis*

The Department is committed to using a data and evidence-based approach to driving policy formation and reform.  To do so, a robust system of data management is necessary.  Two key components of that system are a strong data team and an intentional plan for research that advances the Department's goals and specifically those of the SIP.

*Prior DCFS Commitments*

DCFS committed to:

- Evaluating a structured approach to confirming the accuracy of research produced by DCFS, including the possibility of research agenda developed in collaboration with a range of stakeholders to advance DCFS's objectives.

- Consult with the Expert Panel about this formal process.

- Assess the Department's current capacity to conduct data integrity and analysis functions and consider what expanded support may be necessary.

---

[17] As this service approach is tested, the Expert Panel will continue to work closely with the Department to identify and remove barriers currently impeding delivery of prompt and effective care for these youth.

Dkt. 897 at 24-27.

*Implementation Work Since Prior Report*

DCFS conducted a review of its capacity and concluded that the above commitments require an individual data expert engaged directly at DCFS that can lead DCFS's achievement of its data integrity and analysis goals. As recommended by the Expert Panel, DCFS believes a "dual appointment" of a research and data expert, who can simultaneously work at DCFS on a part-time basis and continue part time at their prior full-time employer (likely a university or a research partner) is an appropriate approach to achieving this goal.

*Commitments For Next Reporting Period*

Subject to external contracting processes, DCFS commits to having in place the dually appointed data leader by the next reporting period. That individual, with resources and support as determined by the Director in consultation with the Expert Panel, will:

- Ensure accuracy, reliability, validity, and quality of the measurement and evaluation tools used to gauge Department progress.

- Minimize data issues to prevent inconsistencies and inaccuracies that otherwise might diminish the value of the conclusions drawn.

- Promote data accuracy and consistency across state and federal reports.

- Critically review DCFS reports through more established review processes and, when necessary, assist the Expert Panel in certifying *B.H.* court reports.

- Develop a structured approach to confirming the adequacy of research produced for DCFS.

- Lead the DCFS Director's developing a research agenda in collaboration with stakeholders and in consultation with the Expert Panel.

**CONCLUSION**

The Parties expect to present a proposed SIP modification to the Court prior to the next status hearing. The modification will identify new proposals for SIP strategies and reporting metrics. These strategies and metrics will continue to focus on achievement of the SIP's primary goals: reducing maltreatment in care; increasing permanency exits from long-term care; and improving outcomes for a specific subset of youth with significant psychological, behavioral or emotional challenges. Where new proposals are made, the modification will address development of the strategy, a timeline for implementation steps and testing where applicable, and development of data and metrics for marking progress and evaluating success of the strategy.

The Department remains dedicated to engaging in the experimentalist approach to reach the goals of the SIP.

Dated: May 1, 2026

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

By: s/Barbara L. Greenspan
Barbara L. Greenspan

Barbara L. Greenspan
Assistant Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
(312) 814-7087
Barbara.greenspan@illinois.gov

## CERTIFICATE OF SERVICE

The undersigned, an attorney, deposes and states that a copy of the **April 2026 Progress Report for Superseding Implementation Plan** was served upon United States Magistrate Judge Geraldine Soat Brown (ret.), Special Master, and upon counsel of record by electronic filing this 1st day of May 2026. The Expert Panel listed below, who are not ECF filers, were served by email on May 1, 2026.

s/Barbara L. Greenspan
Attorney

Marci White, MSW
mwhitedcr@gmail.com

Mark Testa, PhD
mtesta@illinois.edu

## CERTIFICATE OF SERVICE

The undersigned, an attorney, deposes and states that a copy of the **April 2026 Progress Report for Superseding Implementation Plan** was served upon counsel of record and the Special Master by electronic filing this 1st day of May 2026. The Expert Panel listed below, who are not ECF filers, were served by email on May 1, 2026.

s/Barbara L. Greenspan
Attorney

Marci White, MSW
mwhitedcr@gmail.com

Mark Testa, PhD
mtesta@illinois.edu